# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE SUBOXONE (BUPRENORPHINE HYDROCHLORIDE AND NALOXONE) ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Wisconsin, et. al. v. Indivior Inc. et. al.* | MDL No. 2445<br><br>Master File No. 2:13-MD-2445-MSG<br><br>Case No. 2:16-cv-5073-MSG |
| STATE OF WISCONSIN et. al.<br><br>                Plaintiffs,<br><br>      v.<br><br>Indivior Inc. f/k/a Reckitt Benckiser Pharmaceuticals, Inc., et. al.<br><br>              Defendants. | Civ. A. No. 16-cv-5073 |

# MEMORANDUM IN OPPOSITION TO
## MONOSOL RX, LLC'S MOTION TO DISMISS

Table of Contents

Table of Contents .................................................................................................................. i

Table of Authorities ............................................................................................................. ii

INTRODUCTION .................................................................................................................1

LAW AND ARGUMENT .......................................................................................................1

LEGAL STANDARD .............................................................................................................1

LEGAL ELEMENTS OF PLAINTIFF STATES' SHERMAN ACT CLAIMS ...........................2

ARGUMENT ........................................................................................................................3

    A. Plaintiff States' FAC contains facts to show that MonoSol and Indivior successfully entered into an anticompetitive agreement in Violation of Section 1. ......................................................3

        1. MonoSol and Indivior agreed to an anticompetitive scheme to prolong Indivior's monopoly in the co-formulated buprenorphine/naloxone market. ..........................................3

            a. MonoSol and Indivior are capable of conspiring as a matter of law. ............................4

            b. As a co-conspirator, MonoSol is liable for all of the conduct and effects resulting from its anticompetitive agreement with Indivior. ...............................................................7

        2. The anticompetitive agreement between MonoSol and Indivior harmed competition. ......9

        3. Plaintiff States' FAC articulates a plausible product market. ...........................................10

        4. Activities by third-parties do not relieve MonoSol of liability. ........................................12

    B. MonoSol's agreement with Indivior violated Section 2 of the Sherman Act. ....................13

        1. MonoSol took specific overt acts in furtherance of its agreement with Indivior. .............13

        2. MonoSol possessed the specific intent to monopolize. ....................................................14

        3. MonoSol's anti-competitive conduct caused Plaintiff States antitrust injury. ..................16

    C. MonoSol's counterarguments regarding its exclusionary conduct and its statute of limitations defense are unpersuasive. ........................................................................................18

        1. The Development of a New Product is Not Per Se Procompetitive. ..................................18

        2. All conduct is attributable to MonoSol as a result of the conspiracy, and the conduct is exclusionary. ...............................................................................................................20

        3. Plaintiff States' claims are not time barred. ....................................................................21

    D. Plaintiff States' FAC plausibly alleges state law claims against MonoSol. ........................23

CONCLUSION ....................................................................................................................23

i

Table of Authorities

**Page(s)**

**Federal Cases**

*Advo, Inc. v. Phila. Newspapers, Inc.*,
　　51 F.3d 1191 (3d Cir. 1995)...................................................................................14

*Allied Ortho. Appliances, Inc. v. Tyco Health Care Group LP*,
　　592 F.3d 991 (9th Cir. 2009) ...........................................................................18, 19

*Am. Needle v. Nat'l Football League*,
　　560 U.S. 183 (2010)............................................................................................5, 6

*Ashcroft v. Iqbal*,
　　556 U.S. 662 (2009)................................................................................................2

*Basle Theaters, Inc. v. Warner Bros. Pictures Distrib. Corp.*,
　　168 F.Supp. 553 (W.D. Pa. 1958).........................................................................8

*Biovail Corp. Int'l v. Hoechst AG*,
　　49 F.Supp. 2d 750 (D. N.J. 1999) .......................................................................17

*Brunswick Corp. v. Pueblo Bowl-O-Mat. Inc.*,
　　429 U.S. 477 (1977)........................................................................................16, 17

*Bulkferts, Inc. v. Salatin, Inc.*,
　　574 F.Supp. 6 (S.D.N.Y. 1983).............................................................................6

*Burtch v. Milberg Factors, Inc.*,
　　662 F.3d 212 (3d Cir. 2011)..................................................................................2

*California Computer Products, Inc. v. International Business Machines Corp.*,
　　613 F.2d 727 (9th Cir. 1979) ...............................................................................15

*City of Pittsburgh v. West Penn Power Co.*,
　　147 F.3d 256 (3d Cir. 1998)................................................................................12

*Continental Ore Co. v. Union Carbide*,
　　370 U.S. 690 (1962)........................................................................................15, 16

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
　　433 U.S. 36 (1977)................................................................................................9

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
　　290 F.3d 768 (6th Cir. 2002) ...............................................................................15

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) ............................................................................3, 4

*DeJesus v. Knight Indus. & Assoc., Inc.*
2016 WL 4702113 (E.D. Pa. Sept. 8, 2016) ........................................12

*DuPont Glore Forgan, Inc. v. AT&T*,
437 F.Supp. 1104 (S.D.N.Y. 1977) ........................................................7

*E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*
365 U.S. 127 (1961) ..............................................................................21

*Egervary v. Young*,
366 F.3d 238 (3d Cir. 2004) ..................................................................12

*Fineman v. Armstrong World Industries, Inc.*,
980 F.2d 171 (3d Cir. 1992) ....................................................................7

*Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc.*,
602 F.3d 237 (3d Cir. 2010) ......................................................2, 13, 14

*In re Insurance Brokers Litig.*,
618 F.3d 300 (3d Cir. 2010) ....................................................................9

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002) ..................................................................22

*Le v. Zuffra, LLC*,
2016 WL 6134520 (D. Nev. 2016) ........................................................10

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ........................................14, 15, 16

*Levi Case Co. v. ATS Products, Inc.*,
788 F.Supp. 428 (N.D. Ca. 1992) ...........................................................6

*Los Angeles Memorial Coliseum Comm'n v. National Football League*,
726 F.2d 1381 (9th Cir. 1984) .................................................................6

*In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*,
2010 WL 1485328 (D. Del. Apr. 13, 2010) ..........................................12

*Mylan Pharm., Inc. v. Warner Chilcott Pub. Co.*,
2015 WL 1736957 (E.D. Pa. Apr. 16, 2015) ........................................11

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
838 F.3d 421 (3d Cir. 2016) ........................................................ *passim*

*National Society of Professional Engineers v. United States*,
435 U.S. 679 (1978) ................................................................................9

*In re Neurontin Antitrust Litig.*,
2009 WL 2751029 ..........................................................................................17, 21

*Orson, Inc. v. Miramax Film Corp.*,
79 F.3d 1358 (3d Cir. 1996)........................................................................................9

*Parmelee Transp. Co. v. Keeshin*,
144 F. Supp. 480 (D. Ill. 1956) ..................................................................................7

*Pink Supply Corp. v. Hiebert Inc.*,
788 F.2d 1313 (8th Cir. 1986) ...................................................................................6

