**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE SUBOXONE (BUPRENORPHINE HYDROCHLORIDE AND NALOXONE) ANTITRUST LITIGATION | MDL No. 2445 |
| | Master File No. 2:13-MD-2445-MSG |
| THIS DOCUMENT RELATES TO: | Case No. 2:16-cv-5073-MSG |
| *Wisconsin, et. al. v. Indivior Inc. et. al.* | |
| STATE OF WISCONSIN et. al. | |
|                Plaintiffs, | Civ. A. No. 16-cv-5073 |
|       v. | |
| Indivior Inc. f/k/a Reckitt Benckiser Pharmaceuticals, Inc., et. al. | |
|                Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT INDIVIOR PLC'S
<u>MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................... 1

II. LEGAL STANDARD FOR A RULE 12(b)(6) MOTION ...................................... 2

III. FACTS ALLEGED IN THE COMPLAINT ......................................................... 3

IV. ADDITIONAL PUBLIC RECORD FACTS CONCERNING INDIVIOR PLC ..................... 5

V. ARGUMENT ......................................................................................................... 9

    A.  The Complaint Asserts Plausible Direct Claims Against Indivior PLC for Anticompetitive Conduct Continuing to the Present ............................................................................. 9

    B.  The FAC Asserts that Indivior PLC Joined the Suboxone Film Conspiracy ..................... 13

    C.  Indivior PLC is Liable as the Demerger Successor to the Indivior Business ..................... 14

    D.  Indivior PLC Is Estopped from Denying Its Role in the Suboxone Film Conspiracy ........ 18

    E.  Indivior Inc. Is Indivior PLC's Alter Ego ......................................................... 19

    F.  Indivior PLC Is Liable for the Acts of Its Agent, Indivior Inc. ........................... 21

    G.  The FAC Pleads Viable Antitrust Claims ......................................................... 21

VI. CONCLUSION ..................................................................................................... 22

# TABLE OF AUTHORITIES

CASES                                                                                         PAGES

*Alternative Electrodes, LLC v. Empi, Inc.*,
   597 F. Supp. 2d 322 (E.D.N.Y. 2009) ................................................................. 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................ 2

*Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*,
   417 U.S. 703 (1974) ...................................................................................... 20

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................ 2

*Brooks v. Specialty Minerals, Inc.*,
   850 F.Supp.2d 334 (D.Mass.2011) ............................................................... 17

*Hagerman v. Yukon Energy Corp.*,
   839 F.2d 407 (8th Cir. 1988) ........................................................................ 18

*Hedges v. United States*,
   404 F.3d 744 (3d Cir. 2005) ............................................................................ 2

*In re Asbestos Products Liabilty Litigation (No. VI)*,
   822 F.3d 125 (3d Cir. 2016) ........................................................................... 6

*In re Burlington Coat Factory Securities Litigation*,
   114 F.3d 1410 (3d Cir. 1997) ..................................................................... 2, 5

*In re Emoral, Inc.*,
   740 F.3d 875 (3d Cir. 2014) .................................................................... 15, 16

*In Re K-Dur Antitrust Litigation*,
   338 F.Supp 2d 517 (D.N.J. 2004) ................................................................ 13

*In Re Lower Lake Erie Iron Ore Antitrust Litigation*,
   710 F.Supp. 152 (E.D. Pa. 1989) ................................................................. 13

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litigation*,
   64 F. Supp. 3d 665 (E.D. Pa. 2014) ............................................................. 11

*Jacobs v. Lakewood Aircraft Service, Inc.*,
   512 F. Supp. 176 (E.D. Pa. 1981) ........................................................... 14, 15

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
    560 F.3d 156 (3d Cir. 2009)................................................................................. 18

*Lewis v. Atlas Corp.*,
    158 F.2d 599 (3d Cir. 1946)................................................................................. 18

*Mele v. Federal Reserve Bank of New York*,
    359 F.3d 251 (3d Cir. 2004), *as amended* (Mar. 8, 2004) ........................................ 6

*Mobile Oil Corp. v. Linear Films, Inc.*,
    718 F.Supp. 260 (D. Del. 1989) ........................................................................... 21

*Musikiwamba v. ESSI, Inc.*,
    760 F.2d 740 (7th Cir. 1985) ............................................................................... 15

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015), *cert. dismissed sub
    nom. Allergan PLC v. New York ex. rel. Schneiderman*, 136 S. Ct. 581 (2015) ...................... 11

*National Soffit & Escutcheons, Inc. v. Superior Systems, Inc.*,
    98 F.3d 262 (7th Cir. 1996) ................................................................................. 15

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)................................................................................... 5

*Smith Land & Imp. Corp. v. Celotex Corp.*,
    851 F.2d 86 (3d Cir. 1988)................................................................................... 16

*StrikeForce Technologies, Inc. v. PhoneFactor, Inc.*,
    2013 WL 6002850 (D. Del. 2013) ................................................................... 19, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................. 2

*Tender Touch Rehab Services, LLC v. Brighten at Bryn Mawr*,
    26 F.Supp. 376 (E.D. Penn. 2014) ........................................................................ 15

*Town of Lexington v. Pharmacia Corp.*,
    2015 WL 1321457 (D. Mass. Mar. 24, 2015)......................................................... 17

*Tunis Bros. Co. Inc. v. Ford Motor Co.*,
    736 F.2d 1482 (3rd Cir. 1985) ......................................................................... 13, 14

*York v. Georgia-Pac. Corp.*,
    585 F. Supp. 1265 (N.D. Miss. 1984)................................................................... 18

# I. INTRODUCTION

Plaintiff States' First Amended Complaint ("FAC") alleges that Reckitt Benckiser Healthcare (UK) Ltd ("RBH"), Indivior Inc. ("Indivior Inc.") f/k/a Reckitt Benckiser Pharmaceuticals, Inc., ("RBPI"), Indivior PLC, and MonoSol Rx ("MonoSol") (collectively, "Defendants") engaged in an unlawful anticompetitive scheme to monopolize and restrain trade within the U.S. co-formulated buprenorphine/naloxone ("Suboxone") market.

