# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE SUBOXONE (BUPRENORPHINE HYDROCHLORIDE AND NALOXONE) ANTITRUST LITIGATION | MDL NO. 2445<br>13-MD-2445 |

THIS DOCUMENT RELATES TO:

*Wisconsin, et al. v. Indivior Inc. et al.*
Case No. 16-cv-5073

**STATE OF WISCONSIN**
**By Attorney General Brad D. Schimel,** *et al.*

                    **Plaintiffs,**          **CIV. A. NO. 16-5073**

          **v.**

**INDIVIOR INC. f/k/a RECKITT BENCKISER PHARMACEUTICALS, INC., et al.**

                    **Defendants.**

Goldberg, J.                                           October 16, 2017

## MEMORANDUM OPINION

 The Defendants in this multi-district litigation—Indivior Inc., f/k/a Reckitt Benckiser Pharmaceuticals, Inc.; Reckitt Benckiser Healthcare (UK) Ltd.; Indivior PLC, f/k/a/ Reckitt Benckiser Group, plc; and MonoSol Rx, LLC—each play some role in the manufacture, production, and/or sale of Suboxone, a medication used for the treatment of opioid addiction. Plaintiffs, a collection of states,[1] have brought suit against these Defendants alleging violations of federal and state antitrust statutes and state unfair trade and consumer protection laws.

---

[1] These states include Wisconsin, Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New York, North Carolina, Ohio,

Defendant Reckitt Benckiser Healthcare (UK) Ltd. ("RBH") now moves to dismiss all claims against it, arguing that I do not have jurisdiction and that the Amended Complaint does not sufficiently allege any antitrust or state law cause of action. While I disagree with RBH regarding lack of jurisdiction, because a plausible antitrust claim has not been pled, I will grant the motion in its entirety.

## I.     ALLEGATIONS IN THE AMENDED COMPLAINT

### A.     The Defendant Entities

Moving Defendant RBH is a British company incorporated under the laws of England and Wales. According to the Amended Complaint, RBH is engaged in the development and manufacture of pharmaceuticals, including Suboxone, as well as other health care products made and sold subject to FDA approval. RBH is a subsidiary of Reckitt Benckiser Group PLC ("RB Group"), a non-party. (Am. Compl. ¶ 12.)

RB Group also previously owned Defendant Indivior, Inc., formerly known as Reckitt Benckiser Pharmaceuticals, Inc. ("RBPI"). In December 2014, RB Group sold the assets of RBPI to a British company known as Defendant Indivior PLC ("I-PLC"). As a result, RBPI was demerged from its prior parent, the RB Group, into I-PLC. By the terms of the sale, the ownership of all assets and operations related to the production of Suboxone was transferred to I-PLC. (Id. ¶¶ 11, 13.) According to the Certificate of Amendment from the State of Delaware, RBPI simply changed its name to Indivior, Inc.[2] (Def. I-PLC's Mot. to Dismiss, ECF No. 139, Ex. 1.)

---

Oklahoma, Rhode Island, South Carolina, Tennessee, Utah, Vermont, and Washington; the Commonwealths of Kentucky, Massachusetts, Pennsylvania, and Virginia; and the District of Columbia, by their Attorneys General (collectively, "States" or "Plaintiffs").

[2]     To avoid confusion as to the appropriate defendant, I will refer only to "Indivior" instead of "Reckitt."

Defendant MonoSol Rx, LLC is a Delaware limited liability company with its principal place of business in Indiana. (Am. Compl. ¶ 14.) MonoSol produces PharmFilm drug technology, which allows pharmaceuticals to be converted into a sublingual film form. (Id. ¶ 48.)

## B.    Conduct Underlying the Litigation

In broad terms, the Amended Complaint alleges that Defendants engaged in a "product hopping" scheme designed to prevent or delay less expensive generic versions of its drug Suboxone from entering the market. Plaintiff States assert that the primary Defendant Indivior, faced with the impending loss of exclusivity on its Suboxone tablet, developed a new "film" version of Suboxone, which would not be AB-rated, or pharmaceutically equivalent, with a generic version of the Suboxone tablet. Plaintiffs claim that Indivior, in conjunction with RBH and MonoSol, launched the sale of the film in 2010, while simultaneously taking steps to (a) convert the market's prescription base from tablets to film and (b) delay the entry of generic tablets by refusing to participate in a joint REMS safety program and filing a baseless citizen petition. Ultimately, the FDA approved the first generic alternatives to Suboxone tablets in February 2013, and the generics were initially marketed to the public in March 2013.[3]

## C.    Reckitt Benckiser Healthcare (UK) Limited's Role

The defendant at issue in the current motion is RBH. Plaintiffs allege that RBH is responsible for some or all of the antitrust conduct challenged in the Amended Complaint, including the joint venture to create and manufacture Suboxone film, establishment of the

---

[3]      For a more comprehensive statement of the factual allegations underlying this lawsuit, I incorporate by reference my opinion in In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig., No. 16-5073, 2017 WL 3967911, at *1–6 (E.D. Pa. Sept. 8, 2017). For purposes of the present motion, I focus solely on RBH and the facts relevant to the issues before me.

parameters for the timing of the launch and formulation of Suboxone film, gathering and investigating all consumer complaints as to Suboxone products, trademarking the names for the financial programs to encourage the switch from Suboxone tablets to film, and obtaining patents with MonoSol related to Suboxone film development. (Am. Compl. ¶ 12.) They further allege that RBH monitored the taste and quality of Suboxone film, prepared materials for regulatory approval of Suboxone film, manufactured and supplied the ingredients for Suboxone film, and provided grants for the study of Suboxone. Id.

D.      **Procedural History**

In June 2013, several putative classes initiated litigation against Defendants alleging anticompetitive behavior with respect to the marketing and sale of Suboxone. These cases were consolidated into a multi-district litigation ("MDL") assigned to this Court. Among those cases was the class action complaint brought by Direct Purchaser Plaintiffs and End-Payor Plaintiffs alleging that Defendants unlawfully delayed and impeded competition from generic versions of Suboxone tablets, resulting in ongoing overpayments by consumers. On December 3, 2014, I issued an opinion dismissing one of the Direct Purchaser Plaintiffs' stand-alone antitrust claims, a variety of state law claims by the End-Payor Plaintiffs, and claims against several of the other Defendant entities. In re Suboxone, 64 F. Supp. 3d 665 (E.D. Pa. 2014). I allowed the remaining federal and state law claims to proceed.

