# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| **IN RE SUBOXONE (BUPRENORPHINE** | : | **MDL NO. 2445** |
| **HYDROCHLORIDE AND NALOXONE)** | : | **13-MD-2445** |
| **ANTITRUST LITIGATION** | : | |
| | : | |
| **THIS DOCUMENT RELATES TO:,** | : | |
| | : | |
| Wisconsin, et al. v. Indivior Inc. et al. | : | |
| Case No. 16-cv-5073 | : | |
| | : | |
| **STATE OF WISCONSIN** | : | |
| **By Attorney General Brad D. Schimel, et al.** | : | |
| | : | **CIV. A. NO. 16-5073** |
| **Plaintiffs,** | : | |
| **v.** | : | |
| | : | |
| **INDIVIOR INC. f/k/a RECKITT BENCKISER** | : | |
| **PHARMACEUTICALS, INC., et al.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**Goldberg, J.**                                                                 **October 25, 2017**

## MEMORANDUM OPINION

The Defendants in the present litigation—Indivior Inc., f/k/a Reckitt Benckiser

Pharmaceuticals, Inc.; Reckitt Benckiser Healthcare (UK) Ltd.; Indivior PLC; and MonoSol Rx,

LLC—each play some role in the manufacture, production, and/or sale of Suboxone, a

medication that combines naloxone and buprenorphine to treat opioid addiction. Plaintiffs[1] have

brought suit against Defendants alleging violations of federal and state antitrust statutes and state

---

[1]    Plaintiffs are a collection of states, including the States of Wisconsin, Alabama, Alaska,
Arkansas, California, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Iowa, Kansas,
Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New York,
North Carolina, Ohio, Oklahoma, Rhode Island, South Carolina, Tennessee, Utah, Vermont,
and Washington; the Commonwealths of Kentucky, Massachusetts, Pennsylvania, and Virginia; and
the District of Columbia, by their Attorneys General (collectively, "Plaintiffs" or "States").

unfair trade and consumer protection laws. Defendant Indivior PLC ("I-PLC") now moves to dismiss all claims against it due to its non-involvement in any of the alleged anticompetitive activity in the Amended Complaint. For the following reasons, I will grant the motion in its entirety.

## I.    FACTUAL BACKGROUND

### A.    <u>Conduct Underlying the Litigation</u>

The Amended Complaint alleges that Defendants, primarily Indivior, Inc. ("Indivior") f/k/a Reckitt Benckiser Pharmaceuticals, Inc. ("RBPI"), engaged in a "product hopping" scheme designed to prevent or delay less expensive generic versions of its drug Suboxone from entering the market in order to preserve their profits from the sale of Suboxone. (Am. Compl. ¶ 45.) The alleged scheme began when Indivior, faced with the impending loss of market exclusivity on its Suboxone tablet, developed a new "film" version of Suboxone which would not be AB-rated, or pharmaceutically equivalent, with a generic version of the Suboxone tablet. In conjunction with both Defendant Reckitt Benckiser Healthcare (UK) Ltd. and Defendant MonoSol Rx, Indivior then launched the sale of the film in 2010, while simultaneously taking steps to (a) convert the market's prescription base from tablets to film and (b) delay the entry of generic tablets by refusing to participate in a joint REMS safety program and filing a baseless citizen petition. (Id. ¶¶ 46, 70, 77, 89.) Ultimately, the FDA did not approve the first generic alternatives to Suboxone tablets until February 2013, and the generics were initially marketed to the public in March 2013.[2] (Id. ¶¶ 114–15.)

---

[2]    For a more comprehensive statement of the factual allegations underlying this lawsuit, I incorporate by reference my opinion in <u>In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.</u>, No. 16-5073, 2017 WL 3967911, at *1–6 (E.D. Pa. Sept. 8, 2017). For purposes of the present motion, however, I focus solely on I-PLC and the facts relevant to the issues before me.

## B.    The Formation of I-PLC

Understanding the corporate transactions, mergers, and demergers involving the various Defendants is necessary to the resolution of this motion. The following background facts regarding these transactions and where Moving Defendant I-PLC fits within the corporate structure are gleaned from the Amended Complaint.

Moving Defendant I-PLC is a British corporation engaged in the development, manufacture, and sale of Suboxone throughout the United States. (Am. Compl. ¶ 13.) It is the parent company of, and wholly owns, Defendant Indivior. (Id. ¶ 11.) I-PLC was originally formed in 2014 as a new company. (Id. ¶ 13.)

Prior to I-PLC's existence, an entity known as Reckitt Benckiser Group PLC ("RB Group") owned both Defendant RBPI and co-Defendant Reckitt Benckiser Healthcare (UK) Ltd. ("RBH"). In December 2014, RB Group sold the assets of RBPI to Moving Defendant I-PLC via a demerger agreement. By the terms of the sale, the ownership of all assets and operations related to the production of Suboxone was transferred to I-PLC. (Id. ¶¶ 11, 13.) After the sale, RBPI continued to exist as an entity, but changed its name to Indivior, Inc.[3] (Def. I-PLC's Mot. to Dismiss, ECF No. 139, Ex. 1.)[4] Indivior is presently a wholly-owned subsidiary of I-PLC.

The Amended Complaint alleges that I-PLC currently holds itself out as the manufacturer of Suboxone and describes itself as the successor company to RBPI, which was the company that manufactured Suboxone during the period of time when most of the relevant conduct occurred.

---

[3]    To avoid confusion as to the appropriate defendant, I will refer only to "Indivior" instead of "Reckitt."

[4]    On a motion to dismiss, I can consider any documents of which a court may take judicial notice. Winer Family Trust v. Queen, 503 F.3d 319, 328–29 (3d Cir. 2007). Courts may take judicial notice of any public disclosure documents filed by a corporation with the Securities and Exchange Commission. Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000).