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)......................................................................................10

*Rivas v. City of Passaic*,
365 F.3d 181 (3d Cir. 2004).......................................................................................12

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015).......................................................................................19

*Shionogi Pharma. Inc. v. Mylan, Inc.*
2011 WL 3860680 (D. Del. Aug. 31, 2011) ........................................................6, 12

*Siegel Transfer, Inc. v. Carrier Express, Inc.*,
54 F.3d 1125 (3d Cir. 1995).........................................................................................5

*SmithKline Beecham Corp. v. Apotex Corp.*,
383 F.Supp. 2d 686 (E.D. Pa. 2004) ........................................................................17

*In re Suboxone Antitrust Litig.*,
Civ. A. No. 2:13-md-2445, 2017 WL 36371 (E.D. Pa. Jan. 4, 2017)................15, 21

*Thom v. Bristol-Myers Squibb Co.*,
353 F.3d 848 (10th Cir. 2003) ..................................................................................13

*Thurman Indus., Inc. v. Pay' n Pak Stores, Inc.*, No. C84-1171R, 1987 WL
39112, *1,*2 (W.D. Wash. Oct. 2, 1987). ...............................................................14

*U.S. Football League v. Nat'l Football League*,
842 F.2d 1335 (2d Cir. 1988).....................................................................................19

*United States v. Cont'l Grp.*,
603 F.2d 444 (3d Cir. 1979)........................................................................................8

*United States v. GM Corp.*,
121 F.2d 376 (7th Cir. 1941) ......................................................................................7

*United States v. Microsoft Corp.*, 253 F.3d 34, 58-59 ........................................................18, 19

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978)........................................................................................8

*United States v. Vaquero*,
    997 F.2d 78 (5th Cir. 1993) ............................................................................8

*W. Penn Allegheny Health Sys. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010).................................................................... *passim*

*In re Warfarin Sodium Antitrust Litig.*,
    214 F.3d 395 (3d Cir. 2000)..........................................................................12

*Wellbutrin SR/Zyban Antitrust Litig.*, 281 F.Supp. 2d 751 ....................................12

*In re Wellbutrin XL Antitrust Litig.*, No. CIV.A. 08-2431,
2009 WL 678631, (E.D. Pa. Mar. 13, 2009) ..............................................................7

*Zenith Radio Corp. v. Hazeltine Research, Inc.*
    401 U.S. 321 (1971)......................................................................................22

*ZF Meritor, LLC v. Eaton Corp.*
    696 F. 3d 254 (3d Cir. 2012)........................................................................20

**State Cases**

*Aryeh v. Canon Bus. Solutions Inc.*,
    55 Cal. 4th 1185 (2013) ...............................................................................23

*Bd. Of Educ. v. Standhardt*,
    458 P.2d 795 (N.M. 1969) ...........................................................................22

*Bd. Of Sch. Comm'rs of Mobile Cty. V. Architects Grp.*,
    752 So.2d 489 (Ala. 1999) ...........................................................................22

*City of Fairbanks v. Amoco Chem. Co.*,
    952 P.2d 1173 (Alaska 1998)........................................................................22

*State HHS v. Thompkins*,
    205 N.C. App. 285, 695 S.E.2d 133, *disc. rev. denied*, 364 N.C. 326, 701
    S.E.2d 680 (2010) ........................................................................................22

*State v. Mobila*,
    1983 WL 14950 (Conn. Sup. Ct. 1983)........................................................22

**Federal Statutes**

15 U.S.C. § 1............................................................................................ *passim*

15 U.S.C. § 2.................................................................................................2, 13, 14, 19

AREEDA & HOVENKAMP, ANTITRUST LAW 364 (4th ed. 2014).......................................22

**State Statutes**

Alaska Stat. § 09.10.120 ............................................................................................22

Del. Code. Ann. 6 § 2101 ............................................................................................22

Haw. Rev. Stat § 657-1.5 ............................................................................................22

KRS 413.120(2) ..........................................................................................................22

Miss. Code Ann. § 15-1-51 .........................................................................................22

Neb. Rev. Stat. § 59-1612 ...........................................................................................22

O.C.G.A § 10-1-401(a)(2015) .....................................................................................22

ORS 646.770 ...............................................................................................................22

ORS 646.775 ...............................................................................................................22

ORS 646.780 ...............................................................................................................22

Tenn. Code Ann. § 47-25-101 *et seq.* and § 47-18-101 *et seq*. ....................................22

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ................................................................1, 10

**Constitutional Provisions**

Louisiana Constitution, Article 12, § 13 ....................................................................22

Miss. Constitution Article 4, § 104.............................................................................22

## INTRODUCTION

MonoSol RX, LLC ("MonoSol") has moved this Court for an order dismissing Plaintiff States' First Amended Complaint ("FAC"), essentially arguing that its hands are clean in the anticompetitive scheme undertaken by its co-defendants, Indivior Inc. ("Indivior"), Indivior PLC ("PLC") and Reckitt Benckiser Healthcare (UK) Ltd. ("RBHCUK")[1].  MonoSol, however, is in the monopoly maintenance business.  Its own website boasts that it offers a product with "a unique, patent-protected delivery technology," and that "it can be an ideal strategy for extending the life of a brand as generic incursion approaches."[2]

When faced with the unpleasant prospect of impending generic competition, the Indivior Defendants found a savior from their upcoming "patent cliff" in MonoSol.  Together the companies conspired to engage in a course of conduct that would ensure Indivior's continued domination in the market for co-formulated buprenorphine/naloxone.  Plaintiffs' FAC plainly alleges facts that establish a conspiracy between MonoSol and its co-defendants.  As a co-conspirator, MonoSol cannot avoid liability for any conduct attributed to the anticompetitive scheme, including specific actions that may have been carried out by its co-defendant.

Discovery will enable the Plaintiff States to more fully develop the conduct comprising the conspiracy between MonoSol and the Indivior Defendants, but for purposes of this motion the factual allegations in the FAC—taken as true—provide this Court with ample reasons to deny MonoSol's request for dismissal.

## LAW AND ARGUMENT

### I.    Legal Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that

---

[1] Sometimes collectively referred to as "Reckitt " or "Indivior"  Defendants.
[2] FAC ¶ 48.

is plausible on its face.'"[3] To determine the sufficiency of a complaint, a court should: (1) "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, … assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[4]

## II.   Legal Elements of Plaintiff States' Sherman Act Claims

Plaintiff States bring two counts of Sherman Act violations detailed in the First Amended Complaint ("FAC") against Defendant MonoSol.   Specifically, Plaintiff States allege that MonoSol's conduct constitutes a conspiracy to monopolize under Section 2 in Count III, and a conspiracy to illegally restrain trade under Section 1 in Count IV.   Additionally, Plaintiff States bring their own state-law claims against MonoSol under their individual antitrust statues as well as unfair trade practice or unfair and deceptive practices acts.   While some elements of these claims overlap, each distinct claim requires plaintiff to allege certain elements.