Defendant Indivior PLC has moved to dismiss Plaintiff States' FAC pursuant to Fed. R. Civ. P. 12(b)(6) ("Motion").  The Memorandum in Support of Indivior PLC's Motion to Dismiss ("Indivior PLC's Memorandum") asserts that all of the alleged unlawful behavior in the FAC predates Indivior PLC's creation, and that Indivior PLC does not have successor liability for actions taken prior to its creation.

The Court should deny the Motion in total.[1]  The FAC pleads sufficient facts to draw the reasonable inference that Indivior PLC has acted since its inception in 2014 to maintain the Suboxone monopoly and to restrain trade, and is, therefore, directly liable for its own anticompetitive conduct and for the harms caused by the conspiracy that it joined.  There are also sufficient facts pled to draw the reasonable inference that Indivior PLC is also liable for the acts of Reckitt Benckiser Group ("RB Group") that predate the demerger that created Indivior PLC. In addition to successor liability, Indivior PLC can be held liable under equitable estoppel, alter ego, and agency theories.

---

[1] Should the Court disagree with Plaintiff States, and dismiss claims alleged, Plaintiff States request an opportunity to amend their complaint in light of the Court's ruling.

## II. LEGAL STANDARD FOR A RULE 12(b)(6) MOTION

The Federal Rules of Civil Procedure require a "short and plain statement of the claim showing that the pleader is entitled to relief."[2]  A well-pled complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[3]  To survive a motion to dismiss, plaintiffs need only plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting each element.[4]  Evidence is required only at summary judgment.[5]  A complaint may proceed even if a "savvy" judge believes that "actual proof" of the facts alleged is "improbable."[6]

In a 12(b)(6) motion to dismiss, defendants bear the burden of demonstrating that no claim was presented.[7]  All facts and inferences are drawn in favor of plaintiffs, and come from "the complaint in its entirety, as well as other sources courts ordinarily examine . . . , in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[8]

---

[2] Fed. R. Civ. P. 8(a)(2).

[3] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

[4] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 566 (2007).  *See also id.* at 555 (although "a complaint does not need detailed factual allegations," those "[f]actual allegations must be enough to raise a right to relief above the speculative level … on the assumption that all the allegations in the complaint are true (even if doubtful in fact)") (citations omitted).

[5] *Id.* at 554.

[6] *Id*. at 556.

[7] *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

[8] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)  *See also* Wright & Miller, 5B Fed. Prac. & Proc. § 1357 (3d ed. 2004) (explaining, "[t]hese matters are deemed to be a part of every complaint by implication"); Dkt 141-1, Reckitt Benckiser Healthcare (UK) Ltd.'s Memorandum in Support of its Motion to Dismiss at 10 n.8 (quoting *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir. 1997) (explaining, courts may consider on a motion to dismiss a "document *integral to or explicitly relied* upon in the complaint… .") (internal quotation marks omitted) (emphasis in original)).

### III. FACTS ALLEGED IN THE COMPLAINT

The FAC alleges that Indivior Inc. is a wholly owned subsidiary of Indivior PLC.[9] Shortly after Indivior PLC was formed in 2014, RB Group sold the assets of a collection of companies, including Indivior Inc., to Indivior PLC.[10]  The sale included transfer of all assets and operations related to the production of Suboxone.[11]  Moreover, Indivior PLC agreed to indemnify RB Group for any claims and expenses incurred by any company within the Indivior Group[12] or the RB Group arising from the Indivior business before the transfer.[13]  Indivior PLC currently holds itself out as the manufacturer of Suboxone and describes itself as the successor company to Reckitt Benckiser Pharmaceuticals, Inc., the former manufacturer of Suboxone.[14] Furthermore, the FAC alleges that "Indivior PLC has current and former overlapping directors with Reckitt Benckiser Pharmaceuticals, Inc. and Indivior, Inc., and many of the individuals who participated in the conduct alleged herein are now employed by Indivior PLC."[15]

Contrary to the core assertion in Indivior PLC's Memorandum, the FAC repeatedly alleges ongoing violations of antitrust law that continued after Indivior PLC was created.  For example, by causing a hard product switch, Defendants, including Indivior PLC, have continued

---

[9] Pl. States' First Am. Compl. ¶11, Nov. 23, 2016, ECF No. 119 ("FAC").

[10] *Id.* ¶13.

[11] *Id.*

[12] "Indivior Group" is a term used by Indivior PLC and other defendants in various public documents.  *See* footnote 29 *infra*.

[13] FAC ¶13.

[14] *Id.*

[15] *Id.*

to prevent automatic substitution of AB-rated generics under state generic substitution laws.[16] Further, Defendants' scheme to delay FDA approval of generic Suboxone Tablets, while converting the market to patent-protected Suboxone Film, has allowed them to sell Suboxone at supracompetitive prices until the present date.[17] Thus, Indivior PLC's conduct has limited competition and allowed it to enjoy ill-gotten gains from the sales of Suboxone.[18] As a result of this conduct, government entities and consumers continue to pay artificially high monopoly prices for co-formulated buprenorphine/naloxone.[19]

Count I of the FAC alleges that Indivior PLC possesses monopoly power in the market for co-formulated buprenorphine/naloxone in the United States.[20] Count II alleges that there continues to be a dangerous probability that Indivior PLC will achieve its goal of maintaining monopoly power in this market.[21] Count III, Conspiracy to Monopolize under Sherman Act §2, alleges that Indivior PLC made unfounded allegations regarding the safety of generic Suboxone Tablets while engaging in a campaign to convert the relevant market from Suboxone Tablets to its patent-protected Film.[22] Finally, Count IV alleges that Indivior PLC and the other Defendants entered into and maintained a contract, combination or conspiracy to restrain trade in the relevant market from 2006 to the present, in violation of Section 1 of the Sherman Act.[23]

---

[16] FAC ¶120.

[17] *Id.* ¶122.

[18] *Id.* ¶¶119–22.