On December 23, 2015, Amneal Pharmaceuticals LLC ("Amneal"), a generic manufacturer and competitor of Indivior, filed a complaint regarding Indivior's alleged anticompetitive conduct with respect to Suboxone. That case was consolidated with the MDL currently before me. On January 4, 2017, I dismissed part of Amneal's claims that Indivior improperly delayed entry of generic tablets, all claims against Reckitt Benckiser

Pharmaceuticals, Inc., and all claims against Indivior PLC.  In re Suboxone, 13-MD-2445, 2017 WL 36371 (E.D. Pa. Jan. 4, 2017).

On September 22, 2016, the Plaintiff States initiated the current litigation against Defendants, including RBH.  The States filed a First Amended Complaint on November 23, 2016, setting forth five causes of action as follows:  (1) monopolization under the Sherman Act § 2 against Indivior, Indivior PLC, and RBH; (2) attempted monopolization under the Sherman Act § 2 against Indivior, Indivior PLC, and RBH; (3) conspiracy to monopolize under the Sherman Act § 2 against all Defendants; (4) illegal restraint of trade under the Sherman Act § 1 against all Defendants; and (5) individual state law claims against all Defendants.  On September 8, 2017, I denied Indivior's Motion to Dismiss these claims.  In re Suboxone, No. 16-5073, 2017 WL 3967911 (E.D. Pa. Sept. 8, 2017).

On December 12, 2016, RBH filed a separate motion to dismiss the Amended Complaint, arguing: (1) Plaintiffs failed to set forth sufficient grounds for the exercise of personal jurisdiction over RBH and (2) Plaintiffs failed to state a claim against RBH.  The States responded on January 30, 2017, and RBH filed a reply brief on February 21, 2017.

## II.    MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### A.    Standard of Review

Motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) require the court to accept as true the allegations of the pleadings and all reasonable inferences therefrom, and to resolve all factual disputes in favor of the plaintiff.  Fed. R. Civ. P. 12(b)(2); see also Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002). The Rule, however, "does not limit the scope of the court's review to the face of the pleadings"; rather the court must also consider any affidavits submitted by the parties.  Scott v. Lackey, No.

02-1586, 2005 WL 2035598, at *1 (M.D. Pa. Aug. 11, 2005). "Where, as here, the Court resolves the jurisdictional issue in the absence of an evidentiary hearing and without the benefit of discovery, the plaintiff need only establish a prima facie case of personal jurisdiction." Otsuka Pharm. Co., Ltd. v. Mylan Inc., 106 F. Supp. 3d 456, 461 (D.N.J. 2015) (citing Avocent Huntsville Corp. v. Aten Int'l Co., Ltd., 552 F.3d 1324, 1328–29 (Fed. Cir. 2008)). The court may always revisit the issue of personal jurisdiction if later revelations indicate that the facts alleged in support of jurisdiction remain in dispute. See Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 331 (3d Cir. 2009) (citing Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n. 1 (3d Cir. 1992)).

Although a defendant has the initial burden of raising the defense of lack of personal jurisdiction, once such a defense is raised, the burden shifts to the plaintiff to demonstrate facts that suffice to support an exercise of personal jurisdiction. Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987); Cumberland Truck Equip. Co. v. Detroit Diesel Corp., 401 F. Supp. 2d 415, 418 (E.D. Pa. 2005). Plaintiff may do so through affidavits or competent evidence that show sufficient contacts with the forum state. De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP, No. 08-0533, 2008 WL 4822033, at *3 (E.D. Pa. Nov. 4, 2008). Such contacts must be established with "reasonable particularity," to present a prima facie case. Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992) (quoting Provident Nat'l Bank, 819 F.2d at 437). If the plaintiff meets this burden, the defendant must then establish the presence of other considerations that would render personal jurisdiction unreasonable. De Lage Landen, 2008 WL 4822033, at *3 (citing Carteret Sav. Bank, 954 F.2d at 150).

## B.    Discussion

RBH argues that Plaintiffs have failed to establish either general or specific jurisdiction. I disagree and find that the Amended Complaint and Plaintiffs' evidence of record sufficiently set forth grounds for the exercise of specific jurisdiction.

Under Federal Rule of Civil Procedure 4(k)(2), a court may look to a foreign defendant's contacts with the United States in the aggregate to determine whether the exercise of jurisdiction is consistent with the due process clause of the Fifth Amendment.  In re Automotive Refinishing Paint Antitrust Litig., 358 F.3d 288, 298–99 (3d Cir. 2004); TruePosition, Inc. v. LM Ericsson Tel. Co., 844 F. Supp. 2d 571, 586 (E.D. Pa. 2012).  "Personal jurisdiction therein is not limited to the defendant's contacts with a particular federal judicial district or the forum state." Automotive Refinishing, 358 F.3d at 299.  Pursuant to such constitutional considerations, physical presence within the forum is not required to establish personal jurisdiction over a nonresident defendant.  IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998). Instead, personal jurisdiction may be based on either a defendant's general contacts or his specific contacts with the forum.  Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001).

Plaintiffs do not assert that the Court has general jurisdiction over RBH.[4]  Rather, they claim that RBH has minimum contacts with the United States, from which the present dispute

---

[4]    "General jurisdiction depends on a defendant having maintained 'continuous and systematic contacts' with the forum state."  D'Jamoos ex rel. Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 107 (3d Cir. 2009) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415–16 (1984)).  Proof of such contact requires a showing of extensive and pervasive activity in the forum state.  See Reliance Steel Prods. Co. v. Watson, Ess, Marshall, & Engass, 675 F.2d 587, 589 (3d Cir. 1982) (quotations omitted).

Nothing in the Amended Complaint allows any inference that RBH had continuous and systematic contacts with the United States such that the Court may exercise general jurisdiction over it.

arises, such that this Court's exercise of jurisdiction over it will not violate traditional notions of fair play and substantial justice.

A plaintiff may rely on "specific jurisdiction" where the cause of action is related to or arises out of the defendant's contacts with the forum. IMO Indus., 155 F.3d at 259 (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984)). Proper establishment of specific jurisdiction under the Due Process Clause requires satisfaction of a three-part test. Louis A. Grant, Inc. v. Hurricane Equip., Inc., No. 07-438, 2008 WL 892152, at *3 (W.D. Pa. Apr. 2, 2008). First, the plaintiff needs to show that the defendant has "constitutionally sufficient 'minimum contacts' with the forum." IMO Indus., 155 F.3d at 259 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)). Second, the plaintiff's claim must "arise out of or relate to those activities." Helicopteros, 466 U.S. at 414. Third, the reviewing court should consider additional factors to ensure that the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)); see also O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 317 (3d Cir. 2007) (enumerating the three elements of specific jurisdiction).