(Am. Compl. ¶ 13.)  I-PLC has many directors who were formerly directors of RBPI and are now directors of Indivior.  (Id.)  Moreover, I-PLC and Indivior Inc. inherited RBPI's customers and work orders.  (Id.)

### C.    Public Record Evidence About I-PLC

The following is based upon documents attached to I-PLC's Motion to Dismiss.

The intent behind the demerger agreement was for RB Group to "demerge its interest in the Indivior Business" and give it to the newly-created I-PLC.  (Declaration of Utah Assistant Attorney General Mark Christensen ("Christensen Decl."), ECF No. 167-1, Ex. A.)  As a condition of the demerger, I-PLC expressly agreed to indemnify RB Group for any losses "suffered or arising, directly or indirectly, from or in consequence of any of the Indivior Business Liabilities," including liabilities "incurred by Indivior or any Indivior Group Company . . . associated with the Indivior Business, whether or not in the ordinary course of business . . . and whether arising out of circumstances existing prior to" the demerger.  (Id., Ex. A, at pp. 53–54.)

I-PLC's 2014 Annual Report and Financial Statements, 2015 Annual Report and Financial Statements, and 2016 SEC Form 20-F reflect that the production, marketing, and distribution of Suboxone have been done by some member of the Indivior group of companies.  (Id., Exs. A, C, D.)  I-PLC's financial statements suggest that it has taken over the operation of the Suboxone business that formerly belonged to RB Group.  (Id., Ex. C, at pp. 71, 74.)

Finally, the 2015 PLC Annual Report reveals that ten of the eleven members of the I-PLC Executive Committee previously held similar jobs at RBPI.  (Id., Ex. D, at pp. 56–57.)  Plaintiffs suggest that the "brain trust" that ran RBPI during the period prior to March 2013 became the I-PLC Executive Committee after the demerger.  (Pls.' Resp. Opp'n Mot. to Dismiss 9.)

**D.** **Procedural History**

In June 2013, several putative classes initiated litigation against Defendants alleging anticompetitive behavior with respect to the marketing and sale of Suboxone. These cases were consolidated into a multi-district litigation ("MDL") assigned to this Court. Among those cases was the class action complaint brought by Direct Purchaser Plaintiffs and End-Payor Plaintiffs alleging that Defendants unlawfully delayed and impeded competition from generic versions of Suboxone tablets, resulting in ongoing overpayments by consumers. On December 3, 2014, I issued an opinion dismissing one of the Direct Purchaser Plaintiffs' stand-alone antitrust claims, a variety of state law claims by the End-Payor Plaintiffs, and claims against several of the other Defendant entities. In re Suboxone, 64 F. Supp. 3d 665 (E.D. Pa. 2014). I allowed the remaining federal and state law claims to proceed.

On December 23, 2015, Amneal Pharmaceuticals LLC ("Amneal"), a generic manufacturer and competitor of Indivior, filed a complaint regarding Indivior's alleged anticompetitive conduct with respect to Suboxone. That case was consolidated with the MDL currently before me. On January 4, 2017, I dismissed part of Amneal's claims that Indivior improperly delayed entry of generic tablets, all claims against Reckitt Benckiser Pharmaceuticals, Inc., and all claims against Indivior PLC. In re Suboxone, 13-MD-2445, 2017 WL 36371 (E.D. Pa. Jan. 4, 2017).

On September 22, 2016, the Plaintiff States initiated the current litigation against Defendants. The States filed a First Amended Complaint on November 23, 2016, setting forth five causes of action as follows: (1) monopolization under the Sherman Act § 2 against Indivior, I- PLC, and RBH; (2) attempted monopolization under the Sherman Act § 2 against Indivior, I-PLC, and RBH; (3) conspiracy to monopolize under the Sherman Act § 2 against all Defendants;

(4) illegal restraint of trade under the Sherman Act § 1 against all Defendants; and (5) individual state law claims against all Defendants. On September 8, 2017, I denied Indivior's Motion to Dismiss these claims and found that the Amended Complaint adequately alleged an anticompetitive product-hopping scheme and related conspiracy by Indivior. In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig., No. 16-5073, 2017 WL 3967911, at *1–6 (E.D. Pa. Sept. 8, 2017). Subsequently, on October 17, 2017, I granted RBH's Motion to Dismiss in its entirety. In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig., No. 16-5073, 2017 WL 4642285 (E.D. Pa. Oct. 17, 2017).

On December 12, 2016, I-PLC filed the motion to dismiss currently before me urging that, as an entity formed after the operative events, it bears no liability for the anticompetitive conduct described in the Amended Complaint. The States responded on January 30, 2017, and RBH filed a reply brief on February 21, 2017.

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.

The United States Court of Appeals for the Third Circuit has detailed a three-step process to determine whether a complaint meets the pleadings standard. Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014). First, the court outlines the elements a plaintiff must plead to state a claim for relief. Id. at 365. Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." Id. Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 679). The last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (quoting Iqbal, 556 U.S. at 679).

## III. DISCUSSION

The gist of I-PLC's Motion to Dismiss is that I-PLC did not come into existence as an entity until 2014—well after the alleged anticompetitive conduct that occurred between 2007 and 2013. In response, Plaintiffs offer six theories of liability against I-PLC: (1) the Amended Complaint asserts plausible direct claims against I-PLC for its anticompetitive conduct that continues to the present; (2) the Amended Complaint validly asserts that I-PLC joined the Suboxone film conspiracy; (3) I-PLC is the "successor" to RB Group and is therefore liable for RB Group's alleged misconduct; (4) I-PLC is estopped from denying its role in the Suboxone film conspiracy; (5) Indivior Inc. is I-PLC's alter ego; and (6) I-PLC is liable for the acts of its agent, Indivior Inc. Addressing each argument individually, I find that none of them have merit.