To state a viable Section 1 claim, a plaintiff must show: (1) concerted action by defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.[5]

For a Section 2 conspiracy to monopolize claim a plaintiff must show: (1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged.[6]

---

[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[4] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).
[5] *Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 252 (3d Cir. 2010) (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005)).
[6] *Id.* (citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 224-25 (1947); *Am. Tobacco Co., v. United States*, 328 U.S. 781, 788 (1946)).

## III.   Argument

### A. Plaintiff States' FAC contains facts to show that MonoSol and Indivior successfully entered into an anticompetitive agreement in violation of Section 1.

#### 1. MonoSol and Indivior agreed to engage in an anticompetitive scheme to prolong Indivior's monopoly in the co-formulated buprenorphine/naloxone market.

In asserting a Section 1 violation, a plaintiff's first step is to establish concerted action or an agreement. "An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme."[7] A plaintiff can prove the existence of an agreement by direct or circumstantial evidence, or by a combination thereof. "If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled."[8]

Here, the States have sufficiently alleged that MonoSol conspired with the Indivior Defendants to engage in the anticompetitive scheme to prolong Indivior's monopoly in the co-formulated buprenorphine/naloxone market. First, Plaintiff States allege that MonoSol entered into a series of agreements with the Indivior and Reckitt entities to develop Suboxone Film.[9] Indivior and MonoSol perfected these agreements after a meeting in December 2006, in which MonoSol suggested to Indivior that its film product would extend Indivior's exclusivity in the Suboxone market, and convinced Indivior to enter into the agreements based upon those representations of exclusivity. Until that meeting, Reckitt was unaware that a formulation change could provide market share preservation under the United States regulatory laws.[10] The December 2006 meeting is the first certain conspiratorial act, although further discovery may

---

[7] *W. Penn Allegheny Health Sys. v. UPMC,* 627 F.3d 85, 99 (3d Cir. 2010) (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)).
[8] *Id.* at 99.
[9] FAC at ¶ 25.
[10] *Id.* at ¶¶ 46-47.

reveal an earlier meeting of the minds. There is no doubt that MonoSol understood the anticompetitive nature of what it was suggesting to Indivior, based upon its marketing statements on its own webpage.[11]

These factual allegations are sufficient to establish an agreement under Section 1 of the Sherman Act between MonoSol and Indivior which harmed competition.

### a. MonoSol and Indivior are capable of conspiring as a matter of law.

MonoSol's argument that it is incapable of conspiring with Indivior as a matter of law is without merit. MonoSol inaccurately states that in *Copperweld,* the Supreme Court held "that two or more legally distinct entities cannot conspire among themselves if they 'pursue…the common interests of the whole,' and so their conglomeration must be treated as a single entity rather than as a conspiracy."[12] To the contrary, the court in *Copperweld* specifically stated: "We limit our inquiry to the narrow issue squarely presented: whether a parent and its wholly owned subsidiary are capable of conspiring in violation of…the Sherman Act."[13] MonoSol's assertion that the holding of *Copperweld* has any bearing on its ability to conspire with Indivior, a company with which it has no corporate relationship (must less a parent-subsidiary relationship), is erroneous. A full reading of the *Copperweld* passage that MonoSol selectively quoted makes this clear: a "*division within a corporate structure* pursues the common interests of the whole rather than interests separate from the corporation itself."[14] As the court explicitly focused its holding on the narrow issue of parent-subsidiary relationships and MonoSol and Indivior do not exist "within a corporate structure," *Copperweld* does not apply.

---

[11] *Id.* at ¶ 48.
[12] Memorandum in Support of MonoSol Rx's Motion to Dismiss ("Mon. Br.").
[13] *Copperweld*, 467 U.S. 752 at 767.
[14] *Id.* at 770 (emphasis added).

MonoSol also attempts to cast itself as an "agent" of Indivior.  Arguing in support of its claim that an entity and its agent can never legally conspire, MonoSol stretches the language and logic of cases like *Siegel Transfer, Inc. v. Carrier Express, Inc.*[15]  In *Siegel,* however, the court analyzed the relationships of entities far more closely-related than any relationship between Indivior and MonoSol.  The *Siegel* defendants consisted of companies within the Bethlehem Steel corporate family and their agents.[16]  There was complete or near-complete ownership of some of the affiliated entities, and the court held that others were so intertwined that they constituted a single enterprise and an inseparable part of one another's structure.[17] The closeness of ownership and the control exerted over the agents by the principal led the court to treat them as a single entity.[18] Similar facts have not been asserted regarding Indivior and MonoSol, and if MonoSol intends to analogize the two companies in that manner, then discovery is necessary to explore the factual background of the corporate relationships.  In fact, the court decided *Siegel* on a motion for summary judgment only after significant discovery regarding the entities' relationships.[19]

It is well settled that a principal and his agent may indeed conspire within the meaning of the Sherman Act, but further scrutiny of the relationship is required by a court.[20]  The underlying question a court must answer when making a "single-entity" determination is "whether the conduct in question deprives the marketplace of the independent sources of economic control that competition assumes."[21]  This question does not necessarily turn on whether the parties are distinct legal entities, but instead on a "functional consideration of how the parties involved in

---

[15] *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125 (3d Cir. 1995).
[16] *Id.* at 1333-34.
[17] *Id.*
[18] *Id.*
[19] *Id.* at 1333.
[20] *Am. Needle v. Nat'l Football League*, 560 U.S. 183, 194-95 (2010).
[21] *Id.* at 188.

the alleged anticompetitive conduct actually operate."[22]   The factors bearing upon whether an agent and principal are sufficiently intertwined to be considered a single entity have been held to be "factual questions" and ones "which cannot be addressed on a motion for summary judgment,"[23] much less at a motion to dismiss stage before factual discovery.

Regardless, MonoSol has alleged no facts to suggest that it is held in so close an agent-principal relationship with the Indivior entities that the companies should be legally incapable of conspiring.  The companies have wholly separate corporate identities and leadership.  They have no common oversight.  They have independent decision-making ability.  Although they do share a common interest—a fact that is germane to every antitrust conspiracy—their economic interests are not wholly aligned on any other points, much less aligned so completely as to be considered a single entity.

MonoSol's argument that it cannot conspire with Indivior because of companies' patent holder-licensee relationship is also unpersuasive.   Although courts have found some patent relationships to prevent the ability to conspire, such analyses are made by looking at the facts specific to each particular situation and the overall relationship between the parties.[24]   In the patent licensee cases, the antitrust conduct stemmed from the use of the patents themselves after the patent holder granted the license.[25]   Thus the court held that the parties could not conspire because of their pre-existing relationship.[26]   This is distinguishable from MonoSol's relationship

---

[22] *Id.* at 191.
[23] *Bulkferts, Inc. v. Salatin, Inc.,* 574 F.Supp. 6, 8 (S.D.N.Y. 1983) (citing *Fuchs Sugar & Syrups v. Amstar Corp.,* 602 F.2d 1025, 1031 (2d Cir. 1979)); *See also Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1387 (9th Cir. 1984).
[24] *Los Angeles*, 726 F.2d at 1387.
[25] *Shionogi Pharma, Inc. v. Mylan, Inc.* 2011 WL 2174499 (D. Del. 2011), *Levi Case Co. v. ATS Products, Inc.*, 788 F. Supp. 428 (N.D. Ca. 1992).
[26] *See* distinction in *Pink Supply Corp v. Hiebert Inc.*, 788 F.2d 1313, 1318 (8th Cir. 1986) between existing relationships that later give rise to anticompetitive conduct and relationships formed for the specific purpose of engaging in anticompetitive conduct.

with Indivior, where the anticompetitive purpose was the reason for the parties' association, and the patent licensing was a result that flowed from the conspiracy.