[19] *Id.* ¶124.

[20] *Id.* ¶132.

[21] *Id.* ¶143.

[22] *Id.* ¶156.

[23] *Id.* ¶¶161, 162.

Likewise the Plaintiff States' Prayer for Relief invokes the equity jurisdiction of the court and seeks equitable relief against Indivior PLC, including an injunction to keep Indivior PLC "from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive actions" set forth in the Complaint.[24]   Other equitable relief sought includes "statutory or equitable disgorgement, or any other equitable relief for the benefit of the state and its consumers as appropriate under each state laws."[25]

## IV. ADDITIONAL PUBLIC RECORD FACTS CONCERNING INDIVIOR PLC

The Indivior PLC Memorandum paints Indivior PLC as a simple holding company that merely owns 100% of the operating company, Indivior Inc.  The reality is far more complex.  In drafting the FAC, Plaintiff States relied on Indivior PLC's public investment documents, including the Demerger Agreement that created it, its SEC filings, and its Annual Reports.  A review of these documents and related information is integral to understanding the FAC, and in particular the allegations that Indivior PLC:  (1) "is engaged in the development, manufacture and sale of Suboxone," (2) "is in whole or in part responsible for some or all of the conduct alleged in this Complaint and attributed to Reckitt," and (3) "holds itself out as the manufacturer of Suboxone."[26]

---

[24] FAC Prayer for Relief ¶3.

[25] *Id.* ¶6.

[26] FAC ¶13.  Noting that Federal Rule of Evidence 201 "permits a court to take judicial notice of facts that are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,'" the Third Circuit follows the rule permitting "a court, in deciding a motion for judgment on the pleadings, to take judicial notice of properly-authenticated public disclosure documents filed with the SEC."  *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (quoting Fed. R. Evid. 201).  The court may also consider an Annual Report or other document that is integral to the FAC without converting a motion to dismiss into a motion for summary judgment.  *Burlington Coat Factory*, 114 F.3d at 1426 (3d Cir. 1997); *In re Asbestos Prod. Liab. Litig.*

Indivior PLC was created as part of a demerger of RB Group.  According to the Demerger Agreement,[27] the intent was for RB "to demerge its interest in the Indivior Business"[28] – essentially Suboxone – and give that business to the newly created Indivior PLC.  The allocation of assets is so complicated that a "Separation Committee" was created "to review and assist in the implementation of this Agreement and the Ancillary Agreements after Completion, to consider any additional issues arising from the implementation of the Demerger, and to determine any disputes which may arise between members of the RB Group and the Indivior Group."[29]

It is reasonable to infer that at least some of the assets used by the RB Group with respect to Suboxone were transferred to Indivior PLC.  For example, in its 2016 SEC Form 20-F, Indivior PLC claims that its key Suboxone patents are either held by, or used under exclusive license to, the "Indivior Group."[30]  Leases on over 190,000 square feet of office and manufacturing space in England, Virginia, and Colorado are likewise described as being held by the "Indivior Group."[31]

---

(No. VI), 822 F.3d 125, 133 n.7 (3d Cir. 2016); *Mele v. Fed. Reserve Bank of New York*, 359 F.3d 251, 256 n.5 (3d Cir. 2004), *as amended* (Mar. 8, 2004).

[27] The Demerger Agreement, attached as Exhibit "A" to the Declaration of Brian Mark Christensen ("Christensen Decl."), details some aspects of the transaction.

[28] Christensen Decl. Exh. A at 1 (not numbered, follows pg. ii).

[29] Christensen Decl. Exh. A at 21.  The Demerger Agreement defines "Indivior Group" to mean "Indivior, RBP Global and the companies that are, or will following Completion from time to time be, subsidiary undertakings of RBP Global or Indivior[.]"  *Id.* at 5.  "Indivior" in turn refers to Indivior PLC.  *Id.* at 1 (not numbered, follows pg. ii).  However, in a later SEC filing "Indivior Group" is defined as being limited to "Indivior PLC and, as the context requires, its subsidiaries."  Christensen Decl. Exh. B, Indivior PLC, Registration Statement (Form 20-F) (2016) at 1.

[30] Christensen Decl. Exh. B at 55.

[31] Christensen Decl. Exh. B at 56.

Furthermore, Indivior PLC expressly agreed as a condition of the demerger to indemnify RB Group for any losses "suffered or arising, directly or indirectly, from or in consequence of any of the Indivior Business Liabilities," including liabilities "incurred by Indivior or any Indivior Group Company . . . associated with the Indivior Business, whether or not in the ordinary course of business . . . and whether arising out of circumstances existing prior to" the demerger.[32]

In its public investment documents, it is impossible to tell where Indivior PLC ends and Indivior Inc. begins.  Reading Indivior PLC's Annual Report and Financial Statements 2014 ("2014 PLC Annual Report"),[33] its Annual Report and Financial Statements 2015 ("2015 PLC Annual Report"),[34] and the 2016 SEC Form 20-F, one struggles to discern any actions taken exclusively by Indivior Inc.; all of the production, marketing, and distribution of Suboxone appear to have been done by Indivior PLC or the Indivior Group collectively.  For example, Indivior PLC Chairman Howard Pien opens the 2015 PLC Annual Report this way:

> At the beginning of the year, management set itself four priorities for 2015:
>
> 1. To sustain Suboxone® Film's (buprenorphine and naloxone sublingual film) leadership position in the US.
> 2. To expand treatment in the US and to build recognition of, and treatment for, opioid painkiller dependence in Europe.
> 3. To develop the Company's pipeline of potentially transformational products for the treatment of addiction and closely related conditions.
> 4. To expand the business and diversify business risk.
>
> I believe the Company has demonstrated visible success in the first three priorities: Suboxone® Film sustained market share in the US on average of 59%, slightly ahead of the exit share at end of 2014; while pilot programs to expand treatment for opioid

---

[32] Christensen Decl. Exh. A at 53–54.

[33] Christensen Decl. Exh. C.