To satisfy the first two components of the specific jurisdiction test, the acts identified by plaintiff must be "such that [the defendant] should reasonably anticipate being haled into court [in the forum state]." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). The minimum contacts necessary to support specific jurisdiction exist only where the defendant "has purposefully directed its activities toward the residents of the forum state . . . or otherwise 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" IMO Indus., 155 F.3d at 259 (quoting

Hanson v. Denckla, 357 U.S. 235, 253 (1958) (other internal quotations omitted)). "This test is intended to protect a non-resident defendant from jurisdiction based on contacts that are 'random, fortuitous,' or 'attenuated,' or that result from the unilateral activity of another party or a third person." Pullman Fin. Corp. v. Hotaling, No. 07-1703, 2008 WL 2563372, at *4 (W.D. Pa. June 24, 2008) (quoting Burger King, 471 U.S. at 475). "[I]n the course of this necessarily fact-sensitive inquiry, the analysis should hew closely to the reciprocity principle upon which specific jurisdiction rests . . . . With each purposeful contact by an out-of-state resident, the forum state's laws will extend certain benefits and impose certain obligations . . . specific jurisdiction is the cost of enjoying the benefits." O'Connor, 496 F.3d at 323 (internal citations omitted). Contacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself. Id. Nonetheless, a "substantial connection" with a forum arising out of a "single act can support jurisdiction." Burger King, 471 U.S. at 475 n.18 (citing McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)).

Here, the Amended Complaint alleges that RBH is a British Corporation incorporated under the laws of England and Wales, with its registered office in Berkshire. (Id. ¶ 12.) RBH signed an agreement with American company MonoSol to develop the film version of Suboxone and bring it to market in the United States. (Am. Compl. ¶ 46.) In addition, "employees of [RBH] participated in discussion regarding the plan to remove Tablets from the market." (Id. ¶ 71.) While these allegations alone are insufficient to establish specific jurisdiction against RBH, Plaintiffs set forth—both in the remainder of the Amended Complaint and in exhibits attached to their response to the Motion to Dismiss—multiple additional contacts by RBH with the United States, as follows:

- RBH approved and paid for each stage of MonoSol's development of the Suboxone film in the United States, evaluated film samples for MonoSol, and provided MonoSol with

active ingredients, data, and information. (Decl. of Cheryl Lee Johnson ("Johnson Decl."), Ex. 1.)

- RBH worked on responses to the United States' concerns about buprenorphine's environmental impact. (Id., Exs. 4, 7.)

- RBH prosecuted patents on Suboxone in the United States Patent Office. (Id., Exs. 4, 7.)

- RBH secured at least four United States trademarks on the name Suboxone and the patient assistance program designed to coerce the switch from tablets to film. (Am. Compl. ¶ 12.)

- RBH scheduled meetings with the FDA and prepared filings to secure U.S. regulatory approval of the Suboxone film. (Id.; Johnson Decl. Exs. 7, 9, 11, 13, 15, 18, 19, 20.)

- RBH had numerous interactions with MonoSol in the United States via email and telephone, including weekly teleconferences, concerning the strength of MonoSol's patents, and timing, quality, and U.S. approval of Suboxone film. (Johnson Decl. Exs. 7, 9–15, 19.)

Taking these allegations as true and viewing inferences from the exhibits in the light most favorable to Plaintiffs, such contacts reflect efforts by RBH to purposefully avail itself of the privilege of doing business in the United States. While RBH itself may not have sold Suboxone film within the United States, it is alleged that RBH acted with both MonoSol and Indivior to have the products placed into a national distribution network. See LG.Phillips LCD Co., Ltd. v. Chi Mei Optoelectronics Corp., 551 F. Supp. 2d 333, 339 (D. Del. 2008) (finding specific jurisdiction when a company, although not directly selling products in the forum state, has acted to consistently place its products into a national distribution network where they eventually were sold in the forum state). I find that these contacts involving the development of Suboxone film are sufficient for the exercise of personal jurisdiction over RBH.

Moreover, at this juncture of the case, the exercise of jurisdiction "comport[s] with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476 (quoting Int'l Shoe, 326 U.S. at 320). The United States Supreme Court has identified five factors that courts should consider

when balancing jurisdictional reasonableness, including: (1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate and international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest for the several states in furthering fundamental substantive social policies.  O'Connor, 496 F.3d at 324 (citing Burger King, 471 U.S. at 477; Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987)).

RBH does not mention any of these factors or address how they weigh against the exercise of personal jurisdiction.  As Plaintiffs have demonstrated facts that support an exercise of personal jurisdiction, RBH's silence as to the constitutional considerations neglects its burden of "establish[ing] the presence of other considerations that would render personal jurisdiction unreasonable."  De Lage Landen, 2008 WL 4822033, at *3 (citing Carteret Sav. Bank v. Shushan, 954 F.2d 141, 150 (3d Cir. 1992)).  Accordingly, I decline to grant RBH's motion to dismiss for lack of personal jurisdiction.

## III.  MOTION TO DISMISS UNDER FEDERAL RULE 12(b)(6)

### A.  Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that

states a plausible claim for relief survives a motion to dismiss." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. <u>Id.</u>

The Third Circuit Court of Appeals has detailed a three-step process to determine whether a complaint meets the pleadings standard. <u>Bistrian v. Levi</u>, 696 F.3d 352 (3d Cir. 2014). First, the reviewing court outlines the elements a plaintiff must plead to state a claim for relief. <u>Id.</u> at 365. Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." <u>Id.</u> Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 679). The last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 679) (internal quotation marks omitted).

**B.** **<u>Discussion</u>**

RBH puts forth three general arguments in support of its Motion to Dismiss. First, it asserts that Plaintiffs' monopolization and attempted monopolization causes of action (Counts I and II) do not state a claim as to RBH. Second, it contends that Plaintiffs have not sufficiently stated a conspiracy claim (Counts III and IV) as to RBH. Finally, RBH alleges that all of Plaintiffs' state law claims (Count V) fail to plead plausible causes of action. I will address each argument individually.