**A.**     **Claims of Anticompetitive Conduct by I-PLC**

While Plaintiffs acknowledge that the anticompetitive conduct alleged in the Amended Complaint occurred prior to I-PLC's incorporation in 2014, they contend that I-PLC has continued to participate in and reap the benefits flowing from the related antitrust violations, including an artificially enhanced market share and monopoly pricing. Plaintiffs allege that public documents show that I-PLC, through its executive committee, is actually running the Suboxone business. Plaintiffs further identify three goals in I-PLC's 2015 Annual Report that purportedly establish I-PLC's intent to perpetuate the unlawful monopoly:

- "To sustain Suboxone® Film's (buprenorphine and naloxone sublingual film) leadership position in the U.S."

- "To expand treatment in the US . . . ."

- "To develop the Company's pipeline of potentially transformational products for the treatment of addiction and closely related conditions."

(Pls.' Resp. Opp'n Mot. to Dismiss 10–12 (quoting Christensen Decl., Ex. D).) From these stated goals, plaintiffs "reasonably infer" that I-PLC (a) plans to maintain Indivior's "unlawfully acquired supracompetitive market share;" (b) intends to "continue its anticompetitive practice of systematically touting the alleged benefits and safety advantages of Suboxone Film over Generic Tablets" to perpetuate the product-hopping scheme; and (c) plans to develop a new generation of opioid addiction treatment drugs to be used in a new anticompetitive product-hopping scheme. (Id.)

This argument fails to establish I-PLC's participation in or perpetuation of any anticompetitive conduct that falls within the ambit of the Sherman Act § 2. It is well established that Section 2 of the Sherman Act "makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce." Broadcom Corp. v. Qualcomm

Inc., 501 F.3d 297, 306 (3d Cir. 2007) (citing 15 U.S.C. § 2).  To succeed on a claim for actual monopolization under § 2, a party must prove:  "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."  Id. at 307 (quoting U.S. v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)). Crucially, the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993).  "In order to sustain their claims of monopolization and attempted monopolization, Plaintiffs must . . . prove the required elements against *each* individual defendant."  In re Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d 683, 699 (E.D. Pa. 2007) (emphasis added) (quotations omitted).  In general terms, "a firm engages in anticompetitive conduct when it attempts 'to exclude rivals on some basis other than efficiency' or when it competes 'on some basis other than the merits.'"  W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 108 (3d Cir. 2010) (quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985) and LePage's, Inc. v. 3M, 324 F.3d 141, 147 (3d Cir. 2003)).  Mere harm to competitors will not suffice; rather the alleged exclusionary acts must harm the competitive process and must actually have the requisite anticompetitive effect. U.S. v. Microsoft Corp., 253 F.3d 34, 58 (D.C. Cir. 2001).

In the present case, the alleged antitrust scheme at issue involves a claimed product-hopping scheme, which is "the introduction of a new product by a monopolist in combination with exclusionary conduct that either severely restricts the market's ambit or bars a substantial number of rivals."  In re Asacol Antitrust Litig., __ F. Supp. 3d __, No. 15-12730, 2017 WL 588288, at *4 (D. Mass. Feb. 10, 2017).  Plaintiffs' citation of the "corporate goals" in the

Indivior Group's Annual Report[5]—a document that is neither cited nor relied upon in the Amended Complaint—fails to establish I-PLC's participation in this scheme as nothing within these articulated "goals" reflects unlawful anticompetitive conduct.[6]

For example, the first stated goal is to "sustain Suboxone® Film's . . . leadership position in the U.S." The Supreme Court, however, has explicitly recognized that, to rise to the level of an antitrust violation, the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor. Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004). Therefore, the expressed objective of attempting to ensure the leadership position of Suboxone Film in the U.S. market—without any accompanying indication that I-PLC intends on using anticompetitive means to do so—constitutes a legal pursuit.

The second stated goal—"[t]o expand treatment in the US"—also does not permit Plaintiffs' "reasonable inference" that I-PLC intends to perpetuate an illegal product-hopping scheme. Rather, this goal suggests nothing more than I-PLC's desire to pursue the relatively benign objective of allowing for broader prescription of Suboxone for treatment of opioid painkiller dependence. Federal regulations have specifically recognized that "buprenorphine treatment for opioid use disorder is significantly underutilized" due in part to the existence of treatment limits. 81 Fed. Reg 4471201, 44729 (July 8, 2016). Federal policy has called for "increase[d] access to medication-assisted treatment (MAT) with buprenorphine and the

---

[5]     I-PLC objects to any consideration of materials not pled in the Amended Complaint. I need not address that objection as I find that, even considering these materials, Plaintiffs fail to state a claim against I-PLC.

[6]     Notably, these goals are set forth within the Annual Report of the entire Indivior group of companies, not of solely I-PLC. Plaintiffs offer no basis for attributing these goals specifically to I-PLC.

combination buprenorphine/naloxone . . . in the office-based setting" by allowing a practitioner to treat up to 275 patients, up from the previous limit of 100 patients, with the appropriate training and a waiver. Id. at 44730. The Annual Report's goal is consistent with that policy.

Finally, Plaintiffs attempt to infer anticompetitive behavior from the third corporate goal of "develop[ing] the Company's pipeline of potentially transformational products for the treatment of addiction and closely related conditions." Plaintiffs contend I-PLC is currently developing two new buprenorphine drugs and that it will use anticompetitive product-hopping practices to obtain a monopoly for these drugs. No such anticompetitive intent can be gleaned from this goal. Indeed, the only reasonable inference from this stated objective is that the Indivior companies intend to engage in the favored task of innovation in order to improve treatment options for buprenorphine. As the Third Circuit has warned, "courts should be wary . . . of turning courts into tribunals over innovation sufficiency." Mylan Pharms., Inc. v. Warner Chilcott Public Ltd. Co., 838 F.3d 421, 440 (3d Cir. 2016). Absent some indication in the Amended Complaint that I-PLC intends to engage in anticompetitive behavior in connection with their introduction of new products, Plaintiffs cannot speculate that I-PLC's development of new drugs will result in a product-hopping scheme similar to the one at issue in this case.