MonoSol's claim that it cannot legally conspire with Indivior because the two are not competitors is also erroneous.  While MonoSol has taken isolated language out of context to support such a proposition, courts have typically found competitor status to be determinative only when the conduct in question is price-fixing or market allocation among competing firms. Indeed, a "combination of non-competitors may conspire to restrain unreasonably the interstate trade and commerce of third parties and thereby subject themselves to the prohibitions of the Sherman Act."[27]  The status or non-status as a competitor, like the degree of corporate affiliation between entities, "is but one factor in determining whether the alleged agreement is in restraint of trade."[28]

### b. As a co-conspirator, MonoSol is liable for all of the conduct and effects resulting from its anticompetitive agreement with Indivior.

MonoSol and Indivior's relationship is exactly what an antitrust conspiracy looks like: separate firms with separate businesses and separate interests joining together in an overarching scheme whereby each performs the tasks best-suited to their particular functions and abilities, and each offers unique ideas about how to further the goal of the conspiracy.  The fact that Indivior performed some functions and MonoSol performed others is of no consequence.  Every bank robber needs someone to drive the getaway car, and an antitrust conspiracy is no different

---

[27] *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 215 (3d Cir. 1992); *see also In re Wellbutrin XL Antitrust Litig.*, No. CIV.A. 08-2431, 2009 WL 678631, at *4-6 (E.D. Pa. Mar. 13, 2009) (finding plaintiffs alleged sufficient evidence that a drug manufacturer and seller conspired to monopolize that drug's market under Section 1 and 2 of the Sherman Act); *United States v. GM Corp.*, 121 F.2d 376, 404 (7th Cir. 1941) (citing *Loewe v. Lawlor*, 208 U.S. 293, 296 (1908); *United States v. Patten*, 226 U.S. 525, 541 (1913) (Section 1 includes non-competitors who conspire to create artificial conditions which impede due course of trade or commerce); *Patterson v. United States*, 222 F. 599, 618 (6th Cir. 1915) (not limited to conspiracies between competitors but includes conspiracies between any persons)).  *See also Parmelee Transp. Co. v. Keeshin*, 144 F. Supp. 480, 485 (D. Ill. 1956) ("It is clear that non-competitors subject themselves to the prohibitions of the Sherman Act when they conspire to restrain the trade of a third person").

[28] *DuPont Glore Forgan, Inc. v. AT&T*, 437 F. Supp. 1104, 1116 (S.D.N.Y. 1977).

from a criminal one.[29]   Once a plaintiff establishes an antitrust conspiracy between two parties, then it is presumed that both parties participated throughout the course of the conspiracy.[30]

Thus, all anticompetitive conduct and effects resulting from the scheme are attributable to the conspiracy and, consequently, to all participants therein.   This is true even if a party claims that it stopped participating in a conspiracy, but that it continued to engage in certain conduct for legitimate business reasons and not anticompetitive purposes.[31]   If the conduct arose out of an anticompetitive conspiracy, it remains part of that conspiracy and belongs to all conspirators.   Thus, MonoSol's arguments that no anticompetitive effects or antitrust injury can be specifically attributed to its conduct must fail.

MonoSol's arguments that it did not exercise control "over Reckitt's decisions about marketing, pricing or discontinuance of its [T]ablet"[32] are also without consequence.   As co-conspirators, control over such decisions is unnecessary; liability is imputed from the conspiracy itself.   The fact that MonoSol was aware of the scheme and participated in the conspiracy is sufficient.   In fact, "control" over those decisions would make the two entities even more closely related under a single-entity determination, which could impair their ability to conspire with one another.   MonoSol cannot argue that it falls into a gray area free from antitrust liability: too close to Indivior to conspire, yet too removed to have control over or participation in Indivior's anticompetitive conduct.   MonoSol cannot avoid the fact that it conspired with a monopolist to further extend its monopoly and, thus, is liable for the conduct and effects of the conspiracy as well.

---

[29] *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 463-64 (1978)
[30] *United States v. Cont'l Grp.*, 603 F.2d 444, 466-67 (3d Cir. 1979); *United States v. Vaquero*, 997 F.2d 78, 82 (5th Cir. 1993).
[31] *Basle Theaters, Inc. v. Warner Bros. Pictures Distrib. Corp.*, 168 F. Supp. 553, 560 (W.D. Pa. 1958).
[32] Mon. Br. 17.

**2. The anticompetitive agreement between MonoSol and Indivior harmed competition.**

Under Section 1, concerted actions are illegal when they unreasonably restrain trade.[33] Under a "rule of reason" analysis, whether actions unreasonably restrain trade must be examined through an extremely factual, case-by-case analysis,[34] requiring a factfinder to "weigh[] the all circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."[35] Unreasonable restraints are limited to those that suppress competition rather than promote it.[36]

The rule of reason analysis is structured as a burden-shifting framework. First, the plaintiff bears the burden of proving that an agreement has had, or is likely to have, a substantially adverse effect on competition.[37] The defendant may then offer evidence that the action has procompetitive benefits.[38] The burden then shifts back to the plaintiff to show that any alleged procompetitive benefits are pretextual, or are outweighed by anticompetitive effects.[39] This burden-shifting analysis is also used to determine whether conduct is anticompetitive.[40]

Here, Plaintiff States have adequately alleged that MonoSol's actions unreasonably restrained trade and produced anticompetitive effects.[41] Plaintiffs have pled numerous facts that support a plausible claim that the MonoSol's actions harmed competition, including facts establishing its participation in a conspiracy with Indivior to prevent generic Suboxone from entering that market in order to preserve Indivior's market dominance, numerous factual

---

[33] *W. Penn Allegheny*, 627 F.3d at 99-100.
[34] *Id.* at 99 (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 623 (2007)).
[35] *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977).
[36] *National Society of Professional Engineers v. United States*, 435 U.S. 679, 688 (1978).
[37] *In re Insurance Brokers Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005)).
[38] *Id.* (citing *Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001)).
[39] *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367-68 (3d Cir. 1996).
[40] *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 438 (3d Cir. 2016) ("*Doryx*").
[41] FAC at ¶¶ 116-123.

allegations regarding conduct undertaken to complete the anticompetitive scheme, and allegations in the FAC establishing the anticompetitive effects flowing from MonoSol's agreement with Indivior.[42]  Hence, the Court should deny Defendant's Motion to Dismiss.