[34] Christensen Decl. Exh. D.

painkiller dependence were launched in UK and Germany; and, we made considerable progress in our pipeline development, particularly Buprenorphine Monthly Depot.[35]

In its public investment documents, Indivior PLC chooses to use consolidated financial statements.[36]  In its 2016 SEC Form 20-F filing, it states that the "[b]asis of consolidation" is "entities controlled by the Group."[37]  As a result, the investment documents do not disclose how much money went to Indivior PLC from Indivior Inc., or the degree to which Indivior PLC depends upon Indivior Inc.'s income stream for its ability to raise capital.[38]  Furthermore, the financial statements contain language that strongly suggests that Indivior PLC has itself taken over operation of the Suboxone business that formerly belonged to RB:

> Indivior PLC ("the Company") and its subsidiaries (together, "the Group") is engaged in the development, manufacture, and sale of buprenorphine-based prescription drugs for the treatment of opioid dependence (the Indivior Business).
>
> The Indivior Business was previously the pharmaceuticals business of the Reckitt Benckiser Group plc (RB), carried out by RB Global Holdings Limited and its subsidiary undertakings.
> . . .
> As *the Group is engaged in a single business activity*, which is the development, manufacture and sale of prescription drugs that are based on buprenorphine for treatment of opioid dependence, the CEO reviews financial information presented on a combined basis for evaluating financial performance and allocating resources. Accordingly, the Company reports as a single reporting segment.[39]

---

[35] Christensen Decl. Exh. D at 3.

[36] Christensen Decl. Exh. B at F-1–F-39; Christensen Decl. Exh. C at 62, 67–70; Christensen Decl. Exh. D at 88, 95–98.

[37] Christensen Decl. Exh. B at F-17 ("The Financial Statements include the results of the Company (after its incorporation) and all of its subsidiary undertakings made up to the same accounting date. Subsidiary undertakings are those entities controlled by the Group. Control exists where the Group is exposed to, or has the rights to variable returns from its involvement with the investee and has the ability to use its power over the investee to affect its returns.").

[38] Indivior PLC states that it actually has "no direct source of operating income" and "is therefore dependent on its capital raising abilities and dividend payments from its subsidiaries."  Christensen Decl. Exh. B at 68.

[39] Christensen Decl. Exh. C at 71, 74 (emphasis added).

The Indivior PLC Executive Committee, as listed in the 2015 PLC Annual Report,[40] provides another example of the interrelationship between Indivior PLC and Indivior Inc.  Of the eleven members of that Committee, ten previously held similar jobs at Indivior Inc.'s predecessor, RBPI, before the demerger.  They include:  Indivior PLC's Chief Executive Officer, Shaun Thaxter (who was the CEO and President of RBPI); Indivior PLC's Chief Medical Officer; Chief Corporate Affairs and Communications Officer; Chief Strategy Officer; Chief Human Resource Officer; Chief Business Development Officer; Chief Scientific Officer; Chief Legal Officer; Chief Commercial Officer; and Chief Supply Officer.  Each of those people had between 12 and 27 years of experience in the industry in 2015.  In short, it appears that the "brain trust" that ran RBPI during the period prior to March of 2013 became the Indivior PLC Executive Committee after the demerger.  Therefore, it is reasonable to infer that the Indivior PLC Executive Committee actually controls whatever actions Indivior Inc. and the rest of the Indivior Group take.  Indeed, according to an Indivior PLC "Statement of Division of Responsibilities Between the Chairman and the Chief Executive Officer" approved on November 5, 2014, among Shaun Thaxter's "primary responsibilities" as the Indivior PLC CEO are "to manage the day to day running of the group's business," "to recommend the strategic direction of the group to the board," "to implement strategy as approved by the board," and "to supervise and develop senior teams within subsidiaries."[41]

## V. ARGUMENT

### A.  The Complaint Asserts Plausible Direct Claims Against Indivior PLC for Anticompetitive Conduct Continuing to the Present

---

[40] Christensen Decl. Exh. D at 56–57.

[41] Christensen Decl. Exh. E at 1–2.

Undoubtedly, much of the FAC discusses acts taken to create a monopoly for Suboxone Film and to destroy the market for Suboxone Tablets prior to the long-delayed entry of Generic Tablets.  That generic entry took place in March of 2013, before the demerger that created Indivior PLC.  However, the FAC also plainly and repeatedly asserts that all of the defendants, including Indivior PLC, have *continued* to participate in, and to reap the benefits that flow from, the product-hopping scheme and related antitrust violations.  Those benefits include an artificially enhanced market share and monopoly pricing.

Indivior PLC's public documents are integral to the assertions in the FAC and show that Indivior PLC, through its Executive Committee, is actually running the Suboxone business.  A mere holding company doesn't need a "Chief Scientific Officer" or a "Chief Supply Officer."[42] Furthermore, three of the four main goals identified in the 2015 PLC Annual Report are directly at issue in this case:

   1.  *"To sustain Suboxone® Film's (buprenorphine and naloxone sublingual film) leadership position in the US."*[43]

Plaintiff States reasonably infer that this goal expresses an intent to maintain the Indivior Group's unlawfully acquired supracompetitive market share, and, therefore, allege that there "continues to be . . . a dangerous probability that Reckitt will succeed in and achieve its goal of maintaining monopoly power in the relevant market."[44]

---

[42] *See* Christensen Decl. Exh. D at 56–57.

[43] *Id*. at 3.

[44] FAC ¶143.

2. *"To expand treatment in the US . . . ."*[45]

Plaintiff States reasonably infer that this goal expresses an intent by Indivior PLC to continue its anticompetitive practice of systematically touting the alleged benefits and safety advantages of Suboxone Film over Generic Tablets while concealing the known benefits of Generic Tablets over Suboxone Film, thereby perpetuating the unlawful product-hopping scheme at the heart of the Complaint.[46]  It carries out this practice not only in marketing statements but also by its ongoing physician training.  In fact, Indivior PLC expands its business "mainly . . . by encouraging more physicians to train and become DATA 2000 waivered to prescribe Suboxone® Film in an office setting."[47]  In its 2015 Annual Report, Indivior PLC stated that "over 30,000 physicians have been through this process since 2000."[48]  In the prior year, the number of trained doctors was listed as "over 27,000."[49]  That suggests an additional 3,000 doctors were certified in 2015 due to the efforts of Indivior and its large marketing force.