### 1.    Monopolization and Attempted Monopolization Claims

Section 2 of the Sherman Act "makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce." Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 306 (3d Cir. 2007) (citing 15 U.S.C. § 2).  To succeed on a claim for actual monopolization under § 2, a party must prove:  "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." Id. at 307 (quoting U.S. v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)). A monopolization claim does not require proof of the specific intent to monopolize, demanding only proof of "a general intent to do the act, for no monopolist monopolizes unconscious of what he is doing." Times–Picayune Publ'g Co. v. United States, 345 U.S. 594, 626 (1953) (internal quotations and citations omitted).  Nonetheless, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) (emphasis in original).  This is so because the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993).  It is well established that "[i]n order to sustain their claims of monopolization and attempted monopolization, Plaintiffs must . . . prove the required elements against each individual defendant." In re Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d 683, 699 (E.D. Pa. 2007) (quotations omitted).

RBH contends that Plaintiffs have not plausibly pled either monopoly power or anticompetitive conduct.  Because I agree, I will dismiss Counts I and II against RBH.

a.      *Monopoly Power*

The first element of "monopoly power" is "the ability to control prices and exclude competition in a given market." Broadcom Corp., 501 F.3d at 307. Although monopoly power can be demonstrated through direct evidence, id., the "more common way that a party may prove monopoly power is by providing indirect evidence, which includes 'structural evidence of a monopolized market.'" Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co., 838 F.3d 421, 435 (3d Cir. 2016) (quoting Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374, 381 (3d Cir. 2005)). To support a claim of monopoly power through indirect evidence, a plaintiff must show that (1) the defendant had market power in the relevant market and (2) there were barriers to entry into the market. Id. The Third Circuit "generally require[s] a plaintiff alleging antitrust injury under Section 2 to show that [the] [d]efendant[] maintained a market share 'significantly larger than 55%' to establish antitrust liability." Id. at 437 (citations omitted).

Plaintiffs contend that the Amended Complaint adequately alleges RBH's possession of monopoly power in the relevant market. Plaintiffs press a "single economic entity" theory and posit that RBH and Indivior were, at the relevant time, sister companies under non-defendant RB Group. (Pls.' Resp. Opp'n Mot. to Dismiss 5 (citing Copperweld v. Independence Tube Corp., 467 U.S. 752, 770 (1984).) Because RBH controlled the production of Suboxone, held patents for film, and manufactured Suboxone tablets and the ingredients for the film, Plaintiffs assert that RBH directly possessed market power within the United States. (Am. Compl. ¶ 132 ("From 2002 until the present, Indivior Inc. . . . and [RBH] have possessed monopoly power in the relevant market of co-formulated buprenorphine/naloxone in the United States as owners or licensees to use Suboxone intellectual property, or their role in the development, manufacture, and sale of Suboxone.").)

Plaintiffs' argument relies on faulty assumptions that: (a) Indivior and RBH may be treated as a "single economic entity" and (b) their individual acts may be considered collectively for purposes of an antitrust claim. For this first proposition, Plaintiffs mistakenly rely upon the United States Supreme Court's decision in Copperweld v. Independence Tube Corp., 467 U.S. 752 (1984). In Copperweld, the Court only addressed the issue of whether a parent and its wholly owned subsidiary are capable of *conspiring* in violation of *Section 1* of the Sherman Act. Id. at 759. Rejecting the "intra-enterprise conspiracy doctrine," the Court stated that "the coordinated activity of a parent and its wholly-owned subsidiary must be viewed as a single enterprise for purposes of § 1 of the Sherman Act." Id. at 771. Importantly, Copperweld "did not address a parent corporation's liability under Section 2 of the Sherman Act." Climax Molybdenum Co. v. Molychem, L.L.C., 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005). In fact, the Court's rejection of the intra-enterprise conspiracy doctrine was based, in part, on the Court's understanding that liability under Section 1 was unnecessary because concerted anti-competitive activity of a parent and subsidiary could be reached under Section 2 of the Sherman Act. Id. (citing Copperweld, 467 U.S. at 777). Accordingly, Copperweld does not support Plaintiffs' argument that Indivior and RBH are a "single economic entity" for purposes of Section 2 liability.

The inapplicability of Copperweld also highlights Plaintiffs' second faulty assumption that the individual acts of Indivior may be imputed to RBH for purposes of an antitrust claim. I addressed a similar argument by the Class Action Plaintiffs against RB Group as the former parent company of Indivior f/k/a Reckitt. Quoting from the United States District Court for the District of Colorado's pronouncement in Climax Molybdenum Co. v. Molychem, L.L.C., I reasoned that:

> A Section 2 claim brought against a parent corporation based on anticompetitive activity occurring at the subsidiary level is sufficient if there are factual allegations showing that the subsidiary is the alter ego of the parent, . . . or showing independent conduct on the part of the parent. . . . "When the parent controls, dictates or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act."

In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig., 13-MD-2445, 2015 WL 12910728, at *3 (E.D. Pa. Apr. 14, 2015) (quoting Climax Molybdenum Co. v. Molychem, L.L.C., 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005) (internal citations omitted)). Adopting that standard, I concluded that "the degree of control necessary to attribute [Indivior's] market share to RBG [the parent company of Indivior and RBH] is pervasive domination. . . . [A]pproval and consent is not enough as these allegations reflect a typical parent-subsidiary relationship." Suboxone, 2015 WL 12910728, at *3. Ultimately, I held that the Class Action Plaintiffs "failed to allege that [RB Group] exercised sufficient control or pervasive domination over [Indivior] to support attributing [Indivior's] market power to [RB Group]." Id.

Applying that same standard here, the conclusion is even more clear-cut. RBH is simply a sister company to Indivior. The Amended Complaint does not contain a single allegation from which I can reasonably infer that RBH exercised any control or pervasive domination over Indivior. Absent such control, or at least some showing that the companies were alter egos, Indivior's market power cannot be attributed to RBH for purposes of establishing the first element of a Sherman Act § 2 claim.