In short, I disagree with Plaintiffs' position that the corporate goals set forth in an Annual Statement for the entire Indivior group somehow reflect an underlying intent to engage in the identical anti-competitive conduct of a related company. Taking as true the well-pled factual allegations, I cannot find that Plaintiffs plausibly allege that I-PLC has or will continue to engage in the claimed anticompetitive behavior set forth in the Amended Complaint.

### B. Whether I-PLC Joined the Suboxone Film Conspiracy

In their second attempt to impute liability for the alleged anticompetitive scheme to I-PLC, Plaintiffs argue that I-PLC joined the Suboxone conspiracy after its formation, making it retroactively liable for the harm caused by the conspiracy. In support, Plaintiffs baldly argue that "[t]he FAC contains numerous allegations from which it can be inferred that Indivior PLC joined the conspiracy to monopolize and restrain trade within the U.S. co-formulated buprenorphine/naloxone market." (Pls.' Resp. Opp'n Mot. to Dismiss at 14.) In doing so, Plaintiffs fail to cite to a single allegation from the Amended Complaint to bolster their position.[7] Having reviewed the Amended Complaint, I find no such allegations exist.

### C. Whether I-PLC is Liable as the Demerger Successor to the Reckitt Benckiser Business

Plaintiffs next allege that I-PLC is liable as the corporate successor of the RB Group. Under the restricted application of corporate successor liability, I find this argument similarly meritless.

The ordinary rule of corporate successor liability "states that a firm that buys assets from another firm does not assume the liabilities of the seller merely by buying its assets." Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 464 (3d Cir. 2006) (citing Luxliner P.L. Export Co. v. RDI/Luxliner, Inc., 13 F.3d 69 (3d Cir. 1993)). "There are four traditional exceptions, all founded in corporate and contract law." Id. The general rule of non–liability may be overcome if (1) the purchaser expressly or implicitly agrees to assume liability; (2) the transaction was entered into fraudulently for the purpose of escaping liability; (3) the purchase amounts to a

---

[7]     Plaintiffs cite In re Lower Lake Erie Iron Ore Antitrust Litigation, 710 F. Supp. 152 (E.D. Pa. 1989) for the proposition that an entity can be liable for antitrust violations that predate its creation if it permitted the violations to continue after its formation and after reasonable notice. Plaintiffs, however, fail to identify any allegations in the Amended Complaint claiming that I-PLC allowed any antitrust violations of which it had reasonable notice to continue after its formation.

consolidation or merger; or (4) the purchaser is a mere continuation of the seller.  Id. at 464–65,

see also Cont'l Ins. Co. v. Schneider, Inc., 873 A.2d 1286, 1291 (Pa. 2005) (citations omitted).

The third and fourth exceptions "are generally treated identically . . . as both arise where there is

continuity of identity between the buyer and seller."  Berg Chilling Sys., Inc., 435 F.3d at 464–

65 (citing Ruiz v. Blentech Corp., 89 F.3d 320, 325 (7th Cir. 1996); Luxliner P.L. Exp., Co. v.

RDI/Luxliner, Inc., 13 F.3d 69, 73 (3d Cir. 1993)).

Plaintiffs attempt to create corporate successor liability under the first exception, arguing

that I-PLC expressly agreed to indemnify RB Group with respect to "any claims and expenses

incurred by any company within the Indivior Group or the RB Group arising out of or associated

with the Indivior business prior to the transfer."  (Am. Compl. ¶ 60.)  This argument suffers from

three fundamental deficiencies:  (1) the indemnification agreement in this case does not transfer

liability to a successor corporation; (2) the continued existence of the original entity precludes

successor liability; and (3) even if I-PLC was the successor to the RB Group, the RB Group is

not a named defendant and Plaintiffs do not allege that it has any liability.

### 1.      Assumption of Liability

Under the first exception, "successor liability can be created if the buyer contractually

agrees to assume the seller's liabilities."  U.S. v. Sunoco, Inc., 637 F. Supp. 2d 282, 287 (E.D.

Pa. 2009).  As this exception requires an interpretation of the parties' agreement, it must be

analyzed under contract law.  Id.  The Third Circuit has explained that "one who assumes

liability, as distinguished from one who agrees to indemnify against it, takes the obligation of the

transferor unto himself, including the obligation to conduct litigation."  Hatco Corp. v. W.R.

Grace & Co. Conn., 59 F.3d 400, 406 (3d Cir. 1995) (quoting Bouton v. Litton Indus., Inc., 423

F.2d 643, 651 (3d Cir. 1970)).  Thus, "[a]ssumption of liability by consent means that the

acquiring entity agrees to be liable to third parties, . . . whereas an agreement to defend and hold harmless [or indemnify] is an agreement that governs the relationship between the two contracting parties and does not create third party beneficiaries. Sunoco, 637 F. Supp. 2d at 288; see also Goodman v. Challenger Int'l, No. 94-1262, 1995 WL 402510, at *4 (E.D. Pa. June 30, 1995) ("[C]ourts have distinguished these assumption arrangements from mere indemnification agreements, which do not suffice to extinguish the liability of the transferor."), aff'd 106 F.3d 386 (3d Cir. 1996); Girard v. Allis Chalmers Corp., Inc., 787 F. Supp. 482, 489 (W.D. Pa. 1992) (citing cases) (holding that contractual language in which a successor "assumes" or agrees to pay or discharge liability of a predecessor constitutes an assumption of liability, whereas language merely requiring indemnity does not suffice to transfer liability).[8]

In the present case, the contractual provision in the demerger agreement, upon which Plaintiffs rely, states:

> Indivior hereby covenants to pay RB and other RB Group Company on an after Tax basis an amount equal to any losses, Costs, damages and expenses, suffered or arising, directly or indirectly, from or in consequence of any of the Indivior Business Liabilities.