### 3.  Plaintiff States' FAC articulates a plausible product market.

An antitrust plaintiff must allege a relevant market, and a complaint should survive a Rule 12(b)(6) motion to dismiss "unless it is apparent from the face of the complaint that the alleged market suffers a fatal defect."[43]  The validity of a relevant market is typically a factual element rather than a legal element and disputes over the scope of markets usually survive motions to dismiss as a result.[44]

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or cross-elasticity of demand between the product itself and substitutes for it."[45]  In *Queen City*, the Third Circuit rejected the plaintiff's market allegations due to the interchangeability of other products on the market.  Although the Court stated that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers," it identified limited circumstances in which a proposed relevant market could be deemed to be insufficiently pled.  Specifically, if the proposed market is not defined with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or when it "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor,"[46] such a pleading may fail.  Plaintiff States' product market allegations do not contain these fatal flaws.  The FAC

---

[42] *Id.*

[43] *Le v. Zuffra, LLC*, 2016 WL 6134520 *1, *5 (D. Nev. 2016).

[44] *Zuffra*, 2016 WL 6134520  *5 (citing *Cost. Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99F.3d 937, 950 (9th Cir. 1996)).

[45] *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962)).

[46] *Id.*

specifically alleges the lack of cross-elasticity of demand of products outside the relevant market, as well as the bases for the inclusion and exclusion of specific products.[47]

MonoSol's argument that the Third Circuit's decision in the *Doryx* case should apply is not persuasive.  The district court decided *Doryx* on a motion for summary judgment after the court considered the lengthy product histories of the generic and branded drugs along with expert submissions.[48]  The judge observed that Mylan's expert reports lacked record support and that the record "abounds" with uncontroverted evidence—including Mylan's—which confirmed the interchangeability of Doryx and other oral tetracyclines.[49]  The Third Circuit affirmed based on the evidence of interchangeability and cross-elasticity of demand, which the parties did not dispute.[50]

Here, the parties have yet to exchange discovery, let alone consider detailed factual evidence regarding the cross-elasticity of demand or interchangeability of Suboxone with other products.  Attempting to confuse the Court, MonoSol neglects the stark procedural differences that exist between this case and *Doryx.* While the court decided *Doryx* on summary judgment, this case remains at the pleading stage.  Since Plaintiff States met the pleading standards outlined by this Court for alleging a viable product market and have alleged sufficient facts in support, MonoSol's arguments related to product market are meritless.

---

[47] FAC at ¶¶ 19-20.
[48] *Mylan Pharm., Inc. v. Warner Chilcott Pub. Co.*, 2015 WL 1736957, at *2-*5 (E.D. Pa. Apr. 16, 2015).
[49] *Id.* at *9.
[50] *Doryx*, 838 F.3d at 438-41.

**4.  Activities by third-parties do not relieve MonoSol of liability.**

As a preliminary matter, causation is a question of fact,[51] and a defendant's conduct "does not need to be the 'exclusive' cause of the plaintiff's injury."[52]  A supervening cause must be the sole cause of injury to defeat causation.[53]

MonoSol argues that Plaintiff States' injuries flow from an independent government act that breaks causation.  The Third Circuit has already rejected this argument—a delay triggered by the act of a manufacturer is not the responsibility of the FDA.[54]  MonoSol's reliance on *City of Pittsburgh v. W. Penn Power Co.*[55] for the proposition that the regulatory environment truly caused the injury is misguided.  In *W. Penn*, the court specifically explained its ruling as "fact specific to the current climate."[56]  Subsequent court opinions recognize its narrow application and have specifically rejected that it has persuasive value in Hatch-Waxman cases.[57]  Aside from the inapplicability of *W. Penn*, the presence of an intermediary that has been misled cannot break the chain of causation.[58]  Thus any action by the FDA based on Defendant's delay of the shared Risk Evaluation and Mitigation Strategy (REMS) or the sham citizen petition (all attributable to MonoSol regardless of specific conduct through the theory of conspiracy liability) is not a supervening cause.  Plaintiff States make factual allegations that Defendants conspired to file a sham citizen petition that alleged that Suboxone Tablets posed serious safety risks.  MonoSol has not refuted the allegation that the citizen petition delayed generic approval and entry into the market.

---

[51] *Rivas v. City of Passaic*, 365 F.3d 181, 193 (3d Cir. 2004).
[52] *In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, 2010 WL 1485328 *1-*5 (D. Del. Apr. 13, 2010) (citing *Wellbutrin SR/Zyban Antitrust Litig.*, 281 F.Supp. 2d 751, 756 (E.D. Pa. 2003)).
[53] *DeJesus v. Knight Indus. & Assoc., Inc.* 2016 WL 4702113 *1, *11 (E.D. Pa. Sept. 8, 2016) (internal citations omitted).
[54] *Metoprolol*, 2010 WL 1485328 at *7; *Wellbutrin*, 281 F. Supp 2d at 757.
[55] *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 268 (3d Cir. 1998).
[56] *Id.* at 269.
[57] *Metoprolol*, 2010 WL 1485328 at *7; *Shionogi Pharma. Inc. v. Mylan, Inc.* 2011 WL 3860680 *1, *4 (D. Del. Aug. 31, 2011); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000).
[58] *Egervary v. Young,* 366 F.3d 238, 250 (3d Cir. 2004).

MonoSol also blames physician choice for the States' injuries.  MonoSol does not cite a single antitrust case applying this "learned intermediary" defense.  The product liability cases relied upon, however, explain that the doctrine only applies when physicians have been given adequate information.[59]  Having provided misleading information about the relative safety of Suboxone Tablets and their generic competitors, MonoSol cannot now hide behind physician choice.  Because Defendants sought to mislead the physicians, the chain of causation does not break.

### B.  MonoSol's agreement with Indivior violated Section 2 of the Sherman Act.

The agreement between MonoSol and Indivior not only violated Section 1 of the Sherman Act, but also Section 2 as a conspiracy to monopolize.  Plaintiff States adequately allege sufficient facts to demonstrate an agreement between the two companies, a specific intent to monopolize, and overt acts taken in furtherance of the agreement.  Accordingly, Plaintiffs' FAC should withstand a motion to dismiss on this claim as well.

### 1.  MonoSol took specific overt acts in furtherance of its agreement with Indivior.

Plaintiff States have alleged sufficient facts in support of an agreement between MonoSol and Indivior to meet the first element of a Section 2 conspiracy to monopolize claim, which requires an agreement or concerted action.[60]  Plaintiff States refer to Section I.A. of this memorandum and incorporate by reference all discussion of MonoSol and Indivior's agreement to support this element of their Section 2 claim here.