---

[45] Christensen Decl. Exh. D at 3.

[46] FAC ¶¶ 69–88; *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 682 (E.D. Pa. 2014) (direct purchasers plausibly pleaded exclusionary conduct when they alleged "disparagement of Suboxone tablets … alongside 'coercive' measures" including "alleged fabricated safety concerns" that "could plausibly coerce patients *and doctors* to switch from tablet to film.") (emphasis added); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 n.26 (2d Cir. 2015), *cert. dismissed sub nom. Allergan PLC v. New York ex. rel. Schneiderman*, 136 S. Ct. 581 (2015) ("Several other courts have held that product redesign violates [Sherman Act] § 2 when combined with other conduct and the combined effect is anticompetitive or exclusionary" (citing *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group. LP*, 592 F.3d 991, 1000 (9th Cir.2010); *Suboxone*, 64 F. Supp. 3d at 682)). *Cf. Alternative Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 331–32 (E.D.N.Y. 2009) (truthful comparisons of products do not constitute anticompetitive behavior, but "false and misleading statements may provide a basis for antitrust claims").  For further discussion of Indivior PLC and the other Defendants' unlawful marketing tactics to switch the market from Tablets to Film as pled in the FAC, see Plaintiff States' Memorandum in Opposition to Indivior Inc.'s Motion to Dismiss at Part II.A, Plaintiff States' Memorandum in Opposition to RBH's Motion to Dismiss at Part B.2, and Plaintiff States' Memorandum in Opposition to MonoSol's Motion to Dismiss at Parts III.A and III.C.

[47] Christensen Decl. Exh. D at 7.

[48] *Id.*

[49] Christensen Decl. Exh. C at 9.

According to its 2015 Annual Report, more than half of Indivior's 885 employees are in commercial sales and marketing or medical affairs positions.[50]

3. *"To develop the Company's pipeline of potentially transformational products for the treatment of addiction and closely related conditions."*[51]

One of the Plaintiff States' key objectives is for all of the defendants to be enjoined from engaging in new product-hopping schemes when they bring new drugs to market. The 2015 PLC Annual Report asserts that "[t]he Company's pipeline has the potential to transform the treatment of addiction in the next decade, delivering a new generation of opioid disorder treatments."[52] Of particular concern are two new drugs being developed by Indivior PLC: Buprenorphine Monthly Depot, which Indivior PLC estimates will be approved by the FDA in 2017; and Buprenorphine Hemiadipate, described as "an oral, swallowable capsule," which is in development.[53]

In short, it is reasonable to infer that Indivior PLC is directly involved in maintaining Suboxone Film's supracompetitive position, and is encouraging and assisting doctors to become certified to prescribe Suboxone Film (likely by continuing to provide misinformation about the relative merits of Suboxone Film versus Generic Tablets). Indivior PLC is developing a new generation of opioid addiction treatment drugs, and it is also reasonable to infer that, absent injunctive relief, it will continue to employ some of the anticompetitive product-hopping practices that were used to obtain a monopoly for Suboxone Film.

---

[50] Christensen Decl. Exh. D at 39 ("As of December 31, 2015 Indivior employed 885 people … . [A]pproximately 403 were employed in commercial sales and marketing positions … 93 were employed in medical affairs positions[.]").

[51] *Id.* at 3.

[52] *Id.* at 35.

[53] *Id.*

### B.  The FAC Asserts that Indivior PLC Joined the Suboxone Film Conspiracy

Under antitrust law, once Indivior PLC became a part of the conspiracy it likewise became retroactively liable for the harm caused by the conspiracy:

> Conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring.  *See Associated Press v. United States*, 326 U.S. 1, 12–13, 65 S.Ct. 1416, 1420–1421, 89 L.Ed. 2013 (1945).  Those who, with knowledge of the conspiracy, aid or assist in carrying out the purposes of the conspiracy make themselves parties thereto and are equally liable to or guilty with the original conspirators.[54]

The principle that a party joining an ongoing conspiracy is liable to the same extent as the original conspirators is analyzed and applied in *In Re Lower Lake Erie Iron Ore Antitrust Litigation*.[55]  At issue was whether Conrail, a railroad created by Congress to assume ownership of bankrupt railroads, was liable for antitrust activities that predated its creation in 1976.  The court determined that even though the "Rail Act does reflect a congressional intent to enable Conrail to start out . . . with a clean slate" it could be held "liable for the entire amount of damages caused by the conspiracy" if it permitted antitrust violations to continue after reasonable notice:

> I do not mean to suggest that liability may be imposed upon Conrail merely upon proof that, on April 1, 1976 and for a brief time thereafter, employees of the railroads, without the knowledge or participation of Conrail's management, may have continued to carry out pre-existing policies and practices which violated the antitrust laws. Presumably, it would be appropriate in these circumstances to allow Conrail management a brief period in which to learn of, and terminate, the alleged illegalities. But if, as plaintiffs contend in this case, Conrail's management actively participated in conspiratorial activities over a considerable period of time after April 1, 1976, it is my view that Conrail would thereby be rendered liable for all of the damages caused by the conspiracy, within the period of the statute of limitations.[56]

---

[54] *Tunis Bros. Co. Inc. v. Ford Motor Co.*, 736 F.2d 1482, 1491 (3rd Cir. 1985) *vacated and remanded on other grounds*, 475 U.S. 1105, (1986), *reinstated*, 823 F.2d 49 (3d Cir.1987), *cert. denied*, 484 U.S. 1060 (1988).

[55] 710 F. Supp. 152 (E.D. Pa. 1989).