Having rejected Plaintiffs' "single economic entity" theory and Plaintiffs' efforts to impute Indivior's actions to RBH, I must now inquire whether the Amended Complaint allows the plausible inference that RBH as an individual entity, separate and apart from Indivior,

possessed the requisite market power. The relevant market, as defined in the Amended Complaint is the co-formulated buprenorphine/naloxone market in the United States and its territories. (Am. Compl. ¶¶ 19, 21.) Plaintiffs contend that before October 8, 2009, Suboxone was the only co-formulated buprenorphine/naloxone opioid treatment because of its orphan drug status, thereby allowing "Reckitt"—defined as including Indivior, Indivior PLC, and RBH—to enjoy 100 percent of the market share in the United States and its territories. (Id. ¶ 22.) Plaintiffs point out that even after the exclusivity period expired, "Reckitt"-branded Suboxone products, including the film introduced in September 2010, remained the sole source of buprenorphine/naloxone until two generic manufacturers introduced generic tablets in March 2013. (Id.)

As noted above however, allegations that the "Reckitt" entities collectively maintained monopoly power are insufficient to establish that RBH individually maintained the requisite monopoly power. See In re Wellbutrin XL Antitrust Litig., No. 08-2431, 2009 WL 678631, at *7 (E.D. Pa. Mar. 13, 2009) (dismissing claims against the producer of a drug and allowing the monopolization claims to proceed against the distributor because the complaint specifically alleged that the distributor alone "was able to maintain 100% control of the U.S. market for" the drug); see also United Food and Com. Workers Loc. 1776 & Participating Employers Health and Welfare Fund v. Teikoku Pharma USA, Inc., 74 F. Supp. 3d 1052, 1077 (N.D. Cal. 2014) (holding that a monopolization claim could not stand against two defendants referred to collectively in the complaint where only one marketed and sold the product at issue in the United States, while the other defendant simply manufactured the product in Japan).

In an effort to cure this deficiency, Plaintiffs assert that RBH manufactures Suboxone tablets and the ingredients for Suboxone film, and that RBH contracted with MonoSol to develop

the film and obtain patents relative to the film.  (Pls.' Resp. Opp'n Mot. to Dismiss 6 (citing Am. Compl. ¶ 12).)  Plaintiffs do not allege that RBH held the primary patents over the tablets and the film or controlled production of the film.  Indeed, the Amended Complaint is devoid of any allegations that RBH sold Suboxone in any form in the United States or participated in the United States market in any respect such that it could maintain monopoly power.

As possession of monopoly power is a required element for a claim of monopolization, a Sherman Act § 2 claim against RBH cannot survive.

### b. *Anticompetitive Conduct*

Even assuming that Plaintiffs could establish that RBH had monopoly power, their Section 2 claim against RBH would still fail because they have not adequately pled that RBH individually engaged in any anticompetitive conduct.  Under the "rule of reason" burden-shifting framework set forth by the D.C. Circuit in United States v. Microsoft Corp., the party seeking to impose antitrust liability must initially provide evidence of the anticompetitive nature of a defendant's conduct.  253 F.3d 34, 58–59 (D.C. Cir. 2001).  Once the plaintiff has met its burden of pleading or establishing the anticompetitive nature of a defendant's conduct, the burden shifts to the defendant to proffer a "nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal."  Id. at 59; see also Mylan Pharms., 838 F.3d at 438.  The plaintiff may then "either rebut those justifications or demonstrate that the anticompetitive harm outweighs the procompetitive benefit."  Id. (quoting Microsoft Corp., 253 F.3d at 58–59) (internal quotation marks omitted).

In general terms, "a firm engages in anticompetitive conduct when it attempts 'to exclude rivals on some basis other than efficiency' or when it competes 'on some basis other than the

merits.'" W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 108 (3d Cir. 2010),

(quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985) and

LePage's, Inc. v. 3M, 324 F.3d 141, 147 (3d Cir. 2003)).  "Conduct that impairs the

opportunities of rivals and either does not further competition on the merits or does so in an

unnecessarily restrictive way may be deemed anticompetitive." Broadcom Corp., 501 F.3d at

308.  Mere harm to competitors will not suffice; rather the alleged exclusionary acts must harm

the competitive process and must actually have the requisite anticompetitive effect. Microsoft

Corp., 253 F.3d at 58.  "The challenge for an antitrust court lies in stating a general rule for

distinguishing between exclusionary acts, which reduce social welfare, and competitive acts,

which increase it." Id.

　　　Here, the Amended Complaint alleges that RBH executed the initial contract with

MonoSol in December 2006, which in turn "initiated the joint venture to create and manufacture

Suboxone Film."  (Am. Compl. ¶ 12.)  It also alleges that RBH engaged in various activities

geared toward furthering the ultimate launch of Suboxone film including ensuring the regulatory

approval, manufacturing and supplying the ingredients, trademarking the names, obtaining

patents, and addressing safety concerns.  (Id.)  RBH's only other role in the alleged

anticompetitive scheme was "participat[ing] in discussions regarding the plan to remove Tablets

from the market." (Id. ¶ 71.)

　　　Even viewing all of these allegations as true, RBH's actions cannot be deemed to rise to

the level of anticompetitive conduct.  "As a general rule, 'any firm, even a monopolist, may . . .

bring its products to market whenever and however it chooses.'" Steamfitters Local Union No.

420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 925 n.7 (3d Cir. 1999) (quoting Berkey

Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 286 (2d Cir. 1979)).  Indeed, "neither product

withdrawal nor product improvement alone is anticompetitive." New York ex rel Schneiderman v. Actavis PLC ("Namenda"), 787 F.3d 638, 653–54 (2d Cir.), cert. dismissed, 136 S. Ct. 581 (2015). The introduction of new products may become anticompetitive where "a pharmaceutical company makes modest reformulations to a brand name drug prior to the expiration of its market exclusivity for the purposes of stymieing generic competition and preserving monopoly profits." In re Suboxone Antitrust Litigation, No 13-2445, 2016 WL 3519618, at *1 (E.D. Pa. June 28, 2016). But in order for such "product hopping" to be illegal, a monopolist must "*combine[]* product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits." Namenda, 787 F.3d at 654 (emphasis in original) (internal citations omitted).

While the Amended Complaint alleges RBH's participation in the first part of an illegal product-hopping scheme—development and introduction of a new product—those acts alone are not exclusionary. The Amended Complaint lacks allegations setting forth RBH's participation in any other anticompetitive conduct, such as falsely disparaging the safety of the tablets, coordinating the removal of the tablets from the market to effectuate a "hard switch" from the legacy product to the new product, filing a sham citizen petition against the generic manufacturers, or engaging in other activity to delay the entry of generics into the market. Plaintiffs' effort to impute Indivior's conduct to RBH by including it in the collective entity known as "Reckitt,"—merely as a result of the alleged corporate relationship between the two entities—is not only factually unsupported by the Amended Complaint, but again is legally impermissible. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 341 n.44 (3d Cir. 2010) ("As a matter of well-settled common law, a subsidiary is a distinct legal entity and is not liable for the actions of its parent or sister corporations simply by dint of the corporate relationship.").