(Christensen Decl., Ex. 1., Schedule 3, § 3; see also Am. Compl. ¶ 13 ("Indivior PLC has expressly agreed to *indemnify* RB Group in respect to any claims and expenses incurred by any

---

[8]     Compare Caldwell Trucking PRP v. Rexon Tech. Corp., 421 F.3d 234, 243 (3d Cir. 2005) (stock purchase agreement that included language that defendant 1 would "assume and become liable for" and "hold [defendant 2] harmless from any and all liabilities" constitutes an assumption of liability); Aluminum Co. of Am. v. Beazer East, Inc., 124 F.3d 551, 566 (3d Cir. 1997) (holding that language in an agreement that the defendant "does hereby assume all of the liabilities and obligations of [plaintiff] of whatsoever nature, and does hereby agree to indemnify and hold harmless [plaintiff]" is sufficiently unambiguous to be construed as creating successor liability) with Sunoco, 637 F. Supp. 2d at 288–89 (holding that agreement to defend and hold company harmless from any "claims, orders, judgments, or other attempts to require [company] to undertake or be responsible for any off-site recovery or remediation of Contamination" is merely an indemnification clause and is distinct from a situation in which the defendant agreed to assume the other company's liabilities as if it were the other company).

company within the Indivior Group or the RB Group arising out of or associated with the Indivior business prior to the transfer.") (emphasis added).

Nothing in this agreement reflects that I-PLC either expressly or implicitly assumed Indivior's liabilities. Rather, I-PLC only agreed to pay RB Group and Indivior entities for any losses, damages, or expenses. "A court must assume that the contract language was chosen carefully and that the parties understood the meaning of the language selected." <u>Sunoco</u>, 637 F. Supp. 2d at 289 (citing <u>Great Am. Ins. Co. v. Norwin Sch. Dist.</u>, 544 F.3d 229, 243 (3d Cir. 2006)). "Therefore the complete absence of language in [a contract] regarding any assumption of liabilities or successor liability in favor of a promise to defend and hold harmless is dispositive." <u>Id.</u>

### 2.    Existence of Original Entity

Plaintiffs' corporate successor liability argument also fails to plausibly allege that the original entity of RB Group no longer exists. It is well established that "[i]f the original entity still exists . . . there is no successor, and therefore no successor liability." <u>Norfolk S. Ry. Co. v . Pittsburgh & W. Va. R.R.</u>, 153 F. Supp. 3d 778, 807 (W.D. Pa. 2015) (citing <u>Hyjurick v. Commonwealth Land Title Ins. Co.</u>, No. 11-1282, 2012 WL 1463633, at *4 (M.D. Pa. Apr. 27, 2012) ("Fidelity cannot be Commonwealth's successor if Commonwealth exists as a separate corporation, albeit one that is a wholly owned subsidiary.")); <u>see also</u> <u>In re Welding Fume Products Liab. Litig.</u>, No. 03-17000, 2010 WL 2403355, at *7 (N.D. Ohio June 11, 2010) ("Of course, if the original entity still exists, there is no successor—and no successor liability."). At least one district court has concluded that, under Pennsylvania law, the "cessation of ordinary business operations" factor may be satisfied when the predecessor does not dissolve or completely cease to exist, but rather is reduced to an assetless shell. <u>Lehman Bros. Holdings v.</u>

Gateway Funding Diversified Mtg. Servs., L.P., 989 F. Supp. 2d 411, 436 (E.D. Pa. 2013). Where, however, the original entity is not an assetless shell and does not completely cease ordinary operations, successor liability is precluded. Norfolk, 153 F. Supp. 3d at 808.[9]

The Amended Complaint does not allow any inference that RB Group has ceased to exist. Plaintiffs allege that (a) RB Group "sold the assets of a collection of companies, including Defendant Indivior, Inc., from RB Group to Indivior PLC;" (b) "all assets and operations related to the production of Suboxone transferred to Indivior PLC;" (c) "RB Group shareholders received one share of stock in Indivior PLC for each share of RB Group stock that they owned;" (d) "Indivior PLC holds itself out as the manufacturer of Suboxone, and describes itself as the successor company to Reckitt Benckiser Pharmaceuticals, Inc." which manufactured Suboxone during the relevant time period; (e) Indivior PLC has current and former overlapping directors with Reckitt Benckiser Pharmaceuticals, Inc. and Indivior, Inc.; (f) many of the individuals who participated in the conduct alleged are now employed by Indivior PLC; and (g) Indivior PLC, and Indivior Inc. completed work orders initially received by Reckitt Benckiser Pharmaceutical, Inc. and inherited its customers. (Am. Compl. ¶ 13.) Although these allegations suggest that RB Group, as a parent company, sold all of its interest in Indivior, Inc.'s business to I-PLC—including all of the patents, leases, contracts, customer lists, and key personnel, as well as goodwill and name recognition associated with the Suboxone brand—they do not allow any inference that RB Group ceased to exist as an entity, was left devoid of assets, or stopped its ordinary business activities.

Plaintiffs urge that because the transaction between the RB Group and I-PLC was a demerger, the four exceptions to successor liability should not be predicated on the lack of

---

[9]     Notably, "the transfer of a corporation's stock does not destroy the corporate entity." Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 423 (3d Cir. 2010).

continuation of the original company. Plaintiffs reason that the precise goal of a demerger is to create two companies, where before there was one. Therefore, because the Indivior group of companies received everything associated with Suboxone, it should be liable for all of the events that occurred with Suboxone prior to its existence.