While Section I.A. of this memorandum discusses the acts taken by MonoSol and Indivior in support of their conspiracy to monopolize, the overt acts did not stop with their initial

---

[59] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 853 (10th Cir. 2003).
[60] *Dentsply*, 602 F.3d at 254. Courts can analyze the agreement element for a Section 1 conspiracy claim and a Section 2 conspiracy claim together. *See W. Penn Allegheny*, 627 F.3d at 99.

meetings and licensing agreement.  Fully aware of Indivior's goals, MonoSol worked to bring the Film to market as quickly as possible in order to beat generic competition through its own manufacturing efforts and by assisting Indivior with the regulatory process.[61]  MonoSol even made the initial suggestion to Indivior that removing the Suboxone Tablets from the market would provide greater protection from generic incursion,[62] and participated in the delay tactics Indivior used to slow down the generic's timeline in order to complete the product hop.[63] Therefore, the Plaintiff States have adequately alleged an agreement and overt acts in furtherance to support a Section 2 conspiracy to monopolize claim against MonoSol.

### 2.  MonoSol possessed the specific intent to monopolize.

In the context of a Sherman Act conspiracy to monopolize claim, specific intent means that "the defendant must have intended to achieve an illegal monopoly."[64]  Plaintiffs need not "establish specific intent with 'smoking gun' documents that articulate antitrust scienter in no uncertain terms."[65]  Rather, specific intent "may be inferred from a defendant's unlawful conduct."[66]

Conduct is considered unlawful "anticompetitive" conduct when it has no legitimate business purpose and "makes sense only because it eliminates competition."[67]  Anticompetitive conduct can also be identified as conduct that takes place when a monopolist "competes on some basis other than the merits."[68]  Courts have repeatedly stated that the determination of what constitutes anticompetitive conduct is made on a case-by-case basis through a "thorough analysis

---

[61] *See* FAC at ¶¶ 53-54; 61.
[62] *Id.* at ¶ 71.
[63] *Id.* at ¶ 112.
[64] *Dentsply*, 602 F.3d at 257 (internal citations omitted).
[65] *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1199 (3d Cir. 1995).
[66] *Dentsply*, 602 F.3d at 257 (citing *Advo*, 51 F.3d at 1199).
[67] *Thurman Indus., Inc. v. Pay' n Pak Stores, Inc.*, No. C84-1171R, 1987 WL 39112, *1,*2 (W.D. Wash. Oct. 2, 1987).
[68] *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003).147 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985)).

of each fact situation."[69]  This is due, in part, to the fact that "anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties."[70]

To sustain a finding of a conspiracy to monopolize, courts do not require the monopolist's conduct to be "of a kind that would be unlawful for an ordinary enterprise."[71] Instead, a plaintiff need only show that the monopolist's actions "unnecessarily excluded competition."[72]  Simply put, when a monopolist chooses not to compete with another firm on the merits, instead opting to prevent that firm from even *becoming* competition in the marketplace, a conspiracy to monopolize violation has occurred.

The FAC describes MonoSol's anticompetitive conduct as a series of acts performed in concert with Indivior which, taken together, effectively eliminated competition.  This Court recently held that similar allegations were sufficient to state Sherman Act claims against Indivior, stating in the Amneal Opinion: "a plaintiff can allege a series of actions that when taken together make out antitrust liability even though some of the individual actions, when viewed independently, are not all actionable."[73]  The Supreme Court itself has expressly cautioned against analyzing a series of facts in an antitrust case as if they were "completely separate and unrelated lawsuits," stating that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various components and wiping the slate clean after scrutiny of

---

[69] *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 467 (1992)).

[70] *LePage's Inc.*, 324 F.3d at 152 (internal citations omitted).

[71] *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 735 (9th Cir. 1979) (internal citations omitted).

[72] *Id.*

[73] Amneal Opinion at 16 (citing *Continental Ore Co. v. Union Carbide,* 370 U.S. 690, 699 (1962); *LePage's Inc.,* 324 F.3d at 162; *In re Gabapentin Patent Lit.*, 649 F. Supp. 2d 340, 359 (D.N.J. 2009); *In re Neurontin Antitrust Lit.,* 2009 WL 2751029, at *15; *Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408, 428 (D. Del. 2006)).

each,"[74] an approach echoed by the Third Circuit: "the relevant inquiry is the anticompetitive effect of [defendant's] exclusionary practices considered together" and "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."[75]  The Third Circuit further encouraged trial courts to look at the whole picture and consider each alleged action's "overall combined effect."[76]

The Plaintiff States have alleged a number of facts that demonstrate MonoSol's specific intent to conspire with Indivior to monopolize the market for co-formulated buprenorphine/naloxone, including direct evidence of MonoSol's advertising language, which makes clear its willingness to participate knowingly in anticompetitive schemes.  Examples include MonoSol's promise to assist with "revenue-life cycle extensions for products with patent lives that have expired," and descriptions of their products as an "ideal strategy for extending the life of a brand as generic incursion approaches," as well as encouragement to pharmaceutical companies to not let their brand "go over the [patent] cliff."[77]  This Court can also infer MonoSol's specific intent to monopolize based on the anticompetitive conduct of the conspiracy, which includes all conduct related to the product hop and coercion, as well as the tactics used to delay generic approval.[78]

### 3.  MonoSol's anti-competitive conduct caused Plaintiff States' antitrust injury.

Courts define antitrust injury as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[79] What constitutes an antitrust injury is perhaps best explained by examining what courts have held is *not* antitrust

---

[74] *Continental Ore Co.*, 370 U.S. at 698-99.
[75] *LePage's*, 324 F.3d at 162.
[76] *LePage's*, 324 F.3d at 162.
[77] *See* FAC at ¶ 48.
[78] *Id.* at ¶¶ 112; 116-123.
[79] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).

injury.  In the *Brunswick* case, the Supreme Court ruled that plaintiffs had not been injured in a way that the antitrust laws were meant to remedy; the plaintiffs in that case claimed injury as the result of *increased* competition in the marketplace.[80]  The Court explained that harm to competitors as the result of *increased* competition is not the type of injury that the antitrust laws were meant to prevent.[81]  An antitrust injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation," and must be "attributable to…a *competition-reducing* aspect or effect of the defendant's behavior."[82]  In contrast, Plaintiff States have alleged anticompetitive conduct which led to antitrust injury due to the *reduction* of competition within the market.[83]

Plaintiffs are not required to prove direct injury from each of a defendant's anticompetitive acts.  Nor must plaintiffs allege that the defendant's conduct was the *sole* cause of injury.  Instead, a determination should rely upon whether the plaintiff was injured by the anticompetitive conduct as a whole.[84]  The "existence of antitrust injury is not typically resolved through motions to dismiss," and if plaintiffs allege an antitrust injury has been suffered, then they should avoid dismissal.[85]

Plaintiff States' FAC plausibly alleges injury to the general economies of the Plaintiff States, along with injury to governmental entities and consumers in the Plaintiff States.[86]  The FAC includes detailed allegations about how the anticompetitive conspiracy between MonoSol

---

[80] *Id* at 488-489.

[81] *Id.* at 489.

[82] *W. Penn Allegheny*, 627 F.3d at 101 (citing *Brunswick* at 489; *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

[83] *See* FAC at ¶¶ 115-126.