[56] *Lower Lake Erie Iron Ore Antitrust Litig.*, 710 F. Supp. at 155.  *See also In Re K-Dur Antitrust Litig.*, 338 F.Supp 2d 517, 538 (D.N.J. 2004) ("Although Plaintiffs' complaints allege that ESI joined the conspiracy to delay the entry of generic K-Dur to market after it was formed, a co-conspirator is liable for all acts committed in furtherance of a

The FAC contains numerous allegations from which it can be inferred that Indivior PLC joined the conspiracy to monopolize and restrain trade within the U.S. co-formulated buprenorphine/naloxone market.[57]  If Indivior PLC did nothing more than to provide advice and direction to Indivior Inc. through Indivior PLC's Executive Committee, composed almost entirely of former RBPI executives, that alone would be aiding and assisting the conspiracy. Indeed, since those "with knowledge of the conspiracy . . . make themselves parties thereto"[58] it is enough that Indivior PLC was aware of the conspiracy and has done nothing to stop it or to mitigate its effects in the years since Indivior PLC's creation.

### C.  Indivior PLC is Liable as the Demerger Successor to the Indivior Business

Much of Indivior PLC's Memorandum deals with the question of successor liability. Indivior PLC acknowledges that there are four well recognized exceptions to the general rule that a corporation that acquires the assets of another company generally will not be held liable for the debts of that company.  Those exceptions occur where:  (1) the purchaser expressly or impliedly agrees to assume such obligation; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is fraudulently entered into to escape liability.[59]

---

conspiracy, *regardless of when it entered the conspiracy*.") (emphasis added) (citing *In Re Lower Lake Erie*, 710 F. Supp. at 154).

[57] For more analysis of the roles of co-conspirators in this case, see Plaintiff States' Memorandum in Opposition to Indivior Inc.'s Motion to Dismiss at Parts II.C and III.C; Plaintiff States' Memorandum in Opposition to MonoSol's Motion to Dismiss at Part III.A; and Plaintiff States' Memorandum in Opposition to RBH's Motion to Dismiss at Part C.

[58] *Tunis Bros.,* 763 F.2d at 1491.

[59] Indivior PLC Mem. 7 n.1 (citing *Jacobs v. Lakewood Aircraft Serv.*, 512 F. Supp. 176, 179 (E.D. Pa. 1981)).

The FAC adequately alleges that the first exception applies in this case:  "Indivior PLC has expressly agreed to indemnify RB Group in respect to any claims and expenses incurred by any company within the Indivior Group or the RB Group arising out of or associated with the Indivior business prior to the transfer."[60]

However, Indivior PLC's Memorandum asserts that for every exception, "two threshold elements are required" before a successor may be found liable:  (1) "the transfer of all or substantially all of the assets of one corporation to another;" and (2) the discontinuation of the original entity.[61]  Many of the cases cited in Indivior PLC's Memorandum are *de facto* merger cases, i.e., where a transaction's substance amounts to consolidation for merger even though it lacks the formal characteristics of a merger,[62] and/or cases in which one company sells assets to another company.[63]  The underlying question in such cases is whether it is fair to hold the innocent purchaser liable for debts incurred by the seller prior to the sale.  Not surprisingly, if the seller is still in existence, or if only some assets are transferred, the answer is "no."[64]

However, the present case does not involve a sale of substantially all of the assets of one company to another, or an actual or *de facto* merger.  It involves a demerger through the creation of a second company with an associated issuance of stock, which is the antithesis of a merger.

---

[60] FAC ¶13.

[61] Indivior PLC Mem. at 7.

[62] *Id.* at 7 & n.1 (citing *Jacobs*, 512 F.Supp. at 179; *Tender Touch Rehab Services, LLC v. Brighten at Bryn Mawr*, 26 F.Supp. 3d 376, 390  (E.D. Penn. 2014)).

[63] Indivior PLC Mem. at 7 (citing *Tender Touch Rehab Services*, 26 F.Supp. 3d at 390; *National Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 266 (7th Cir. 1996) (rejecting successor liability because the defendant had purchased only $700 worth of hand tools from the selling entity)).

[64] *See In re Emoral, Inc.*, 740 F.3d 875, 881 (3d Cir. 2014) ("[T]he purpose of successor liability is to promote equity and avoid unfairness"); *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985) ("The successor doctrine is derived from equitable principles, and it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself[.]").

The goal of a merger is to create one company, where before there were two; the goal of a demerger is to create two companies, where before there was one.[65]  Hence it makes no sense to predicate the four exceptions to successor liability on the lack of continuation of the original company or to require it to have transferred substantially all of its assets.  This view is supported by case law.  Courts recognize that successor liability principles must be applied to the particular facts of the underlying transactions at issue.[66]

The question in a demerger is this:  As between the two resultant companies, which should be responsible for the prior acts associated with the development and marketing of a specific and discrete product line?  The clear answer in this case is Indivior PLC.  It inherited Indivior Inc, and everything associated with Suboxone.  The Indivior Group appears to have received all of the patents, leases, contracts, customer lists, and key personnel (e.g. the Indivior PLC Executive Committee) associated with the production and marketing of Suboxone (including the anticompetitive marketing schemes alleged in the FAC), along with the business goodwill and name recognition associated with the Suboxone brand.  The Demerger Agreement's intent is stated in this opening declaration:  "WHEREAS:  (A)  RB intends to

---

[65] *See* Christensen Decl. Exh. A at 47 (agreement governed by English law); Law Commission of England, *Capital and Income in Trusts: Classification and Apportionment* (LC 315) § 2.27 (June 5, 2009), available at https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/248331/0426.pdf ("A demerger involves the transfer by a company ('Company A') of part of its business to a new company ('Company B'), with the shareholders of the demerged company receiving shares in the new company by way of a declaration of dividend.").  Under the demerger at issue, RB Group shareholders received one share of stock in PLC for each share of RB Group stock they owned.  FAC ¶13.