###### 2. Conspiracy Claims

Counts III and IV of the Amended Complaint allege a conspiracy between the Reckitt Defendants and MonoSol to monopolize under Sherman Act § 2 and to restrain trade under Sherman Act § 1 respectively. A Section 2 conspiracy claim has four elements: (1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged. Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 253 (3d Cir. 2010) (citing United States v. Yellow Cab Co., 332 U.S. 218, 224–25 (1947); Am. Tobacco Co. v. United States, 328 U.S. 781, 788, 809 (1946)). "A plaintiff asserting a Section 1 claim also must allege four elements: '(1) concerted action by the defendants; [(2)] that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.'" Id. (quoting Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir. 2005)).

"To prevail on a section 1 claim or a section 2 conspiracy claim, a plaintiff must establish the existence of an agreement, sometimes also referred to as a 'conspiracy' or 'concerted action.'" W. Penn Allegheny Health System, Inc. v. UPMC, 627 F.3d 85, 99 (3d Cir. 2010) (quoting Twombly, 550 U.S. at 553; Gordon, 423 F.3d at 207 & n.16). "An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." Id. (citing Copperweld, 467 U.S. at 771 (1984); Howard Hess, 602 F.3d at 254; Gordon, 423 F.3d at 208). To plead an agreement, a plaintiff may allege direct or circumstantial evidence, or a combination of the two. Id. "If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled." Id.

Here, the allegations regarding RBH and its participation in concerted action are sparse at best. The Amended Complaint states that after meeting in December 2006, MonoSol and RBH signed a development agreement granting Reckitt the right to use MonoSol's patented sublingual film technology to manufacture Suboxone in a film version and bring it to market "for the purpose of extending Reckitt's exclusivity in the co-formulated buprenorphine/naloxone market." (Am. Compl. ¶¶ 46, 150.) Thereafter, when MonoSol made the initial suggestion that withdrawal of Suboxone tablets could provide further protection from generic incursion, "employees of [RBH] participated in discussions regarding the plan to remove Tablets from the market."[5] (Id. ¶ 71.)

Neither of these allegations suffice to plead an actionable antitrust conspiracy against RBH. Taking the latter allegation first—RBH employees' participation in discussions regarding the removal of tablets from the market—such an assertion does not rise to the level of an agreement. The Third Circuit has held that the "allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act." Garshman v. Univ. Res. Holding Inc., 824 F.2d 223, 230 (3d Cir. 1987). Rather, as noted above, "[a]n agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." W. Penn Allegheny, 627 F.3d at 99; see also VI Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1402b (noting that courts may infer agreements among non-competitors where there is "an unambiguously express promise on the point of the challenged action, usually for a quid pro

_____

[5] Notably, the Amended Complaint does not allege a conspiracy between RBH and Indivior, and Plaintiffs concede that, under Copperweld, these two sister companies could not engage in a conspiracy for antitrust purposes. (Pls.' Resp. Opp'n. Mot. to Dismiss 8.)

quo."). The simple allegation that RBH "participat[ed] in discussions" among unnamed entities regulating a plan to remove tablets does not allow a reasonable inference that RBH entered into any agreement with MonoSol to do so.[6] Indeed, at no point does the Amended Complaint allege even an informal promise or understanding between MonoSol and RBH specifically to remove tablets.[7]

As to the allegation that RBH and MonoSol entered into a development agreement to create Suboxone film and bring it to market, this assertion does not describe any illegal, concerted antitrust activity. "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). The Sherman Act only prohibits conspiracies that unreasonably restrain trade. In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 315 (3d Cir. 2010). As I previously explained, "simply introducing a new product on the market, whether it is a superior product or not, does not, by itself, constitute exclusionary conduct." In re Suboxone, 64 F. Supp. 3d 665, 682 (E.D. Pa. 2014). "Product innovation generally benefits consumers and inflicts harm on competitors, so courts look for evidence of

---

[6]    In their opposition brief, Plaintiffs allege that "RBH, with the help of MonoSol, an independent company, also engaged in a plan to withdraw Tablets from the market—to ensure generic manufacturers were unable to compete upon market entry." (Pls.' Resp. Opp'n Mot. to Dismiss 10.) The Amended Complaint, however, only states that RBH "participated in discussions" regarding the removal of the tablets. (Am. Compl. ¶¶ 71, 118.) Such pleading does not amount to an allegation that MonoSol and RBH had any type of express plan or agreement. Plaintiffs may not now supplement their Amended Complaint with their briefing.

[7]    Plaintiffs allege that "at the motion to dismiss stage[,] allegations need not make any unlawful agreement 'more likely than independent action nor need they rule out the possibility of independent action.'" (Pls.' Resp. Opp'n Mot. to Dismiss 10 (quoting Evergreen Partnering Group, Inc. v. Pactiv Corp., 720 F.3d 33, 47 (1st Cir. 2013).) While it is true that the determination of the motives behind alleged actions is improper at the motion to dismiss stage, the allegations of the complaint must, at minimum, allow the inference of concerted action done for an illegal anticompetitive purpose.

'exclusionary or anticompetitive effects' in order to 'distinguish between conduct that defeats a competitor because of efficiency and consumer satisfaction' and conduct that impedes competition through means other than competition on the merits." Namenda, 787 F.3d at 652 (some internal quotation marks omitted). While RBH's agreement with MonoSol to develop the film may have been one step in the broader product-hopping scheme perpetuated by Indivior, the Amended Complaint does not allege RBH's participation in any other exclusionary activity that could render its agreement with MonoSol an unlawful antitrust conspiracy.