Aside from the lack of legal support for this theory,[10] its very premise is illogical. Although the transaction in this case was termed a "demerger," both parties agree that RB Group simply "demerged" its interest as a parent in RBPI by way of an indirect dividend demerger, and sold it to I-PLC, which changed RBPI's name to Indivior, Inc. (Am. Compl. ¶ 11.) The mere fact that officers and employees served in both companies after demerger does not give rise to a reasonable inference that the two companies were *de facto* consolidated or that I-PLC was a mere continuation of RB Group. See Portfolio Fin. Servicing Co. ex. rel. Jacom Computer Servs., Inc. v. Sharemax.com, Inc., 334 F. Supp. 2d 620, 629 (D.N.J. 2004). Rather, taking all of the allegations of the Amended Complaint as true, RB Group continued to exist as a separate corporate entity, meaning that I-PLC could not be its successor-in-liability.

### 3. No Liability of RB Group

Finally, even if I were to find that the demerger agreement and the indemnification clause made I-PLC the successor-in-liability to RB Group, I-PLC has no liability to inherit. Plaintiffs have not named the RB Group as a defendant or alleged that the RB Group is liable for any of the anticompetitive activity that is the subject of the Amended Complaint. Indeed, in a prior

---

[10]     In order to skirt the requirement that the original entity no longer exists, Plaintiffs rely on Town of Lexington v. Pharmacia Corp., No. 12-11645, 2015 WL 1321457 (D. Mass. Mar. 24, 2015) for the proposition that "courts have held that an assumption of liability can create successor liability even where a predecessor entity continues to exist." (Pls.' Resp. Opp'n Mot. to Dismiss 17.) Aside from the fact that this case was decided under Massachusetts law and Plaintiffs have not identified any equivalent Pennsylvania cases, it is inapposite given my finding that there was no assumption of liability.

opinion addressing all claims against RB Group, I previously held that the RB Group was not liable for any Sherman Act § 2 violation.  In re Suboxone Antitrust Litig., MDL No. 13-2445, 2015 WL 12910728, at *3 (E.D. Pa. April 14, 2015).  Accordingly, even as a successor to RB Group, I-PLC could not be held liable for any of the claims in the Amended Complaint.

### D.    Whether I-PLC is Estopped from Denying Its Role in the Suboxone Conspiracy

Plaintiffs' fourth effort to impose liability on I-PLC invokes the doctrine of equitable estoppel.  Under Pennsylvania law, equitable estoppel operates to "prevent a person from taking a position that is inconsistent with a position previously taken or acting differently than the manner in which that person induced another person by word or deed to expect."  Louis W. Epstein Family P'ship v. Kmart Corp., 828 F. Supp. 328, 343 (E.D. Pa. 1993), rev'd on other grounds, 13 F.3d 762 (3d Cir. 1994).  The basic elements of equitable estoppel include (1) an inducement, whether by act, representation, or silence when one ought to speak, that causes one to believe the existence of certain facts; (2) justifiable reliance by the party seeking estoppel on that inducement; and (3) prejudice to the one who relies if the inducer is permitted to deny the existence of such facts.  Zivari v. Willis, 611 A.2d 293, 295 (Pa. Super. Ct. 1992) (quoting Nw. Nat'l Bank v. Commonwealth, 27 A.2d 20, 23 (Pa. 1942)).  These elements must be established by the party asserting equitable estoppel by "clear, precise and unequivocal evidence."  Kmart, 828 F. Supp. at 344 (quoting Bolfson v. Cutaiar, 333 A.2d 841, 844 (Pa. 1975)).

Plaintiffs' argument seems to rest on a variation of equitable estoppel known as the regulatory estoppel doctrine.[11]  Under this doctrine, a plaintiff must show that the defendant (1)

---

[11]    Plaintiffs never specifically identify this doctrine as such.  In support of their argument, however, Plaintiffs cite to three cases, all of which apply the regulatory estoppel doctrine.  Thereafter, they refer to public statements made to investors.  Based on this briefing, and the fact

made a statement to a regulatory agency; (2) the regulatory agency relied upon the statement when deciding the issue presented by the party; and (3) the defendants have taken a position in the litigation opposite to the one presented to the regulatory agency. Simon Wrecking Co., Inc. v. AIU Ins. Co., 530 F. Supp. 2d 706, 714 (E.D. Pa. 2008) (citing Sunbeam Corp. v. Liberty Mut. Ins. Co., 781 A.2d 1189 (Pa. 2001)); Hussey Copper Ltd. v. Royal Ins. Agency of Am., No. 07-758, 2009 WL 2913959, at *1 (E.D. Pa. Sept. 9, 2009). No element of reliance by the party asserting the estoppel is necessary. Simon Wrecking Co., Inc. v. AIU Ins. Co., 541 F. Supp. 2d 714, 717 (E.D. Pa. 2008).

Plaintiffs' regulatory estoppel theory contends that, in public investment documents, I-PLC holds itself out to potential investors as being intimately involved in every aspect of the production of Suboxone film. Plaintiffs note that I-PLC emphasizes not only its deep level of involvement with Suboxone film, but also the quality of its executive committee and their "nearly universal experience working with RBPI prior to the demerger." (Pls.' Resp. Opp'n Mot. to Dismiss 19.) Plaintiffs claim that, having held itself out as being an active participant in all things related to Suboxone film, I-PLC must be equitably estopped from now claiming that it has no role in the Suboxone film conspiracy, and that only Indivior Inc. is responsible for how Suboxone film is marketed and sold.

This argument suffers from two general defects. Primarily, Plaintiffs do not identify[12] with any precision the alleged statements made to any regulatory agency that form the basis for the regulatory estoppel claim. Plaintiffs' broad reference to "public investment documents" that

that Plaintiffs do not claim that they personally relied on any of the alleged statements, I presume that Plaintiffs intend to assert regulatory estoppel.