[84] *In re Neurontin Antitrust Litigation*, 2009 WL 2751029 *15 (D. N.J. Aug. 28, 2009) (*see also*, *Biovail Corp. Int'l v. Hoechst AG*, 49 F. Supp. 2d 750, 767 (D. N.J. 1999)); *SmithKline Beecham Corp. v. Apotex Corp.*, 383 F. Supp. 2d 686, 702 (E.D. Pa. 2004).

[85] *Apotex Corp.*, 383 F. Supp. 2d at 695 (citing *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417-419 (3d Cir. 1997); *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 268 (3d Cir. 1998)).

[86] *See* FAC at ¶ 124.

and Indivior caused the injury alleged.[87]   Thus, Plaintiff States adequately pled a causal

connection and MonoSol's Motion to Dismiss should be denied.

### C.   MonoSol's counterarguments regarding its exclusionary conduct and its statute of limitations defense are unpersuasive.

MonoSol's attempts to undermine Plaintiff States' factual allegations supporting its

Section 1 and 2 claims are misguided.   Moreover, MonoSol's argument that its film design

represents an innovative improvement – even if true – does not confer antitrust immunity.

Further, Defendant's arguments regarding its role in the exclusionary conduct alleged and the

time-barred nature of Plaintiff States' claims are without merit.

### 1.  The development of a new product is not per se procompetitive.

MonoSol's claims of procompetitive innovation through the introduction of a new

product are nothing more than a part of the burden-shifting framework under *Microsoft*, which

the Third Circuit discussed in *Mylan Pharmaceuticals v. Warner Chilcott* (*Doryx*).[88]   Plaintiff

States dispute the "innovative" nature or alleged advantages of Suboxone Film, but even if this

Court determined that the changes are indeed innovative, MonoSol cannot rely on this

justification as an absolute defense to antitrust liability.   "Changes in product design are not

immune from antitrust scrutiny and in certain cases may constitute an unlawful means of

maintaining a monopoly."[89] In *Microsoft*, the D.C. Circuit required defendant Microsoft to put

forth a "procompetitive justification" for its product design changes, but Microsoft failed to show

"that its conduct served a purpose other than protecting its operating system monopoly."[90]

Even if MonoSol can show the benefits of its design change, the Plaintiff States'

allegations of other associated anticompetitive conduct can give rise to a violation under Section

---

[87] *See e.g.*, FAC at ¶¶ 69 -72; 112; 124-126.
[88] *Microsoft Corp.*, 253 F.3d 34, 58-59; *Mylan Pharmaceuticals v. Warner Chilcott*, 838 F.3d 421, 438 (3rd Cir. 2016) (*Doryx*).
[89] *Allied Ortho. Appliances, Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 998 (9th Cir. 2009).
[90] *Id.* at 998 (quoting *Microsoft*, 253 F.3d at 65).

2.[91]   Assuming that product innovation generally benefits consumers, courts "look for evidence of 'exclusionary or anticompetitive effects' in order to 'distinguish between conduct that defeats a competitor because of efficiency and customer satisfaction' and conduct that impedes competition through means other than competition on the merits."[92]   As stated by the Second Circuit in the *Namenda* case, "product redesign is anticompetitive when it coerces consumers and impedes competition,"[93] because coercion destroys the "free choice of consumers" that normally operates in a market to determine the relative superiority of products.[94]   In assessing the anticompetitive effects of product redesign, an examination of all anticompetitive actions alleged through a course of conduct analysis is appropriate.[95]

Plaintiff States have adequately alleged facts demonstrating that the Defendants' anticompetitive actions destroyed the free choice of consumers in this case.   Despite MonoSol's statement that "bringing a new product to market can only increase consumer choice,"[96] consumer choice is significantly impaired when the older product it is replacing is removed from the market and additional steps are taken to ensure that the newer product captures market share and extends exclusivity.   As such, even an innovative product redesign can be anticompetitive, as "judicial deference to product innovation…does not mean that a monopolist's product design decisions are per se lawful."[97]

All anticompetitive conduct and effects that flow from the conspiracy between MonoSol and Indivior are attributable to both parties.   Thus, any distinction MonoSol has tried to make

---

[91] *Id.* at 998-999; *Doryx,* 838 F.3d at 440.
[92] *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015) ("*Namenda*") (citing *Trans Sport Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 188-89 (2d Cir. 1992)); *U.S. Football League v. Nat'l Football League,* 842 F.2d 1335, 1359 (2d Cir. 1988).
[93] *Namenda*, 787 F.3d at 652 (internal citations omitted).
[94] *Id.* at 655.
[95] *Id.* at 654.
[96] *See* Mon. Br. at 24.
[97] *Microsoft*, 253 F.3d at 65.

regarding its specific participation in the development of the Film and the manner in which any resulting antitrust injury should be attributed is immaterial.  Plaintiff States have sufficiently alleged that Defendants' conduct impaired generic competition which harmed consumers and the Plaintiff States.[98]

### 2. All conduct is attributable to MonoSol as a result of the conspiracy, and the conduct is exclusionary.

MonoSol cannot escape legal responsibility for any of the actions that took place as part of the conspiracy's anticompetitive scheme.  All acts are attributable to MonoSol as well as Indivior.  To the extent that MonoSol alleges that any of these actions are not exclusionary, that claim fails as well.

MonoSol's allegation that only predatory pricing has a requisite anticompetitive effect[99] is an overstatement of the law and a misunderstanding of the role that pricing allegations play in the Plaintiff States' FAC.  Third Circuit precedent supports the notion that when plaintiffs do not rely "solely on the exclusionary effect" of prices and instead allege a number of anticompetitive practices, pricing is not alleged to be the "predominant mechanism of exclusion," but a court can still consider it as a factor in evaluating anticompetitive conduct under the rule of reason.[100] Here, pricing is far from being the sole allegation of anticompetitive conduct in Plaintiff States' FAC.  MonoSol's role in the pricing of the Film, however, demonstrates its ongoing knowledge about the purpose of the overall conspiracy, which included an anticompetitive scheme to induce prescribers, payors and patients to switch from Suboxone Tablets to Film.

MonoSol also argues that meetings about a *possible* citizen petition are not exclusionary and argues that such meetings are protected by the First Amendment under the *Noerr-*

---

[98] FAC at ¶¶ 116-123.
[99] Mon. Br. at 25.
[100] *ZF Meritor, LLC v. Eaton Corp*. 696 F. 3d 254, 269 (3d Cir. 2012).