[66] *See, e.g., Smith Land & Imp. Corp. v. Celotex Corp.*, 851 F.2d 86, 91 (3d Cir. 1988) (when "one corporation buys all of the assets of another, the successor will not be saddled with the seller's liability except under certain conditions," but in the unique transactions at issue "*the sale of assets or the de facto merger doctrines do not appear pertinent*") (footnote omitted) (emphasis added)); *Emoral*, 740 F.3d at 881 (successor liability requires a "fact specific and equitable analysis") (quoting *Baker v. Nat'l State Bank*, 161 N.J. 220, 227–28 (1999)) .

demerge its interest in the Indivior Business (as defined below) by way of an indirect dividend demerger[.]"[67]

Specifically, courts have held that an assumption of liability can create successor liability even where a predecessor entity continues to exist.  For example, in *Town of Lexington v. Pharmacia Corp.*,[68] the defendants moved for summary judgment on the grounds that the predecessor company was still in existence, citing *Brooks v. Specialty Minerals, Inc.*,[69] a case very similar to those cited in Indivior PLC's Memorandum.  The court rejected the argument:

> Taken in context, this ruling [from *Brooks*] does not support the Moving Defendants' argument. The plaintiff in *Brooks* sought to impose successor liability on a theory of *de facto* merger because the purchase agreement expressly rejected the imposition of successor liability. A *de facto* merger, however, is unlikely where both the predecessor and successor continue to exist. The case does not speak to the imposition of successor liability under the theory that the successor expressly or impliedly assumed the liability of the predecessor, the theory expounded by Lexington in the case at bar. Successor liability may have no application on a theory of *de facto* merger where the predecessor entity continues to exist, but a successor who assumes the liabilities of its predecessor may not escape liability simply because the predecessor lives on.  An express assumption of liability of the successor would be meaningless if it is unenforceable during the continued life of the predecessor entity.[70]

In short, the FAC pleads facts adequate to assert successor liability in a demerger context due to the express indemnification agreement and the intent of the Demerger Agreement. Furthermore, Indivior PLC's Memorandum fails to address other theories under which Indivior PLC can be held liable for the actions of Indivior Inc., including alter ego and agency.  Those

---

[67] Christensen Decl. Exh. A at 1 (not numbered, follows pg. ii).  As noted elsewhere, the Indivior Business is essentially Suboxone.

[68] Civ. Action No. 12-cv-11645, 2015 WL 1321457 (D. Mass. Mar. 24, 2015).

[69] 850 F.Supp.2d 334, 340 (D.Mass.2011).

[70] *Town of Lexington*, 2015 WL 1321457, *3 (internal citations omitted).

theories are supported by the facts alleged in the FAC, including the allegation that "Indivior

PLC holds itself out as the manufacturer of Suboxone."[71]

**D.  Indivior PLC Is Estopped from Denying Its Role in the Suboxone Film Conspiracy**

Indivior PLC holds itself out to potential investors as being intimately involved in every

aspect of the production, marketing, and sale of Suboxone Film.  It is thus equitably estopped

from now claiming that it has no role with respect to Suboxone Film, and that only Indivior Inc.

is responsible for how Suboxone Film is marketed and sold.

Equitable estoppel "precludes a party from doing an act differently than the manner in

which he induced another party to expect."[72]  A company is specifically estopped from making

representations in litigation that are inconsistent with statements contained in its SEC and IRS

filings.[73]

There is a continuum of involvement by parent corporations with their subsidiaries.  On

the one hand, a parent can be a passive holding company that does nothing more than appoint

directors to run the subsidiary.  On the other extreme, the parent and subsidiary can be so

intermingled that it is impossible for an outsider to tell where one company begins and the other

ends, which appears to be the case here.  There is a material difference to rational investors

between a passive holding company and a parent company that is intimately involved in the

---

[71] FAC ¶13.

[72] *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 165 (3d Cir. 2009) (citing *Zitelli v. Dermatology Educ. & Research Found.,* 633 A.2d 134, 139 (1993)).

[73] *See, e.g.*, *Lewis v. Atlas Corp.*, 158 F.2d 599, 602 (3d Cir. 1946) ("Plaintiff can hardly be in a position of asserting the existence of an agreement before a public regulatory body and denying it before a court."); *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 410 (8th Cir. 1988) (affirming the district court's determination that the corporation, because it had "unequivocally affirmed the validity" of a stock option in its SEC prospectus, was estopped from denying the existence of and liability for the option); *York v. Georgia-Pac. Corp.*, 585 F. Supp. 1265, 1279 (N.D. Miss. 1984) ("This court must hold that Dr. York is now estopped to assert anything contrary to his sworn representations to the Internal Revenue Service.").

activities of its subsidiaries as a member of a single working group.  The more passive the parent company is, the more likely that the subsidiary may take unwise unilateral action, and the more important it is for investors to evaluate the capabilities of the subsidiary and the skills of its key employees separately from those of the parent company.  The more actively involved the parent company is, the more investors rely upon the capabilities of the parent company and the skills of its key employees, rather than those of the subsidiary.

In its public investment documents, Indivior PLC clearly emphasizes its deep level of involvement with Suboxone Film, as well as the quality of its Executive Committee, including their nearly universal experience working with RBPI prior to the demerger.  Having held itself out as being an active participant in all things related to Suboxone Film, Indivior PLC should now be equitably estopped from denying its involvement in order to escape liability for alleged violations of antitrust law.

### E.  Indivior Inc. Is Indivior PLC's Alter Ego

A subsidiary may be deemed the alter ego of its parent corporation, rendering the parent liable, when there is "(1) 'a lack of attention to corporate formalities, such as where the assets of two entities are commingled, and their operations intertwined,' or 'where a corporate parent exercises complete domination and control over its subsidiary,' and (2) the use of the corporate form would cause fraud or a similar injustice."[74]

With respect to the first requirement, the FAC, read together with Indivior PLC's public documents, raises a reasonable inference that the assets of the two entities are intermingled and their operations are intertwined.  The two entities share a consolidated financial statement,[75] and

---

[74] *StrikeForce Technologies, Inc. v. PhoneFactor, Inc.*, 2013 WL 6002850, *4 (D. Del. 2013) (quoting *Mobile Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 266 (D. Del. 1989)).