In an effort to bolster the minimal allegations against RBH individually, Plaintiffs again attempt to group RBH in with its sister company of Reckitt Benckiser Pharmaceuticals (now Indivior), referring to them jointly as "Reckitt," and argue that the illegal conspiracy was between MonoSol and "Reckitt." (Pls.' Resp. Opp'n Mot. to Dismiss 8.) But again, such collective pleading is insufficient to impute the actions of Indivior to RBH. The Third Circuit has rejected efforts to hold multiple defendants liable under a conspiracy claim where the complaint's allegations lump defendants together by nature of their corporate relationship, but set forth specific facts as to only some defendants. Ins. Brokerage Antitrust Litig., 618 F.3d at 341 n.44 (citing 1 William Meade Fletcher, Cyclopedia of Law of Private Corporations § 33, at 89 (perm. ed. rev. vol. 2006) (observing that "the mere fact that there exists a parent-subsidiary relationship between two corporations [does not] make the one liable for the torts of its affiliates")). Plaintiffs do not suggest that RBH played any role in the disparagement of Suboxone tablets, the filing of the citizen petition, or the other delay tactics used to thwart generic entry. Therefore, I will grant RBH's motion to dismiss the conspiracy claims against it.

3. **State Law Claims**

In the final portion of its motion to dismiss, RBH asserts that the antitrust and consumer protection state law claims against it must be dismissed for two reasons. First, because each of the state antitrust laws at issue is interpreted consistently with federal antitrust laws, those claims must be dismissed for the same reasons as the federal antitrust claims. Second, RBH contends that Plaintiffs have improperly used state consumer protection statutes and unfair trade practices to reassert deficient federal antitrust claims.

a. *State Antitrust Claims*

RBH first contends that the thirty-five state antitrust laws at issue are either explicitly aligned or interpreted consistently with federal antitrust laws, meaning that Plaintiffs' failure to state viable federal antitrust claims against it is fatal to the corresponding state antitrust claims. In response, Plaintiffs assert that ten of the States' antitrust laws—those from Wisconsin, North Carolina, Utah, Vermont, New York, California, Kansas, Iowa, Maine, and Connecticut—differ from federal law and require a separate analysis.

Plaintiffs' argument, however, rests on a string cite of cases that do nothing more than reaffirm that the state antitrust laws exist independently of the Sherman Act. These state antitrust laws, however, continue to be consistently interpreted in parallel, if not identically, with the Sherman Act. See Ut. St. § 76-10-3118 ("The Legislature intends that the courts, in construing th[e] [Utah Antitrust Act], will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."); In re Tamoxifen Citrate Antitrust Litig., 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) (holding that since the plaintiffs failed to state a claim under the Sherman Act, "and since the state antitrust law claims [including claims under California and Kansas law] are based on

the same allegations," those claims must also be dismissed), aff'd, 466 F.3d 187 (2d Cir. 2006);

Yankees Entm't and Sports Network, LLC v. Cablevision Sys. Corp., 224 F. Supp. 2d 657, 677 (S.D.N.Y. 2002) ("The [Donnelly] Act was closely patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act.");

Microsoft Corp. v. Computer Support Servs. of Carolina, Inc., 123 F. Supp. 2d 945, 955 (W.D.N.C. 2000) ("[B]ecause the North Carolina antitrust statutes track the language of the Sherman Act, the North Carolina Supreme Court has described the Sherman Act as 'instructive in determining the full reach' of the statutes.") (quoting Rose v. Vulcan Materials Co., 194 S.E.2d 521, 530 (N.C. 1973)); Lerma v. Univision Commc'n, Inc., 52 F. Supp. 2d 1011, 1016 (E.D. Wis. 1999) ("Wisconsin courts have held that the state version is generally controlled by federal court decisions regarding the Sherman Act."); Davies v. Genesis Med. Ctr. Anesthesia & Analgesia, P.C., 994 F. Supp. 1078, 1103 (S.D. Iowa 1998) ("When interpreting Iowa antitrust statutes, Iowa courts are required by section 553.2 to give considerable weight to federal cases construing similar sections of the Sherman Act.") (citing Neyens v. Roth, 326 N.W.2d 294, 297–98 (Iowa 1932)); Tri-State Rubbish, Inc. v. Waste Mgt., Inc., 998 F.2d 1073, 1081 (1st Cir. 1993) ("The Maine antitrust statutes parallel the Sherman Act."); Miller's Pond Co., LLC v. City of New London, 873 A.2d 965 (Conn. 2005) (holding that when interpreting the Connecticut antitrust law, the courts will follow federal precedent "unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently."); Carter v. Gugliuzzi, 716 A.2d 17, 21 (Vt. 1998) (holding that in construing the Vermont Consumer Fraud Act, the state looks to the interpretations accorded federal antitrust laws).[8]

---

[8]     The sole exception to this ruling is the claim brought under Connecticut General Statute §§ 35-28 and 35-29. "Section 35–28 has no specific counterpart in the federal antitrust statutes but is a codification of federal case law concerning 'per se' violations of the Sherman Act, 15

In light of these cases, Plaintiffs' state antitrust claims premised on the identical actions that form the basis of the Sherman Act claims are similarly deficient. Therefore, for the same reasons I dismissed the Sherman Act claims against RBH, I dismiss the state law antitrust claims against RBH.[9]

        *b.*    *State Unfair Trade Practices/Consumer Protection Statute Claims*

RBH's final argument contends that all of the state unfair trade practices claims must be dismissed. It reasons that each of the identified unfair trade practices/consumer protection statutes asserted mirror and are construed consistently with Section 5 of the FTC Act, which is analyzed under the same principles as Sherman Act claims. In turn, RBH argues that courts in antitrust cases have dismissed "tagalong claims" based on the same factual allegations under state unfair practices/consumer protection statutes where the complaint failed to state a federal antitrust claim.

To the extent the state laws are commensurable with federal antitrust law and the Amended Complaint's allegations are insufficient to state a federal cause of action, the state law

---

U.S.C. § 1 et seq." Bridgeport Harbour Place I, LLC v. Ganim, 958 A.2d 210, 216 (Conn. App. 2008), aff'd, 32 A.3d 296 (Conn. 2011). General Statute § 35-29 is patterned after § 3 of the Clayton Act, a federal statute not raised by the Amended Complaint. State v. Hossan-Maxwell, Inc., 436 A.2d 284, 288 (Conn. 1980).

Nevertheless, the Connecticut legislature has explicitly directed that the judiciary should be guided by interpretation of federal antitrust statutes, providing that: "It is the intent of the General Assembly that in construing sections 35–24 to 35–46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes." Conn. Gen. Stat. § 35-44b; see also Miller's Pond, 873 A.2d at 978. To the extent Plaintiffs allege that a particular action by RBH violated a unique provision of the Connecticut antitrust statute, the burden fell on Plaintiffs to articulate, in the Amended Complaint, the elements of that provision and RBH's violations. They have failed to do so.