[12]     Notwithstanding I-PLC's argument to the contrary, there is no requirement that regulatory estoppel be affirmatively pled. Wiseman Oil Co., Inc. v. TIG Ins. Co., No. 11-1011, 2013 WL 264370, at *13 (W.D. Pa. Jan. 22, 2013).

"emphasize[] its deep level of involvement with Suboxone Film" does not set forth any direct statements to which the regulatory estoppel doctrine could apply. To the extent Plaintiffs rely on the financial statements, those documents refer only to the activities of all the Indivior entities without specifying which entity performs which activity.

Moreover, even assuming that I-PLC expressly represented to a regulatory agency that it was involved with the production of Suboxone film, such a statement does not constitute any admission that it participated in the anticompetitive activities directly attributed to Indivior, Inc., all of which occurred prior to I-PLC's existence. Short of explicitly proclaiming its responsibility for the actions of its subsidiary, a parent corporation neither is required to supervise its subsidiary nor is liable for the wrongful acts of a subsidiary. Belmont v. MB Investment Partners, Inc., 708 F.3d 470, 490 (3d Cir. 2013) (quotations omitted). Therefore, I decline to find that the regulatory estoppel doctrine extends to the circumstances of this case.

E.      Whether Indivior is I-PLC's Alter Ego

Plaintiffs next allege that I-PLC is the alter ego of Indivior, Inc. and, therefore, is liable for its acts. I again find no merit to this argument.

"The corporate form was created to allow shareholders to invest without incurring personal liability for the acts of the corporation." Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d Cir. 2001), (citing U.S. v. Bestfoods, 524 U.S. 51, 69 (1998)). "These principles are equally applicable when the shareholder is, in fact, another corporation, and hence, mere ownership of a subsidiary does not justify the imposition of liability on the parent." Id. Similarly, liability will not be imposed on the parent corporation merely because directors of the parent corporation also serve as directors of the subsidiary. Id. (citing Bestfoods, 524 U.S. at 69).

Nonetheless, under both state and federal common law, abuse of the corporate form will allow for disregard of the corporate entity to impose liability on the corporation's shareholders. Id. To prevail under the alter-ego theory, *i.e.*, a theory that the subsidiary is the alter ego of the parent, a plaintiff must demonstrate that "[t]he degree of control exercised by the parent [is] greater than normally associated with common ownership and directorship." In re Latex Gloves Prods. Liab. Litig., No. MDL 1148, 2001 WL 964105, at *3 (E.D. Pa. Aug. 22, 2001) (quotations omitted). "Plaintiffs must prove that the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent." Id. at *3 n.10 (quoting Arch v. Am Tobacco Co., 984 F. Supp. 830, 837 (E.D. Pa. 1997)).

To determine whether a parent is the alter ego of the subsidiary, the Third Circuit has considered seven factors: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends; (4) insolvency of the debtor corporations at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) whether the corporation is merely a façade for the operations of the dominant stockholder. United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981) (approving the federal alter ego factors used by the Fourth Circuit in DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 686–87 (4th Cir. 1976)); see also Trustees of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003). While the list of factors is not exhaustive and no single factor is dispositive, some combination is required, and an overall element of fraud, injustice, or unfairness must always be present. Trevino v. Merscorp., Inc., 583 F. Supp. 2d 521, 529 (D. Del. 2008) (citing United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1104 (D. Del. 1988)).

Without specifically addressing any of these factors, Plaintiffs argue that "the [First Amended Complaint], read together with Indivior PLC's public documents, raises a reasonable inference that the assets of the two entities are intermingled and their operations are intertwined." (Pls.' Resp. Opp'n Mot. to Dismiss 19.)  They contend that the two entities share a consolidated financial statement, and "the constant references in Indivior PLC's public disclosures to the Indivior Group (defined as 'Indivior PLC and, as the context requires, its subsidiaries') suggest intertwined operations."  (Id. at 19–20.)  They also note that the 2014 PLC Annual Report states that I-PLC and its subsidiaries are engaged in a "single business activity" comprised of the development, manufacture and sale of prescription drugs for the treatment of opioid dependence. (Id. at 20.)  Finally, Plaintiffs assert that "an inference can be drawn that I-PLC exercises complete dominion and control over Indivior Inc. based in part upon the existence of an Indivior PLC Executive Committee that is composed of the key individuals who are responsible for the day-to-day operation of the Suboxone business, almost all of whom were operating in similar roles in RBPI before the demerger."  (Id.)

Plaintiffs' argument is again faulty on multiple grounds.  As a primary matter, Plaintiffs completely disregard the fact that all of the actions constituting the alleged anticompetitive activity set forth in the Amended Complaint occurred prior to I-PLC's formation.  Thus, even if Plaintiffs could establish that I-PLC became the alter ego of Indivior upon formation, Plaintiffs have not explained how it became liable for activities that pre-dated its existence.

Second, the Amended Complaint pleads almost none of the facts Plaintiffs now rely on in their brief.  Indeed, the Amended Complaint alleges only that (a) I-PLC received all of the assets related to the production of Suboxone from RB Groups; (b) I-PLC holds itself out as the manufacturer of Suboxone; (c) I-PLC has current and former overlapping directors with Indivior;

(d) many of the individuals who participated in the alleged anticompetitive conduct are now employed by I-PLC; and (e) I-PLC inherited RB Pharmaceuticals/Indivior's customers. (Am. Compl. ¶ 13.) Although I may take judicial notice of I-PLC's financial statements, such statements do not permit the broad inferences Plaintiffs now ask that I make.