*Pennington* doctrine.[101]   Any attempt by MonoSol to distinguish between its conduct regarding the citizen petition and Indivior's action of actually *filing* the citizen petition by inserting the phrase "meetings about *possible* citizen petition" fails because its participation in meetings about the citizen petition supported the conspiracy in itself, which harmed competition in the pharmaceutical industry.   This Court has already found that the citizen petition claims alleged by the private parties are not subject to dismissal under *Noerr-Pennington* because plaintiffs properly alleged that the petition constituted a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."[102] Additionally, the filing of a citizen petition is not a stand-alone allegation of anticompetitive conduct in the FAC, but rather is one part of Defendants' overall scheme to monopolize.   Courts have stated that when conduct that is *potentially* protected by the First Amendment is alleged as part of a course of anticompetitive conduct, a court should preserve those allegations for discovery, even if the applicability of *Noerr-Pennington* protection is unclear at the time of the motion to dismiss.   If the court found that the conduct did not constitute a sham and deserved protection under *Noerr-Pennington*,[103] a motion *in limine* would be the proper vehicle to address the issue.

### 3.  Plaintiff States' claims are not time barred.

By nature, an antitrust conspiracy is typically and necessarily secret.   As such, it is only when a reasonably diligent plaintiff would discover the conspiracy that the cause of action begins to accrue.   The "general doctrine that the statute of limitation does not run while the defendant's

---

[101] Mon. Br. at 26 (citing *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.* 365 U.S. 127, 136-38, 144-45 (1961); *Mine Workers v. Pennington*, 381 U.S. 657, 669-72 (1965)).
[102] *Noerr*, 365 U.S. at 144; *See also* Memorandum Opinion dated Jan. 4, 2017 in *In re Suboxone Antitrust Litig.*, Civ. A. No. 2:13-md-2445, 2017 WL 36371 (E.D. Pa. Jan. 4, 2017) (ECF Dkt. No. 311) (granting in part and denying in part Indivior's partial motion to dismiss Amneal Pharmaceuticals LLC's).
[103] *See In re Neurontin Antitrust Litig.*, 2009 WL 2751029 at *17, fn. 42.

offense is 'fraudulently concealed' has been adopted in antitrust litigation."[104]   Plaintiff States could not have known about Monosol's conduct, even with a reasonably diligent inquiry, before the applicable statute of limitation.

Furthermore, as the Supreme Court said in *Zenith Radio Corp. v. Hazeltine Research*, "In the context of a continuing conspiracy to violate the antitrust laws…each time a plaintiff is injured by an act of the defendants a cause of action accrues."[105] As MonoSol notes, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." [106]   The harm to the States' general economies continues with each sale of Suboxone, and is therefore a continuing violation.[107]

Even if a four-year statute of limitations did apply to Sherman Act violations on the date that MonoSol provides in its Motion to Dismiss, MonoSol also incorrectly attributes a four-year statute of limitations to certain states' antitrust and consumer protection laws.[108]   Finally, while some states may have four-year statutes of limitations in their antitrust and consumer protection

---

[104] *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 160 (3d Cir. 2002); 2 AREEDA & HOVENKAMP, ANTITRUST LAW 364 (4th ed. 2014).

[105] *Zenith Radio Corp. v. Hazeltine Research, Inc.* 401 U.S. 321, 338 (1971).

[106] *Id. See also* 2 AREEDA & HOVENKAMP, at 328. Delaware has codified the "continuing violation" concept in Del. Code. Ann. 6 §2101.

[107] FAC at ¶¶ 144; 148;163.

[108] A number of states' statute of limitations periods do not run against the State; Alabama: *Bd. Of Sch. Comm'rs of Mobile Cty. V. Architects Grp.,* 752 So.2d 489, 491 n.3 (Ala. 1999) ([U]nder the doctrine of *nullum tempus occurrit reipublicae,* …no time runs against the state."); Connecticut: *State v. Mobila,* 1983 WL 14950, at *1(Conn. Sup. Ct. 1983) ("Section 35-40 is not made expressly applicable by its terms…to claims brought by the state in its sovereign capacity under Section 35-32[.]"); Georgia: O.C.G.A § 10-1-401(a)(2015) ( the section cited by MonoSol only applies to private rights of action – actions other than those brought by the State of Georgia); Hawaii: Haw. Rev. Stat § 657-1.5 (§ 480-24(b) was repealed by Act 7, 2016 Haw. Sess. Laws 6); Louisiana:  Louisiana Constitution, Art. 12, Section 13; Mississippi: Miss. Code Ann. §15-1-51, and Miss. Constitution Art.4, §104; Nebraska: Neb. Rev. Stat. § 59-1612 (4 year statute of limitations only applies to a claim for damages); New Mexico: *Bd. Of Educ. v. Standhardt,* 458 P.2d 795 (N.M. 1969); North Carolina: *State HHS v. Thompkins,* 205 N.C. App. 285, 288, 695 S.E.2d 133, 135, *disc. rev. denied,* 364 N.C. 326, 701 S.E.2d 680 (2010) ("[t]he doctrine of *nullum tempus occurritt regi* 'survives in North Carolina and applies to exempt the State and its political subdivisions from the running of time limitations unless the pertinent statute expressly includes the State.'"); Tennessee: Tenn. Code Ann. § 47-25-101 *et seq.* and § 47-18-101 *et seq.*  Other states have a different statute of limitations for state actions; Alaska: Alaska Stat. §09.10.120, *City of Fairbanks v. Amoco Chem. Co.,* 952 P.2d 1173 (Alaska 1998) (6 years); Kentucky: KRS 413.120(2) (5 years).  Oregon's claims under ORS 646.770 and ORS 646.775 are not subject to a statute of limitations; Oregon's claim under ORS 646.780 remain unchallenged by MonoSol's Motion to Dismiss.

laws, there are broad equitable exceptions to the usual rules governing limitations period.[109]  For these reasons, the States' claims included in the FAC are not time-barred and MonoSol's Motion to Dismiss should be denied.

      **D**.      **Plaintiff States' FAC plausibly alleges state law claims against MonoSol.**

MonoSol's argument that Plaintiff States' state law claims are not viable under the States' antitrust, consumer protection, and unfair trade practice statutes are addressed and hereby incorporated by reference in Plaintiff States' Memorandum of Law in Opposition to Defendant Reckitt Benckiser Healthcare (UK) Limited's Motion to Dismiss, which Plaintiff States join.

## CONCLUSION

For the foregoing reasons, the States respectfully request that the Court deny MonoSol's Motion to Dismiss in its entirety.

Dated: January 30, 2017               Respectfully submitted,

                                        JEFF LANDRY
                                        Louisiana Attorney General

                                        __s/Stacie Lambert deBlieux____
                                        STACIE LAMBERT DEBLIEUX
                                        Louisiana Assistant Attorney General
                                        Admitted *Pro Hac Vice*
                                        Attorneys for Plaintiff States

                                        Louisiana Department of Justice
                                        1885 N. 3rd Street
                                          Baton Rouge, Louisiana 70802
                                        (225) 326-6458
                                        (225) 326-6499 (Fax)
                                        deblieuxs@ag.louisiana.gov

---

[109] *See Aryeh v. Canon Bus. Solutions Inc.*, 55 Cal. 4th 1185, 1195-97 (2013) (California's antitrust and unfair competition laws have broad equitable exceptions to the usual rules governing limitations period that is governed by common law principles, rather than federal interpretations of equitable tolling doctrines).