[75] *See* footnote 37 *supra*.

the constant references in Indivior PLC's public disclosures to the Indivior Group (defined as "Indivior PLC and, as the context requires, its subsidiaries")[76] suggest intertwined operations. Indeed, the financial statement in the 2014 PLC Annual Report expressly states that Indivior PLC and its subsidiaries are "engaged in a *single business activity*, which is the development, manufacture and sale of prescription drugs that are based on buprenorphine for treatment of opioid dependence."[77]   Likewise, an inference can be drawn that Indivior PLC exercises complete dominion and control over Indivior Inc. based in part upon the existence of an Indivior PLC Executive Committee that is composed of the key individuals who are responsible for the day-to-day operation of the Suboxone business, almost all of whom were operating in similar roles in RBPI before the demerger.

With respect to the second element, a failure to include Indivior PLC in this antitrust enforcement action by the States would create a serious injustice.  The FAC alleges that the defendants intentionally violated the law, causing harm to many people.  Public policy supports the efficient and thorough enforcement of antitrust law by government.  It would be unjust to allow Indivior PLC to use corporate formalities to avoid being bound by appropriate equitable relief related to antitrust violations that it clearly knew about and sanctioned.  In particular, Indivior PLC should be bound by prospective injunctive relief to prevent a future product-hopping scheme (possibly through a different subsidiary) and should be subject to disgorgement of ill-gotten gains that may have passed from Indivior Inc. through to Indivior PLC.[78]

---

[76] Christensen Decl. Exh. B at 1.

[77] Christensen Decl. Exh. C at 74 (emphasis added).

[78] *See Bangor Punta Operations, Inc. v. Bangor & Aroostook R. R. Co.*, 417 U.S. 703, 713 (1974) ("Although a corporation and its shareholders are deemed separate entities for most purposes, the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy. In such cases, courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form." (internal citations omitted)).

### F.  Indivior PLC Is Liable for the Acts of Its Agent, Indivior Inc.

"Agency theory treats the parent and its subsidiary as two separate corporate entities, holding the parent liable for the specific actions it directed or authorized the subsidiary to perform."[79] While this type of liability requires that the relationship of the corporations be closely connected to the cause of action, it does not require a showing of complete dominion and control of the subsidiary by the parent.[80]  An agency relationship "may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside of the limited agency setting."[81]

The FAC, read together with Indivior PLC's public documents, raise a reasonable inference that Indivior PLC directed or authorized Indivior Inc. to take such actions as may be necessary in order to maintain the Suboxone Film monopoly, which is the overwhelming source of Indivior PLC's profits.  Indeed, the Indivior PLC Executive Committee seems to exist primarily for that very purpose.  Shaun Thaxter's "primary responsibilities" as the Indivior PLC CEO are "to manage the day to day running of the group's business," "to recommend the strategic direction of the group to the board," "to implement strategy as approved by the board," and "to supervise and develop senior teams within subsidiaries."[82]  For these reasons, Indivior PLC should be held liable for the actions of Indivior Inc.

### G.  The FAC Pleads Viable Antitrust Claims

Plaintiff States' FAC pleads viable antitrust claims against Indivior PLC and the other defendants for the reasons stated above and for the additional reasons set forth in the Plaintiffs

---

[79] *StrikeForce Technologies, Inc*., 2013 WL 6002850 *5–*6.

[80] *See id.*

[81] *Mobile Oil Corp. v. Linear Films, Inc*., 718 F.Supp. 260, 271 (D. Del. 1989).

[82] Christensen Decl. Exh. E at 1–2.

States' memoranda opposing the motions to dismiss filed by Indivior Inc., RBH, and MonoSol. Plaintiff States adopt those memoranda as if set out here in full.

## VI. CONCLUSION

The FAC, particularly when read in conjunction with Indivior PLC's public investment documents, adequately alleges plausible claims against Indivior PLC.  Since its inception, Indivior PLC has been directly involved in the scheme to protect the monopoly power of Suboxone Film, the product that constitutes the overwhelming bulk of its income.  As a co-conspirator, it is liable for all harm done from the inception of the conspiracy to the same extent as all other conspirators.  Furthermore, Indivior PLC has successor liability for the acts of RB prior to the demerger, due to the intent of the Demerger Agreement and the indemnification provisions of that agreement.  Indivior PLC is also liable for the acts of Indivior Inc. under principles of alter ego and agency law.  For the foregoing reasons, the Plaintiff States respectfully request that the Court deny Indivior PLC's motion in its entirety.

Dated: January 30, 2017                    Respectfully Submitted,

                                           SEAN D. REYES
                                           Utah Attorney General

                                            */s/ David N. Sonnenreich*
                                           DAVID N. SONNENREICH
                                           Deputy Attorney General
                                           BRIAN M. CHRISTENSEN
                                           Assistant Attorney General
                                           Admitted *Pro Hac Vice*

                                           Utah Office of the Attorney General
                                           160 E 300 S, 5th Floor
                                           PO Box 140872
                                           Salt Lake City, UT 84114-0872
                                           Telephone: 801-366-0132
                                           Fax: 801-366-0315

                                           *Counsel for Plaintiff States*

22

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE SUBOXONE (BUPRENORPHINE HYDROCHLORIDE AND NALOXONE) ANTITRUST LITIGATION | MDL No. 2445 |
| | Master File No. 2:13-MD-2445-MSG |
| THIS DOCUMENT RELATES TO: | Case No. 2:16-cv-5073-MSG |
| *Wisconsin, et. al. v. Indivior Inc. et. al.* | |
| STATE OF WISCONSIN et. al. | |
| Plaintiffs, | Civ. A. No. 16-cv-5073 |
| v. | |
| Indivior Inc. f/k/a Reckitt Benckiser Pharmaceuticals, Inc., et. al. | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, David N. Sonnenreich, do hereby certify that on this 30th day of January, 2017, I served a true and correct copy of the foregoing document upon all counsel of record via the Court's ECF system.

   */s/ David N. Sonnenreich*
DAVID N. SONNENREICH
*Counsel for Plaintiff States*

23