[9]     Plaintiffs do not contend that the state antitrust laws not specifically addressed in their brief differ from the Sherman Act analysis. Therefore, I dismiss those claims as well.

claims must also be dismissed. Multiple courts have dismissed state consumer protection and unfair trade practices claims that simply mirror deficient federal antitrust laws. See, e.g., In re Aluminum Warehousing Antitrust Litig., MDL No.13-2481, 2014 WL 4743425, at *1 (E.D. Pa. Sept. 15, 2014) (dismissing twenty-nine state law consumer protection, unfair competition, and unfair trade practices claims for the same reason that the claims relied on the same allegations that were deficient to state Sherman Act and Clayton Act claims); In re Tamoxifen Citrate Antitrust Litig., 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) (dismissing twenty-one state law consumer protection and unfair competition claims where the claims track the allegations underlying the deficient federal antitrust claims), aff'd, 466 F.3d 187 (2d Cir. 2006); R.J. Reynolds Tobacco Co. v. Philip Morris, Inc., 199 F. Supp. 2d 362, 396 (M.D.N.C. 2002) ("Because Plaintiffs do not allege any facts that suggest that Defendant's conduct is unlawful beyond the conduct that is the basis for their failed federal claims, Plaintiffs' state common law and statutory claims fail as well."), aff'd, 67 F. App'x 810 (4th Cir. 2003).

Plaintiffs do not seem to contest this point, but rather argue that the state consumer protection law claims are not co-extensive with either the Sherman Act or the FTC Act, and most go beyond condemnation of unfair methods of competition to include prohibitions on unfair or deceptive conduct. Plaintiffs further contend that many of their state law claims are based on plausible allegations of fraud and/or deception, including that "Reckitt" (1) voiced unfounded safety concerns about the tablets in order to convince prescribers and payors that Suboxone film was safer; (2) issued a press release advising the public and prescribing physicians that it intended to withdraw tablets from the market due to the pediatric safety issue; and (3) represented to the FDA and Buprenorphine Products Manufacturers Group that it would

cooperate in the shared REMS process, even though it never intended to, for the sole purpose of delaying generic approval. (Pls.' Resp. Opp'n 15.)

The flaw in Plaintiffs' argument is two-fold. First, Plaintiffs again attempt to premise liability against RBH by grouping it in with its sister corporation Indivior. Plaintiffs' claims about "Reckitt" voicing unfounded safety concerns about tablets, issuing misleading press releases, and misrepresenting a willingness to cooperate in the shared REMS process are actions taken by Indivior and, as noted above, not attributable to RBH merely as a result of their corporate relationship.[10] The limited conduct ascribed specifically to RBH includes:

> [T]he execution of the initial contract with MonoSol Rx, LLC in December 2006 that initiated the joint venture to create and manufacture Suboxone Film. [RBH] also established the parameters for the timing of the launch and the formulation of Suboxone film, gathers, and investigates all consumer complaints as to Suboxone products, trademarked the names for the financial programs to encourage the switch from Suboxone tablets to film, and obtained patents together with MonoSol related to Suboxone film development. [RBH] monitored the taste and quality of Suboxone film, prepared materials for regulatory approval of Suboxone film, manufactured and supplied the ingredients for Suboxone film, and provided grants for the study of Suboxone.

(Am. Compl. ¶ 12; see also id. ¶ 46.) Further, employees of RBH are alleged to have "participated in discussions regarding the plan to remove Tablets from the market." (Id. ¶ 71.) None of these activities give rise to any fraud or deception on the part of RBH.

Second, Plaintiffs fail to identify any activities by RBH, aside from those set forth in support of the federal antitrust claims, that would invoke liability under any of the identified state

---

[10] Indeed, any effort by Plaintiffs to impute conduct to RBH by grouping it in under the name "Reckitt" is disingenuous, as evidenced by their personal jurisdiction argument. When describing RBH's contacts with the United States in an effort to establish specific jurisdiction, Plaintiffs make no mention of any of the allegedly fraudulent conduct such as issuing press releases in the U.S., disparaging tablets in the U.S., or false participation in the shared REMS process in the U.S.

statutes. While Plaintiffs tout the distinctions among the various states' laws, each of the state law claims in the Amended Complaint follows the same format of "repeat[ing] and realleg[ing] every preceding allegation" and then adding the conclusory statement that the "[t]he aforementioned practices by Defendants," are in violation of a particular state law. (Am. Compl. ¶¶ 166–297.) "The complaint does not contain specific reference to the various state standards under which the claims are made or tailor facts to suit the '*significant* differences among States' consumer protection laws." Avenarius v. Eaton Corp., 898 F. Supp. 2d 729, 739 (D. Del. 2012) (quoting Thompson v. Jiffy Lube Int'l Inc., 250 F.R.D. 607, 625 (D. Kan 2008)) (emphasis in original). "Several courts have held that merely listing statutes that could provide possible causes of action without explaining even the broadest contours of how those statutes were violated 'is insufficient to state a claim.'" Aluminum Warehousing, 2014 WL 4743425, at *1 (quoting In re Trilegiant Corp., No. 12-00396, 2014 WL 1315244, at *35 (D. Conn. Mar. 28, 2014)) (further quotations omitted); see also McGarvey v. Penske Auto Grp., Inc., 639 F. Supp. 2d 450, 465 (D.N.J. 2009) (granting motion to dismiss state consumer fraud acts claim for relief because "[p]laintiffs do not even set forth the elements of the fifteen causes of action they assert . . . or explain how the fifteen listed statutes apply to the facts of this case"), vacated in part on other grounds on reconsideration, No. 08–5610, 2010 WL 1379967 (D.N.J. Mar. 29, 2010).

Peeling away the allegations that are no more than legal conclusions, I find that the state law claims contain no well-pled factual allegations that could plausibly give rise to an entitlement to relief against RBH under the state consumer protection and unfair competition statutes. Accordingly, I will dismiss all of these state law claims against RBH.

## IV.    CONCLUSION

While the Amended Complaint sets forth a plausible product-hopping scheme and related conspiracy claims, it fails to properly attribute any of the allegedly illegal conduct to RBH.  RBH cannot be held liable simply due to its former corporate relationship to Indivior. In light of the foregoing, I grant RBH's Motion to Dismiss in its entirety and dismiss all claims against it.