Finally, even liberally reading the Amended Complaint and the public financial statements, none of the alleged facts set forth by Plaintiffs allow any reasonable inference that I-PLC exercises a greater than normal degree of control over Indivior, such that Indivior is I-PLC's "alter ego." As noted above, liability will not be imposed on the parent corporation merely because directors of the parent corporation also serve as directors of the subsidiary. Pearson, 247 F.3d at 484. Moreover, the fact that a parent corporation filed consolidated financial statements with its subsidiary does not mandate a finding of an alter ego relationship. Savin Corp. v. Heritage Copy Prods., Inc., 661 F. Supp. 463, 471 (M.D. Pa. 1987); see also Case Fin., Inc. v. Alden, No. 1184-VCP, 2009 WL 2581873, at *4–5 (Bankr. D. Del. Aug. 21, 2009) (rejecting alter ego theory where a parent filed consolidated financial statements with the SEC, which included the subsidiary's results). Finally, it is well recognized that a statement in an SEC filing in which a parent corporation is in some way consolidating by description its subsidiary's efforts and its own—for example, by stating that they are engaged in the "single business activity" of the manufacture and sale of Suboxone—"is not atypical, and certainly does not suggest that, via fraud or its equivalent, the parent corporation has become indistinguishable from the subsidiary." MacQueen v. Union Carbide Corp., No. 13-831, 2014 WL 6809811, at *7 (D. Del. Dec. 3, 2014); see also In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 570–71 (M.D. Pa. 2009) (finding that alter ego theory could not be invoked, where, *inter alia*, statements in annual reports indicated that corporate parents and subsidiaries cultivated a

"unified global image[,]" as the evidence failed to demonstrate "the corporate parents' actual control over the daily affairs of their subsidiaries"); Action Mfg. Co., Inc. v. Simon Wrecking Co., 375 F. Supp. 2d 411, 424 (E.D. Pa. 2005) (holding that neither references in the parent's annual report to subsidiaries as divisions of the parent company nor references in annual report to parent and subsidiaries as "we," "our," and "us" establish alter ego relationship).

Notably absent from Plaintiffs' pleading and briefing is any suggestion that Indivior is a mere sham corporation. See Culbreth v. Amosa, 898 F.2d 13, 14 (3d Cir. 1990) (holding that to pierce the corporate veil in Pennsylvania, it must be shown that the "separate [corporate] existence was a mere sham"); see also Everitt v. Dover Downs Entm't., No. 08-6116, 1999 WL 374163, at *6 (E.D. Pa. June 9, 1999) (noting that the alter ego theory requires a showing that the corporation is a mere sham). Plaintiffs have not set forth any facts to suggest that Indivior was grossly undercapitalized, failed to observe corporate formalities, had its funds siphoned or used indiscriminately by I-PLC, failed to maintain corporate records, or was otherwise a mere façade. Given the strong presumption against holding shareholders or a parent company liable for the obligations of a corporation, In re Blatstein, 192 F.3d 88, 100 (3d Cir. 1999), I find that Plaintiffs' scant allegations in support of its alter ego theory cannot survive a motion to dismiss.

F. **Whether Indivior is I-PLC's Agent**

Plaintiffs' final theory of liability against I-PLC asserts that I-PLC is liable for the acts of Indivior on an agency basis, as follows:

> The FAC, read together with Indivior PLC's public documents, raise a reasonable inference that Indivior PLC directed or authorized Indivior Inc. to take such actions as may be necessary in order to maintain the Suboxone Film monopoly, which is the overwhelming source of Indivior PLC's profits. Indeed, the Indivior PLC Executive Committee seems to exist primarily for that very purpose. Shaun Thaxter's "primary responsibilities" as the Indivior PLC CEO are "to manage the day to day running of

> the group's business," "to recommend the strategic direction of the
> group to the board," "to implement strategy as approved by the
> board," and "to supervise and develop senior teams within
> subsidiaries." (Christensen Decl. Exh. E at 1–2.) For these
> reasons, Indivior PLC should be held liable for the actions of
> Indivior, Inc.

(Pls.' Resp. Opp'n Mot. to Dismiss 21.)

A parent corporation may be liable under the agency theory for the acts of its subsidiary depending on the amount of control the parent corporation exercises over the actions of the subsidiary. Intellectual Ventures I LLC v. Toshiba Corp., 66 F. Supp. 3d 495, 498 (D. Del. 2014). "Simply being a wholly-owned subsidiary of a parent corporation alone does not make the subsidiary the agent of the parent; rather '[a] parent corporation will be liable for the activities of the subsidiary only if the parent dominates those activities.'" Id., quoting Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 658 F. Supp. 1061, 1084 (D. Del. 1987). Under this theory, only the conduct shown to be instigated by the parent may be attributed to the parent. StrikeForce Techs., Inc. v. PhoneFactor, Inc., No. 13-490, 2013 WL 6002850, at *5 (D. Del. Nov. 13, 2013).

Contrary to Plaintiffs' arguments, the Amended Complaint contains no allegations of any anticompetitive or conspiracy-related actions taken by Indivior after the corporate formation of I-PLC, let alone any actions taken by Indivior at the behest of I-PLC. The mere fact that I-PLC's CEO bears responsibility for the management of the day-to-day operations of the Indivior group, strategic planning of the group, and supervising subsidiary teams does not create any reasonable inference that I-PLC either directed or perpetuated the alleged anticompetitive conduct by Indivior.

## IV. CONCLUSION

Perhaps recognizing that I-PLC has had no direct connection with the Amended Complaint's product-hopping antitrust scheme, Plaintiffs offer a hodgepodge of theories in order to indirectly implicate I-PLC in the anticompetitive conduct and related conspiracy. As reflected by their briefing, however, Plaintiffs' theories find no support either in the allegations of the Amended Complaint or in the public records of which they now ask that I take judicial notice. Indeed, Plaintiffs do little to overcome the glaring fact that I-PLC did not come into existence until well after the relevant time period in this case and has not taken any obvious actions to perpetuate the alleged monopoly created by the anticompetitive scheme. Accordingly, I will grant I-PLC's motion in its entirety and dismiss all claims against it.