## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| IN RE SUBOXONE (BUPRENORPHINE HYDROCHLORIDE AND NALOXONE) ANTITRUST LITIGATION | : : | MDL NO. 2445 13-MD-2445 |
| | : | |
| THIS DOCUMENT RELATES TO:, | : | |
| | : | |
| *Wisconsin, et al. v. Indivior Inc. et al.* Case No. 16-cv-5073 | : : | |
| | : | |
| STATE OF WISCONSIN By Attorney General Brad D. Schimel, *et al.* | : : | |
| | : | CIV. A. NO. 16-5073 |
| **Plaintiffs,** | : | |
| v. | : | |
| | : | |
| INDIVIOR INC. f/k/a RECKITT BENCKISER PHARMACEUTICALS, INC., et al. | : : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**Goldberg, J.**                                                **February 19, 2021**

## MEMORANDUM

This Opinion resolves numerous motions brought in this multi-district, antitrust matter pursuant to Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993). As with the first round of Daubert motions filed in this case, the challenges raised do not warrant exclusion of expert opinions, but rather are more appropriately left for cross-examination.

## I.   FACTUAL AND PROCEDURAL HISTORY[1]

Defendant Reckitt Benckiser, Inc. ("Reckitt") manufactures Suboxone, a drug commonly used to combat opioid addiction.[2]  Suboxone previously came in tablet form.  In 2010, citing safety concerns and working in connection with Defendant MonoSol Rx, LLC ("MonoSol")),[3] Reckitt effectuated a change in the administration of this drug, switching from tablet to sublingual film. Various purchasers/consumers of Suboxone claim that this switch was anticompetitive and solely designed to maintain Reckitt's market exclusivity—a scheme known as a "product hop."

The Plaintiffs are comprised of a class of Direct Purchasers of Suboxone ("Direct Purchasers" or "DPPs"), a class of End Payors of Suboxone ("End Payors" or "EPPs"), and a group of States' Attorneys General (the "States") (collectively, "Plaintiffs").  Plaintiffs claim that Reckitt switched from a Suboxone tablet to a sublingual Suboxone film for the purpose of foreclosing generic competition.  According to Plaintiffs, this switch (the "product hop") was accompanied by Reckitt disparaging the tablet through fabricated safety concerns and ultimately removing Suboxone tablets from the market just as generic Suboxone tablets were able to begin competing.  Reckitt is also accused of having manipulated FDA regulations to delay the entry of generic Suboxone onto the market through the filing of an unsubstantiated Citizen Petition and via "misconduct" during the

---

[1]      Rather than re-hashing the complicated regulatory background and factual basis of this case, I incorporate by reference the history set forth in my prior decision certifying a class for both the DPPs and EPPs, In re Suboxone, 421 F. Supp. 3d 12 (E.D. Pa. 2019), aff'd, 967 F.3d  264 (3d Cir. 2020), as well as my ruling on Reckitt's Motion to Dismiss the States' action.  In re Suboxone, No. 13-md-2445, 2017 WL 3967911 (E.D. Pa. Sept. 8, 2017)

[2]      Reckitt is currently known as Indivior, Inc.  In December 2014, Reckitt Benckiser Pharmaceuticals, Inc. was demerged from its prior parent, the Reckitt Benckiser Group PLC, into Indivior PLC.  Although Indivior is technically the named defendant in this case, the pleadings and many of the relevant exhibits use the name "Reckitt."

[3]      MonoSol is currently known as Aquestive Therapeutics, Inc. ("Aquestive").  Although Aquestive is technically the named defendant, the pleadings and many of the relevant exhibits use the name "MonoSol." For clarity's sake, I will therefore refer to Aquestive as "MonoSol."

shared Risk Evaluation and Mitigation Strategies ("REMS") process.   According to Plaintiffs, Reckitt's conduct foreclosed competition, thereby allowing Reckitt to unlawfully maintain a monopoly in violation of Section 2 of the Sherman Act and overcharge for its Suboxone products. Reckitt readily acknowledges the product switch, but responds that the switch was done for the pro-competitive purpose of marketing and selling an improved, safer, and superior product.

Reckitt achieved the switch from tablets to film in collaboration with Defendant MonoSol, who is a party to the action by the States but not the actions by the DPPs or EPPs.  According to the States' action, MonoSol had patented a method of drug administration through a sublingual film.  In December 2006, MonoSol and Reckitt signed an agreement to develop and market a sublingual film form of Suboxone, for which MonoSol would receive royalty payments on the sales of Suboxone film.  The States posit that MonoSol effectively conspired with Reckitt to effectuate the entirety of its product hop scheme, foreclosing generic entry and resulting in an increase in its own profits.

While Reckitt's appeal of my class certification ruling was pending, I directed the parties to file any Daubert challenges for those experts whose opinions would not be impacted by the forthcoming ruling on the class issues (Phase I Daubert motions).  On November 24, 2020, I issued an opinion granting in part and denying in part those motions.  In re Suboxone Antitrust Litig., No. 13-md-2445, 2020 WL 6887885 (E.D. Pa. Nov. 24, 2020).  Presently before me are the remaining Daubert challenges involving experts whose opinions were in fact implicated by the Third Circuit's affirmance of my class certification decision (the Phase II Daubert motions).  These Motions are:  (1) Reckitt's Motion to Exclude Certain of the Opinions of Russell Lamb, Ernst Berndt, Rena Conti, and Eric Emch, and Pricing-Related Opinions of Laurence Westreich and Yvonne Tso, and (2) MonoSol's Motion to Exclude Dr. Ernst Berndt.  For the following reasons, I will deny both motions in their entirety.

## II.     STANDARD OF REVIEW

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case

Fed. R. Evid. 702.  Rule 702 places district courts in the role of "gatekeeper," requiring courts to "'ensure that any and all [expert] testimony . . . is not only relevant, but reliable.'" Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) (quoting Daubert, 509 U.S. at 589).  The party offering an expert must demonstrate, by a preponderance of the evidence, that the expert's qualifications and opinions comply with Federal Rule of Evidence 702.  See Daubert, 509 U.S. at 592–93 (citation omitted).  Rule 702 has "a liberal policy of admissibility," Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quotation omitted), and "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Advisory Comm Notes (2000).  As the Court in Daubert stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  509 U.S. at 595.

The Daubert inquiry "embodies a trilogy of restrictions on expert testimony:  qualification, reliability, and fit."  Schneider ex re. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted).

**A.**     <u>Qualification</u>

In <u>Waldorf v. Shuta</u>, 142 F.3d 601 (3d Cir. 1998), the United States Court of Appeals for the

Third Circuit articulated the "qualification" standard for an expert:

> Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony. The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." . . . We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts." . . . However, "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . ."

<u>Id.</u> at 625 (citations omitted).

Construing this standard, the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 741 (3d Cir. 1994).  In other words, "an expert's qualifications should be assessed 'liberally,' recognizing that 'a broad range of knowledge, skills, and training qualify an expert as such.'" <u>Thomas v. CMI Terex Corp.</u>, No. 07-3597, 2009 WL 3068242, at *5 (D.N.J. Sept. 21, 2009) (quoting <u>Paoli</u>, 35 F.3d at 741).  An expert will not be excluded "simply because [the court] does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." <u>Holbrook v. Lykes, Bros. S.S. Co.</u>, 80 F.3d 777, 782 (3d Cir. 1996).  The focus, instead, is on whether the qualifications that an expert does have provide a foundation for the witness to testify meaningfully on a given matter.  <u>See</u> <u>Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.</u>, 669 F. Supp. 2d 514, 522 (M.D. Pa. 2009).

**B.**     <u>Reliability</u>

The reliability restriction requires that the testimony be based upon "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'" and that the

expert have "'good grounds' for his or her belief." Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (quotations omitted). In that respect, reliability mandates an examination into the expert's conclusions in order to determine "whether [the conclusions] could reliably flow from the facts known to the expert and [the] methodology used." In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig., 706 F.3d 217, 225 n.7 (3d Cir. 2013) (quoting Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000) (internal quotation marks omitted)).

The Third Circuit has identified the following non-exhaustive factors to be taken into consideration when evaluating the reliability of a particular methodology: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. Elcock v. Kmart Corp., 233 F.3d 734, 745–46 (3d Cir. 2000). Although this list of factors is lengthy, not each factor will be relevant to every reliability analysis. The "test of reliability is 'flexible.'" Kumho, 526 U.S. at 141. According to the Supreme Court, "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts." Id. The relevance of the Daubert factors depends "on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. at 150 (internal quotation marks and citations omitted).

Importantly, the rule does not require the party proffering the expert to demonstrate the "correctness" of the expert's opinion. Paoli, 35 F.3d at 744 (concluding that the "evidentiary requirement of reliability" amounts to a lower burden "than the merits standard of correctness"). Rather, the party need only demonstrate "by a preponderance of the evidence" that the expert's

opinion bears adequate indicia of reliability.  Id.  Indeed, "[a] judge will often think that an expert has good grounds to hold the opinion . . . even though the judge thinks the opinion otherwise incorrect."  Id.  Therefore, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate."  Daubert, 509 U.S. at 595.  "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."  i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 852 (Fed. Cir. 2010), aff'd, 564 U.S. 91 (2011).

> **C.**     **Fit**

The issue of fit "is one of relevance and expert evidence which does not relate to an issue in the case is not helpful."  In re TMI Litig., 193 F.3d 613, 670 (3d Cir. 1999).  The standard for fit is "not that high" but is "higher than bare relevance."  Paoli, 35 F.3d at 745.  To determine whether an expert's testimony "fits" the proceedings, this Court asks whether it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a); see also UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 835 (3d Cir. 2020).  "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."  Id. (quoting Daubert, 509 U.S. at 591). "Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*."  Id. (quoting Paoli, 35 F.3d at 743 (emphasis in original)).

**III.   RECKITT'S MOTION TO EXCLUDE OPINIONS OF RUSSELL LAMB, ERNST BERNDT, RENA CONTI, ERIC EMCH, LAURENCE WESTREICH, AND YVONNE TSO**

Reckitt offers five challenges to the economic and pricing-related decisions of Plaintiffs' experts: (1) Plaintiffs' experts' opinions regarding the effect of pricing are unreliable and fail to fit the Complaints; (2) Plaintiffs' experts' assertion that Reckitt's tablet price increases were

"economically irrational" is not derived from any reliable methodology; (3) any economist models must be excluded to the extent they rely on Plaintiff's assumption regarding when generic tablets would have lauched but for the alleged delay; (4) Drs. Lamb and Emch fail to present a reliable methodology for determining the product market in which wholesalers participate; and (5) Dr. Rena Conti's overcharge calculation should be excluded.

### A.    Opinions Regarding the Effect of Pricing on Market Share

Plaintiffs' experts generally opine that Reckitt's lower pricing of Suboxone film as compared to Suboxone tablets was one key factor in Reckitt's anti-competitive scheme.  Reckitt contends that opinions regarding the effect of pricing on market share fail to fit Plaintiffs' Complaints and, alternatively, are unreliable.  According to Reckitt, Plaintiffs' Complaints repeatedly reference what is known as a "price disconnect" in the prescription drug market—*i.e.* a disconnect between the person paying for the prescription and the person selecting the appropriate treatment—which derails the ordinary market forces that would allow consumers to consider price when selecting a product. Reckitt argues that while Plaintiffs' experts discuss the existence of the price disconnect, they also contradict that theory by opining, at great length, that price has tremendous influence over purchasing decisions and that significant market share migrated from Suboxone tablet to Suboxone film due to the film's lower relative pricing at both the insurer and patient level.[4]  Reckitt posits "there is a direct contradiction between the allegations in Plaintiffs' Complaints (that a price disconnect resulted in foreclosure of generic manufacturers whose products were not subject to automatic substitution for Suboxone Film) and their experts' opinions that lower pricing of Suboxone Film was a significant,

---

[4]      Reckitt identifies several different experts who allegedly engaged in such contradictions:  (1) damages experts Dr. Berndt and Dr. Lamb opined that the price increases on Suboxone tablets relative to Suboxone film drove greater conversion to Suboxone film; (2) Dr. Westreich, a medical doctor, opined that affordability can be an important consideration in medication choice; (3) Ms. Tso, a managed care expert, asserted that insurance formulary decision can make certain products economically inaccessible to many patients; and (4) Dr. Emch, an economist, claimed that Reckitt achieved entrenchment of Suboxone film by raising prices of tablets relative to film and giving payors incentive to favor film over tablets in their formularies.

allegedly anticompetitive driver of increased Film sales at the expense of costlier Suboxone Tablets." (Reckitt's Mot. 6.)  As such, Reckitt presses that these expert opinions as to the anticompetitive effect of Suboxone tablet pricing do not fit Plaintiffs' theory of the case.

Reckitt's argument oversimplifies both Plaintiffs' theory and the expert opinions offered on this subject.  To fully assess the shortcomings in Reckitt's position, further discussion of both the law and Plaintiffs' theory is necessary.

The United States Court of Appeals for the Third Circuit has explicitly recognized that the concept of a price disconnect exists in the pharmaceutical industry.  It noted that, "courts may need to be cognizant of the unique separation between consumers and drug manufacturers in the pharmaceutical market, especially in cases where there is evidence of extreme coercion of physician prescribing decisions or blatant misrepresentation about a generic manufacturer's version of a drug." Mylan Pharms Inc. v. Warner Chilcott Public Ltd. Co., 838 F.3d 421, 440–41 (3d Cir. 2016).

Two of Plaintiffs' experts expanded upon the nature of the price disconnect in the pharmaceutical industry.  Dr. Russell Lamb opined that, based upon his review of the evidence, physicians generally do not consider costs when determining which medication to prescribe to patients and that, typically, physicians are unaware of pricing until patients complain about the cost of a particular drug.  (Reckitt Mot., Ex. 1, Rep. of Dr. Lamb ("Lamb Rep.") ¶ 108.)  Similarly, Dr. Berndt, noted that "a 'price disconnect' can occur between physician and patient, stemming from the fact that, typically, the physician is unaware (at least until the patient communicates information otherwise) of what a patient's out-of-pocket costs are for a given medication."  (Reckitt Mot., Ex. 3, Rep. of Dr. Berndt ("Berndt Rep.") ¶ 26.)

To account for this well-known price-disconnect, Congress implemented the Hatch-Waxman Act, followed by similar substitution laws by state legislators, which allowed for "AB-rated" generic substitution.  As explained by Dr. Berndt, an "AB-rated" generic drug is a designation given by the

FDA for a generic drug that is therapeutically equivalent and interchangeable with its branded counterpart. (Berndt Rep. ¶ 15.) "[W]hile the Hatch-Waxman Act dramatically reduced the costs for generics to enter the market . . . it is the AB-rated substitution mechanism that causes generics to compete primarily on price and leads to the broad, wholesale switching from brand to generic drugs that delivers cost savings to our healthcare system." (Id. ¶ 15.) Thus, although physicians will write prescriptions for branded drugs without regard for the cost, "[t]he automatic substitution system addresses this habit . . . by having the pharmacist engineer the switch [to the lower cost generic drug] automatically, without the need for participation by the physician." (Id. ¶ 64.)

Contrary to Reckitt's characterization of Plaintiffs' theory, Plaintiffs do not argue that the "price disconnect"—the fact that price does not influence physicians' prescribing decisions—is the driver behind Plaintiffs' antitrust damages. Rather, Plaintiffs contend that it is Reckitt's capitalization on this disconnect to undermine the AB-rating system through a multi-faceted antitrust scheme that resulted in the harm at issue. More specifically, Plaintiffs' theory is that, in order to avoid the profitability impact of the expiration of Reckitt's exclusivity on Suboxone tablets, Reckitt developed a film version of Suboxone that was not AB-rated to the tablets. Reckitt then engaged in a multi-faceted scheme to sway the market from use of the tablet to use of the film before generic tablets could enter the market, including signaling its intent to both payors and physicians to withdraw Suboxone tablets from the market, engaging in a false and misleading marketing campaign directed to both payors and physicians to disparage the safety branded Suboxone tablets, making efforts to delay the entry of generics, and implementing a series of "economically-irrational" price increases on Suboxone tablets relative to prices for Suboxone film. (Lamb Rep. ¶ 9; Berndt Rep. ¶¶ 16–17.)

According to Plaintiffs, the last of these tactics—the increases in price on Suboxone tablets accompanied by decreases in pricing plus co-pay assistance on Suboxone film—was specifically

directed towards the managed-care organizations ("MCO"s), who are the direct payors of the drug. As explained by Plaintiffs' expert, Yvonne Tso, "Reckitt used the promise of added rebates for Film, discontinuation of rebates for Tablets, and large increases in Tablet prices to place economic pressure on MCOs to give Film favorable formulary coverage, and to disfavor Suboxone Tablets to 'block Tablet access.'" (Def.'s Ex. 11, Rep. of Yvonne Tso ("Tso Rep.") ¶ 20.) Ms. Tso opined that "Reckitt's pattern of raising Tablet prices during the pre-generic period—combined with eliminating Tablet rebates—would place enormous economic pressure on the typical, reasonable MCO decision-maker to make formulary adjustments to drive patients and doctors to Film." (Id.) According to Ms. Tso, these formulary adjustments that Reckitt allegedly induced MCOs to implement resulted in tablets being removed from insurance formularies and imposed an extreme cost increase for patients taking Suboxone tablets. (Id. ¶ 102.)

Ultimately, under Plaintiffs' theory, the combination of Reckitt's activities in support of the alleged anticompetitive scheme resulted in the shift of prescriptions away from tablets and towards film prior to the entry of generic tablets. When the generic tablets came on the market, they were not AB-rated to film and, thus, according to Plaintiffs, generic manufacturers faced almost insurmountable barriers to entry. Plaintiffs explain that because of the price-disconnect between cost of drugs and physician-prescribing decisions, together with the formulary restraints imposed by MCOs, physicians, who were already writing prescriptions for film, would not be quick to change their prescriptions to those for lower-priced generic tablets. Plaintiffs theorize that without the benefit of the AB-rated generic substitution program, moving prescriptions from brand film to generic tablets, even despite any price differential, was cost-prohibitive. (See Berndt Rep. ¶ 160 (explaining the importance of AB-rating in the context of generic substitution).)

Given this more fulsome explanation of Plaintiffs' antitrust theory, I find no contradiction between Plaintiffs' allegations of a price disconnect and Plaintiffs' experts' opinions regarding the

anticompetitive effect of Suboxone film's lower pricing, such that these experts' opinions should be excluded under Daubert. According to Plaintiffs, Reckitt's pricing tactics with regard to Suboxone tablets and Suboxone film prior to the entry of generic tablets drove MCOs to disfavor tablets on their formularies, which, in turn, drove MCO coverage decisions. Plaintiffs will assert that those coverage decisions, in combination with Reckitt's disparagement of the safety of the Suboxone tablet, then coerced physicians to prescribe Suboxone film. By the time generics entered the market with tablets priced lower than Suboxone tablets, the market had shifted substantially to film, thus precluding the non-AB-rated tablets from overcoming, in a cost-effective manner, the "price disconnect" and obtaining a share of the prescription market. Thus, Plaintiffs' experts' testimony fits the facts of this case such that these opinions may be considered by a jury.

Alternatively, Reckitt seeks to exclude the expert testimony of Dr. Berndt and Dr. Lamb as unreliable because their opinions are "internally contradictory" to the existence of the purported "disconnect." (Reckitt's Mot. 7.) Reckitt presses that "Drs. Lamb and Berndt assert a 'price disconnect' when seeking to explain why generic manufacturers could not (indeed, did not even try to) offer lower prices for Suboxone tablets (compared to Film) in order to capture more market shares . . . . [Y]et when describing the purportedly increase in Film's market share, Dr. Lamb and Dr. Berndt no longer believe in a 'price disconnect' [and] [t]he lower price of Film is explicitly alleged to drive the market share from Tablet to Film." (Def.'s Mot. 7.)

Aside from simply rehashing the "fit" argument, this assertion violates the Third Circuit's mandate that, in assessing Plaintiffs' theory, I must look at "all the acts taken together [to determine whether they] show the willful acquisition or maintenance of a monopoly." In re Suboxone Antitrust Litig., 967 F.3d 264, 270 (3d Cir. 2020) (internal quotations omitted). Doing so reveals no internal contradiction in the expert reports that renders them inadmissible under Daubert. Both Dr. Berndt and Dr. Lamb explained that the "price disconnect" exists as an inherent function of the market. To

compensate for this price disconnect, the AB-rating system allows for automatic substitution of lower-priced generic drugs.  As both experts opined, however, Reckitt's combined conduct—consisting of introducing film that was not AB-rated with tablets, driving up the price of its tablet, disparaging its tablet, and ultimately withdrawing its tablets—allegedly destroyed the market for the tablet, leaving film as the only effective competitor in the market.  Thus, Plaintiffs theorize that when generics entered the market with non-AB-rated tablets, any effort by the generics to compete with film on the basis of price would have been ineffective.  See New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 655–56 (2d Cir. 2015) ("[C]ompetition through state drug substitution laws [AB-rating] is the only cost-efficient means of competing available to generic manufacturers. . . . For there to be an antitrust violation, generics need not be barred 'from all means of distribution' if they are 'bar[red] . . . from the cost-efficient ones.'") (quoting U.S. v. Microsoft, 253 F.3d 24, 64 (D.C. Cir. 2001)).

Certainly, Reckitt remains free to challenge these opinions through cross-examination or the introduction of contradictory expert testimony.  Viewed through the lens of the Daubert standard, however, I find no basis on which to exclude such testimony.

**B.      Economic Irrationality Opinions**

Reckitt next seeks to exclude the opinions by Drs. Berndt and Lamb that Reckitt's increase in the price of Suboxone tablets was "economically irrational" and a "profit sacrifice" designed to further Reckitt's broader anticompetitive scheme.  Reckitt claims that although Drs. Berndt and Lamb identified a methodology for determining the "economic irrationality" of Reckitt's price increases on Suboxone tablets, these experts "made no attempt, as would be required by their own methodologies, to determine whether the incremental profits from the Tablets price increases exceed the alleged losses from increasing sales of Film."  Rather, according to Reckitt "these economists

13

simply asserted, as a matter of faith, that the Tablet price increases were unprofitable in the absence of a long-term foreclosure of competition."  (Reckitt Mot. 9–10.)

Consideration of Reckitt's argument again requires some additional context.  Plaintiffs' general theory is that, in January 2011, after film launched, Reckitt raised the prices on its tablets even though tablets were cheaper to produce and more profitable than film.  Plaintiffs claim that Reckitt did this in order to move the market away from tablets prior to the entry of generic tablets. In support of its theory that these tablet price increases were inherently anticompetitive, Plaintiffs offer expert opinions from Drs. Lamb and Berndt.

Dr. Lamb opined that Reckitt's price increases on its brand tablets were "economically irrational" and were "implemented by Reckitt in order 'to drive cost differential for Film with payers and patients to accelerate conversion and protect [Reckitt's] market position.'"  (Lamb Rep. ¶ 49.) To reach his conclusion that such conduct was anticompetitive, Dr. Lamb recognized that two tests are "commonly used by economists."  (Id. ¶ 150.)  The first is the "no economic sense test," which involves comparing non-exclusionary profits from the conduct to the profits the firm would have earned from alternative, legal conduct in which it would have engaged.  If the non-exclusionary profits are less, the conduct would not make economic sense and thus be potentially illegal.  (Id.) The second, related test is the "profit sacrificing test," which asks whether the scrutinized conduct is more profitable in the short run than any other conduct the firm could have engaged in that did not have the same or greater exclusionary effects.  (Id.)  Applying these two tests in light of various admissions from Reckitt executives about the profitability of tablets compared to film, Dr. Lamb concluded that Reckitt's efforts to disadvantage Suboxone tablets relative to Suboxone film through the "hard switch" scheme despite tablets being more profitable was anticompetitive.  (Id. ¶ 159.)

Similarly, Dr. Berndt opined that "the fact that Reckitt consciously drove the market towards its less profitable product (Film) and assiduously reduced the share of its more profitable product

(Tablets) by offering Film rebates exhibits economically irrational behavior *unless* Reckitt reckoned a long term offsetting gain to commuting the patient population to the temporarily less profitable Film product that would subsequently become more profitable due to its having foreclosed competition from generic tablets."  (Berndt Rep. ¶ 109 (emphasis in original).)  Dr. Berndt further explained the alleged rationale behind Reckitt's price increase on tablets:

> The generics that ultimately entered in March 2013 set their prices based upon the increased Tablet prices, as Reckitt had anticipated they might do.  However, had Reckitt not taken the price increases on the Tablets, the prevailing brand Suboxone tablet prices at the time of generic entry would have been lower and Suboxone Tablets would not have been withdrawn.  Consequently, absent Reckitt's "generic defense strategy," the generic competitors would have priced their products at a discount off of the lower Suboxone Tablet prices, lowering generic tablet costs.  While Reckitt did not "force" the generic tablet manufacturers to set list prices off of the higher prevailing tablet prices because Reckitt had taken its price increases, had Reckitt not taken those same tablet price increases and instead maintained the tablet prices at parity with Film, the generics would have been "forced" to set their list prices based at a discount off of the lower prevailing brand tablet prices.

(Id. ¶ 122.)

With these theories in mind, Reckitt now argues that Dr. Berndt's and Dr. Lamb's opinions that the brand tablet price increases were "economically irrational" remain untethered to the application of any reliable methodology.  As to Dr. Berndt, Reckitt points to his deposition admission that he did not measure either the price elasticity of demand between Suboxone film and branded Suboxone tablets, what marginal revenue Reckitt obtained by increasing the prices of its tablets, or what reduction in demand for Suboxone tablets Reckitt experienced as a result of higher prices. (Reckitt's Mot., Ex. 16, Dep. of Ernst Berndt ("Berndt Dep.") 694:7–696:4.)  As to Dr. Lamb, Reckitt asserts that he did not attempt to quantify the amount of additional profits that Reckitt made on its sales of brand tablets as a result of the price increases and did not measure what the effect the brand tablet price increases had on market share.  (Reckitt's Mot., Ex. 19, Dep. of Russell Lamb ("Lamb

Dep.") 151:19–152:9, 154:24–156:20.)   Instead, according to Reckitt, both experts based their opinions solely on internal Reckitt documents and statements.  As such, Reckitt presses that neither expert conducted the tests needed to identify economically irrational conduct and thus have proffered no reliable methodology other than an improper analysis of Reckitt's subject motivations.

Reckitt's argument improperly goes to the correctness of Drs. Lamb and Berndt's opinions as opposed to their reliability, which is the applicable inquiry under Daubert.  As set forth above, the reliability restriction demands that the testimony be based upon "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'" and that the expert has "'good grounds' for his or her belief."  Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (quotations omitted).  A party need only demonstrate "by a preponderance of the evidence" that the expert's opinion bears adequate indicia of reliability.  Paoli R.R. Yard, 35 F.3d at 744. A flaw in methodology does not automatically disqualify an expert opinion; the flaw must be of such substance to create a lack of "good grounds" for the expert's conclusions.  Id.

Here, both experts opined that Reckitt's price increases were "economically irrational" and/or made "no economic sense."   "Application of the no economic sense test is conceptually straightforward.  If conduct allegedly threatens to create a monopoly because of a tendency to exclude existing competitors, the test is whether the conduct likely would have been profitable if the existing competitors were not excluded and monopoly was not created."  Gregory Werden, "Identifying Exclusionary Conduct Under Section 2:  The 'No Economic Sense' Test," 73 Antitrust Law Journal 413, 415 (2006) (cited in Viamedia, Inc. v. Comcast Corp., 951 F.3d 429, 461 (7th Cir. 2020)).  The test calls for an inquiry into the objective economic considerations for a reasonable person, and not the state of mind of any particular decision maker.  Id. at 416–17.  "Applying the no economic sense test requires consideration of both the gains from the challenged conduct apart from any that stem from eliminating competition, and the costs of undertaking the conduct."  Id. at 416.  "That conduct

16

produces some gross benefit for the defendant is not a sufficient basis for concluding that it makes economic sense.  Conduct fails the no economic sense test if it is expected to yield a negative payoff, net of the costs of undertaking the conduct, and not including any payoff from eliminating competition."  Id. at 416.

Both Drs. Lamb and Berndt engaged in this methodology when opining that Reckitt's increase on tablet prices was economically irrational.  Dr. Lamb opined that Reckitt's efforts to disadvantage Suboxone tablets relative to Suboxone film "was contrary to its own short-term economic interests."  (Lamb Rep. ¶ 152.)  Citing to internal Reckitt documents, he noted that Suboxone film was costlier to manufacture and less profitable than Suboxone tablets.  (Id.)  Further, Dr. Lamb remarked that, based on his review of the evidence, the success of Reckitt's conversion of the market to film required investment in rebates to managed care organizations to ensure favorable placement on formularies.  (Id. ¶ 153.)  Dr. Lamb then remarked that Reckitt specifically discussed that its efforts to convert the market to film would not result in higher overall sales through increased market, and actually expected that its efforts would stifle market growth and result in loss of profits given that film was costlier to produce.  (Id. ¶ 156.)  Ultimately, Dr. Lamb concluded that "Reckitt's efforts to disadvantage Suboxone tablets relative to Suboxone film through its Hard Switch Scheme . . . only makes sense as a matter of economics if Reckitt expected that by doing so it could eliminate competition for branded Suboxone tablets from generic Suboxone tablets, resulting in greater profits in the long run that would offset short-run profit sacrifice, allowing it to protect and prolong net revenue and profits it would earn on the Suboxone franchise in the long run."[5]  (Id. ¶ 158.)

Dr. Berndt's report provided a similar analysis.  Again citing to Reckitt internal documents, Dr. Berndt observed that the costs of goods sold for the film are higher than the tablet because "the

---

[5]     Dr. Lamb's rebuttal report addressed efforts by Reckitt's expert, Dr. Normann, to establish that the increase on brand Suboxone tablets was not "economically irrational."  (Reckitt's Mot., Ex. 2, Lamb Rebuttal Rep. ¶¶ 78–84.)

manufacturing supply chain involves a 3rd party manufacturer and a secondary packer as opposed to complete in house production per tablets." (Berndt Rep. ¶¶ 96–97.)  Moreover, Dr. Berndt remarked that beyond manufacturing cost differences, (a) Reckitt owed royalties to MonoSol on the film, while tablets had no royalties, and (b) some of the original development costs of tablets were borne by the National Institute on Drug Abuse.  (Id. ¶ 98.)  In light of these factors, Dr. Berndt concluded that "the fact that Reckitt consciously drove the market towards its less profitable product (Film) and assiduously reduced the share of its more profitable product (Tablets) by offering Film rebates exhibits economically irrational behavior *unless* Reckitt reckoned a long term offsetting gain to commuting the patient population to the temporarily less profitable Film product that would subsequently become more profitable due to its having foreclosed competition from generic tablets." (Id. ¶ 109.)

Reckitt's challenge to these opinions is nothing more than an argument that, rather than relying on internal Reckitt documents and admissions about profitability margins of tablet and film products, Drs. Lamb and Berndt should have independently analyzed the economic data to determine whether Reckitt's own statements about their products' profitability were correct.  Reckitt, however, offers no authority for this proposition.  Nor do I find that the experts' methodology to be so inherently unreliable as to warrant exclusion under Daubert.  To the extent Reckitt believes that Drs. Berndt and Lamb should have gone further in their economic analyses, Reckitt may explore such alleged deficiencies on cross-examination.  Likewise, if Reckitt can establish that its internal statements were incorrect and that its overall short-term profits were not impacted by its increases on the price of brand tablets together with its efforts to move the market from tablet to film, it may attempt to present its own evidence and expert testimony to that effect.  Accordingly, I will deny this portion of Reckitt's Motion.

**C.**     **Opinions Relying on Assumptions About When Generic Tablets Would Have Launched But For the Alleged Delay**

In its third argument, Reckitt challenges any economic opinions that rely on the assumption that Reckitt unlawfully delayed the launch of competing generic tablets for six months. Plaintiffs' theory on this issue posits that although generic alternatives to Suboxone tablets did not launch until March 5, 2013, Reckitt improperly delayed generic approval by, in part, negotiating in bad faith during the REMS/SSRS process. Plaintiffs press that absent such delay, and "but for" Reckitt's conduct, generics could have launched in September 2012. Plaintiffs' economic/damages experts rely on this "but-for" timeline and opine on damages based on a September 2012 launch date. Reckitt seeks to exclude this damages testimony, arguing that Plaintiffs have failed to proffer any admissible expert testimony to support the assumption that generic tablets could have launched in September 2012.

Reckitt's argument suffers from several deficiencies. First, Plaintiffs do, in fact, offer two experts to testify regarding their "but-for" timeline: Patricia Zettler and Deborah Jaskot. Although, in an earlier-filed <u>Daubert</u> motion, Reckitt sought to exclude Zettler's and Jaskot's testimony on the "but-for" launch date, I declined to exclude either expert's opinion. See <u>In re Suboxone Antitrust Litig.</u>, No. 13-md-2445, 2020 WL 6887885, at *34–37 (E.D. Pa. Nov. 24, 2020). That ruling, however, was not issued until after Reckitt filed the current Motion, thus leading Reckitt to erroneously assume that its prior <u>Daubert</u> motion would be granted and that neither Professor Zettler nor Ms. Jaskot would be permitted to offer expert testimony to support the assumption that generic models could have launched in September 2012.

Experts "are permitted to rely on materials used by other experts in developing their own opinions." <u>I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants</u>, No. 03-4932, 2008 WL 2265269, at *3 (E.D. Pa. June 3, 2008) (quotations omitted). Experts "may use a mix of objective

data and subjective analysis from another expert to . . . create an admissible report," and the testifying expert's knowledge regarding the underlying facts "go[es] to the weight accorded to [that expert's] report and testimony, rather than its admissibility." Id. (quoting In re Wagner, No. 06-1026, 2007 WL 966010, at *4 (E.D. Pa. Mar. 29, 2007)). "[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." Dura Auto. Sys. of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 613 (7th Cir. 2002) (Posner, J.); see also Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., 286 F.R.D. 266, 271 (W.D. Pa. 2012) ("[I]t is well-settled that one expert may rely upon another expert's opinion in formulating his own.").

Plaintiffs' economists—Dr. Lamb, Dr. Conti, and Dr. Berndt[6]—all premised their various damages opinions on the but-for worlds constructed by Professor Zettler and Ms. Jaskot. As this reliance is proper, and as the opinions of Professor Zettler and Ms. Jaskot are admissible, I find no basis on which to exclude Drs. Lamb, Conti, and Berndt's derivative opinions.

Moreover, even assuming that I were to exclude the Jaskot and Zettler opinions as to the but-for generic launch date, Plaintiffs correctly note that they may introduce direct factual evidence of when the generic companies would have launched but for Reckitt's conduct.

In re Namenda Direct Purchaser Antitrust Litig., 331 F. Supp. 3d 152 (S.D.N.Y. 2018) touched on a similar issue. There, the plaintiffs, proceeding under a reverse settlement antitrust theory, offered an expert to testify regarding whether there were any supply, equipment, or

---

[6]     Dr. Lamb was retained by the Direct Purchaser class to calculate the aggregate amount of overcharge damages suffered by class members. Dr. Conti was retained by the End Payor class to measure overcharges to class members. Dr. Berndt was retained by the State Plaintiffs to conduct a disgorgement analysis to calculate the financial state Defendants would have found themselves in had they not engaged in the alleged scheme.
        Reckitt posits that neither the End Payor class nor the States have retained Professor Zettler or Ms. Jaskot, and thus have no expert testimony to support the but-for timeline. Reckitt, however, has not cited any case law to establish that Dr. Conti and Dr. Berndt cannot rely on expert testimony proffered by the other Plaintiffs.

manufacturing challenges that would have prevented five generic competitors from launching a generic version of the brand drug at issue prior to a certain date.  Id. at 169.  The court concluded that although the expert was qualified to opine on a "but-for" launch date, the expert had reviewed no data from the generics or elsewhere about matters that might have impacted the generics' ability to enter the market earlier.  As such, it excluded her testimony  Id. at 171.  Nonetheless, the court observed that the plaintiffs could still prove an earlier generic launch date by calling fact witnesses at trial to offer an explanation, grounded in the actual circumstances facing each individual generic, about why each generic could have entered the market earlier but for the alleged anticompetitive conduct.  Id. at 172.

Here, Plaintiffs have identified factual evidence to support their proposed but-for timeline.  Both Professor Zettler and Ms. Jaskot outlined the timeline of the shared REMS process regarding Suboxone and described the timeline of events relevant to approval of the generic ANDAs, including regulatory evidence regarding the readiness of the generic ANDAs.  (ECF. No. 625, Ex. 1, Zettler Rep. ¶¶ 72–109; ECF No. 625, Ex. 10, Jaskot Rep. ¶¶ 63–86.)  While the absence of expert testimony on these events would perhaps result in a more disjointed presentation, Plaintiffs could call fact witnesses to present this evidence and suggest, based on this evidence, when the generic manufacturers were ready to launch their products.

Drs. Berndt, Lamb, and Conti could then rely on such evidence as a foundation for their economic calculations.  To the extent Reckitt has competing evidence regarding generic entry, it may present that evidence either in its case-in-chief or on cross-examination.  Contradictory evidence, however, would not provide a basis for the exclusion of these experts' opinions.  See Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the

basis for his opinion can highlight those weaknesses through effective cross-examination"). Accordingly, I will deny this portion of Reckitt's Motion.

### D.    Expert Testimony About the Relevant Product Market

Reckitt's fourth Daubert challenge concerns opinions by Plaintiffs' experts (Dr. Lamb for the class Plaintiffs and Dr. Eric Emch for the States) regarding the relevant product markets.  Both Dr. Lamb and Dr. Emch opine that the relevant market in this matter consists of Suboxone film, Suboxone tablets, generic alternatives to tables.  (Lamb Rep. ¶ 39; Reckitt's Mot., Ex. 7, Report of Dr. Eric Emch  ("Emch Rep.") ¶ 10.)  Challenging these definitions, Reckitt objects to the inclusion of both wholesalers of such products—*i.e.*, those who purchase buprenorphine drugs from the manufacturers—and consumers of such products—*i.e.*, those who purchase buprenorphine products from licensed pharmacies at a price set by either the pharmacy or their insurance company and for the purpose of treating opioid use disorder.  Reckitt asserts that "although wholesalers and consumers both purchase buprenorphine medications, they do so from different suppliers, in different amounts, for different purposes, and at different prices.  There is thus no reason to assume that wholesalers and consumers will agree on what products are substitutable."  (Reckitt Mot. 22–23.)  Given these distinctions, Reckitt argues that one cannot assume that a wholesaler market will encompass the same products as a consumer market.   Because Plaintiffs' experts state that the wholesaler and consumer markets should share the same definition, Reckitt contends that their opinions are unreliable and should be excluded.

This argument does not provide any basis for exclusion of these opinions under Daubert standards.   "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)).  "Interchangeability 'implies that one

product is roughly equivalent to another . . . [and] while there might be some degree of preference for one over the other, either would work effectively.'" Allen-Myland, Inc. v. Int'l Bus. Machs. Corp., 33 F.3d 194, 206 (3d Cir. 1994). "Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product [X] to changes in the price of a different product [Y]." Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co., 838 F.3d 421, 437 (3d Cir. 2016).

The United States Supreme Court has defined the relevant cross-price elasticity demand inquiry as whether a price changes causes *consumers* to change their consumption of one product in response to a price change in another. Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 469 (U.S. 1992) ("The extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.,* the 'cross-elasticity of demand.'"). The Third Circuit has recognized that "[t]he test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'" Queen City Pizza, Inc., 124 F.3d at 438 (citing United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956); Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991)).

Therefore, the relevant market definition must focus on the product rather than the distribution level. See PSKS, Inc. v. Leegin Creative Leather Prods., Inc., 615 F.3d 412, 418 (5th Cir. 2010). In pharmaceutical antitrust cases brought by direct purchasers and end payors, courts have repeatedly allowed the relevant product market for *both* groups to be defined by reference to consumer demand. See, e.g., In re Loestrin 24 Antitrust Litig., 261 F. Supp. 3d 307, 327–28 (D.R.I. 2017) (stating, in pharmaceutical antitrust case brought by both end payors and direct purchasers, that relevant market must be defined as consisting of commodities reasonably interchanged by

consumers for the same purpose); <u>In re Aggrenox Antitrust Litig.</u>, 94 F. Supp. 3d 224, 246–47 (D. Conn. 2015) (recognizing, in an antitrust case brought by direct purchasers of prescription pharmaceuticals, that the relevant market must still be defined by consumer demand even though insurance plans and prescribing physicans largely insulate consumers from cost and choice).[7]

Consistent with this line of cases, Plaintiffs' experts offered a reliable methodology for defining the relevant market. Dr. Lamb noted that demand for pharmaceutical drugs is driven through a supply chain that runs (a) from healthcare providers who select drugs, (b) to pharmacy benefit managers who manage the insurance, (c) to patients who pay some or all of the cost of the prescription, (d) to the pharmacy level and treatment facilities where demand is driven by prescriptions, and (e) ending with wholesalers who seek to fill the demand of pharmacies and other intermediaries. (Lamb Rep. ¶ 27.) Dr. Lamb characterized the relevant market as buprenorphine/naloxone products (Suboxone film, Suboxone tablets, and AB-rated generic buprenorphine/naloxone tablets). (<u>Id.</u> ¶ 39.) He explained that prior to generic entry, Reckitt could regularly implement price increases of seven to fifteen percent for branded Suboxone tablets and film without losing significant Suboxone sales volumes. (<u>Id.</u> ¶¶ 46, 48.) He further remarked that Suboxone sales were "generally unaffected by Reckitt's economically-irrational branded Suboxone tablet increases, and . . . these significant price increases affected the sales of drugs used for the

---

[7]     Reckitt indiscriminately cites multiple antitrust cases for the proposition that the relevant product market at a supplier or middleman level of distribution will often have different contours from the market at a consumer level, and a product market is properly pled only if defined from the perspective of the plaintiff. These cases are legally and factually distinguishable and, in fact, often advocate for a broader definition of the relevant market  <u>See, e.g.</u>, <u>Physician Specialty Pharm., LLC v. Prime Therapeutics, LLC</u>, No. 18-1044, 2019 WL 5149866, at *6 (D. Minn. Aug. 8, 2019) (finding, in a claims alleging a vertical restraint of trade by a pharmacy benefit manager who  refused to fill claims by a pharmacy, the relevant market included all potential customers of the pharmacy regardless of what type of insurance or payment the customer used); <u>Little Rock Cardiology Clinic PA v. Baptist Health</u>, 591 F.3d 591, 596–97 (8th Cir. 2009) (in antitrust claim by cardiology clinic and its physicians against nonprofit hospital operator and insurance company alleging vertical restraint of trade, the relevant product market should include all consumers  of cardiology services regardless of how they pay for them).

treatment of opioid dependence within the relevant product market only (i.e., only affected sales of BPN/NLX)." (Id. ¶ 51.)  Dr. Lamb then engaged in extensive discussion of why other opioid-dependence treatments were not part of the relevant antitrust products market. (Id. ¶¶ 52–73.)

In his rebuttal report, and in direct response to Reckitt's argument that demand substitution factors could vary depending on where in the pharmaceutical supply chain the purchaser exists, Dr. Lamb offered an explanation for his relevant market definition.  He opined that "the purchasing decisions of all Class members (either wholesalers or clinics) are driven by the same market demand factors and are subject to the same market forces, and that it makes no sense of a matter of economics to define separate relevant antitrust markets for different types of purchasers (such as wholesalers and clinics) because all of the Class members in this matter purchased directly from Reckitt and paid higher BPN/NLX prices as a result of Reckitt's anticompetitive scheme." (Reckitt's Mot., Ex. 2, Reply Report of Russell Lamb ("Lamb Reply Rep.") ¶ 160.)  He further commented that "all Class members are market participants whose purchasing decisions are affected by physicians' prescribing behavior and choices, which reflects the effects of Reckitt's anticompetitive scheme." (Id.; see also Reckitt Mot., Ex. 18, Dep. of Russell Lamb ("Lamb Dep."), 581:4–14.)

Similarly, Dr. Emch evaluated demand-side substitution and determined the relevant product market by examining evidence in five different categories, including (1) medical and other differences between buprenorphine/naloxone and other drugs used to treat opioid use disorder, (2) evidence on demand-side substitution among drugs used to treat opioid use disorder from Reckitt planning strategy documents, (3) usage trends in drugs used to treat opioid use disorder, (4) cross-price elasticity of demand between buprenorphine/naloxone and methadone, and (5) application of the hypothetical monopolist test.  (Emch Rep. ¶¶ 37–59.)  Ultimately, Dr. Emch concluded that "[t]he relevant product market for assessing Defendants' actions is drugs with co-formulated

buprenorphine/naloxone as the active ingredient used for the medication-assisted treatment of opioid use disorder." (<u>Id.</u> ¶ 60.)

Although Reckitt may counter Dr. Lamb and Dr. Emch's relevant product market definitions, I find, for purposes of a <u>Daubert</u> analysis, that these experts have provided ample rationale for analyzing cross-price elasticity at the consumer level rather than limiting the analysis to the wholesaler level. Reckitt cites to nothing that renders such an analysis so wholly unreliable as to require exclusion.

### E.    Expert Testimony from Dr. Rena Conti

Reckitt's final <u>Daubert</u> challenge concerns the End Payor Class's economic expert, Dr. Rena Conti. Dr. Conti was asked "to describe the institutional nature of the pharmaceutical market and to provide a methodology that illustrates End-Payor purchaser overcharges resulting from Defendants' alleged misconduct." (Reckitt's Mot., Ex. 12, Expert Rep. of Rena Conti ("Conti Rep.") ¶ 1.) She opined that "if the delay and suppression of generic entry by Defendants occurred as alleged, then it resulted in overcharges to End-Payor purchasers." (<u>Id.</u> ¶ 2.)

Reckitt contends that Dr. Conti's opinions should be excluded on two grounds. First, Reckitt posits that Dr. Conti fails to provide either data, a methodology, or a cogent explanation for her assumption that the use of data showing payments made to pharmacies is a fair proxy for payments made by class members. Second, Reckitt presses that Dr. Conti's overcharge calculations are not relevant to any issue that will be tried in any joint trial because the End Payor Class has only been certified as to certain issues, and the amount of overcharges or damages that any End Payor plaintiff may have incurred is not one of them.

I find that any <u>Daubert</u> ruling as to Dr. Conti is premature at this time. In my Class Certification Memorandum and Order, I certified the End Payor Class to address only six discrete questions: (1) whether Reckitt engaged in anticompetitive and deceptive conduct; (2) whether

Reckitt willfully maintained monopoly power through such conduct; (3) whether Reckitt had a specific intent to monopolize; (4) whether Reckitt had a dangerous probability of achieving monopoly power; (5) whether Reckitt offered a non-pretextual procompetitive justification that could not have been obtained through less restrictive means, and if so; (6) whether the anticompetitive effects of Reckitt's conduct outweigh their proffered procompetitive benefits, if any. (ECF No. 588, Sept. 26, 2019 Order ¶ 3(b).)  I further indicated that, assuming antitrust liability was established, each individual End Payor Plaintiff would then have to prove antitrust impact and damages at a separate trial or trials.  In re Suboxone, 421 F. Supp. 2d 77–78.

Dr. Conti's testimony will not be offered on any of the common class questions regarding antitrust liability.  Rather, her testimony is strictly limited to the issue of whether the named End Payor Plaintiffs independently suffered antitrust injury and, to some extent, what those damages are. (Pls.' Opp'n Reckitt's Mot. 28.)  In turn, her testimony will not be relevant to any class trial on the certified class issues.  It will only become pertinent if a jury concludes that Reckitt indeed violated antitrust laws.  Accordingly, any motion to exclude her testimony is premature at this time and will be resolved at the appropriate stage of this litigation.

## IV.      MONOSOL'S MOTION TO EXCLUDE DR. BERNDT

Defendant MonoSol separately moves to exclude the testimony of economist Dr. Ernst Berndt as offered against MonoSol in the Plaintiff States' action.  Dr. Berndt submitted two expert reports on behalf of the Plaintiff States.  In his "Market Effects" report, Dr. Berndt described the U.S. prescription drug market and the evolution of practices involving generic drug competition, and then opined on how Reckitt and MonoSol's alleged conspiracy to circumvent the AB-rating system through the alleged "hard switch" scheme prevented generic competition.  (MonoSol's Mot., Ex. 1, Market Effects Report of Ernst Berndt ("Berndt ME Rep.") ¶ 9.)  In his "Disgorgement" report, Dr. Berndt opined on how Reckitt's and MonoSol's conduct "may have impacted the timing of market

entry for generic buprenorphine/naloxone tablets and estimated what profits for these companies would have been but-for the alleged scheme." (Monosol's Mot., Ex. 2, Dr. Ernst Berndt Disgorgement Rep. ("Berndt Disgorgement Rep.") ¶ 8.)

MonoSol now contends that Dr. Berndt's reports and testimony are inadmissible on two grounds. First, MonoSol presses that Dr. Berndt is not qualified to offer an opinion on antitrust economics. Second, MonoSol asserts that Dr. Berndt's method of identifying anticompetitive harm is not supported by a reliable application of accepted antitrust economics.

### A.        Qualifications

MonoSol first argues that Dr. Berndt is not qualified to offer an opinion on antitrust liability or violations because "he is an expert in health economics, not antitrust economics." (MonoSol's Mot. 6.)

As set forth above, "[q]ualification requires 'that the witness possess specialized expertise.'" Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008) (quoting Schneider ex re. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)). There is a liberal policy of admissibility and the Third Circuit has held that a "broad range of knowledge, skills, and training qualify an expert." Id. (quoting Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741–42 (3d Cir. 1994)). The Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." Paoli R.R., 35 F.3d at 741. An expert will not be excluded "simply because [the court] does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." Holbrook v. Lykes, Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996). The focus, instead, is on whether the qualifications that an expert does have provide a foundation for the witness to testify meaningfully on a given matter. See Buzzerd v. Flagship Carwash of Port St. Lucie, Inc., 669 F. Supp. 2d 514, 522 (M.D. Pa. 2009). "If the expert meets liberal minimum qualifications, then

the level of the expert's expertise goes to credibility and weight, not admissibility." <u>Kannankeril v. Terminix Int'l</u>, 128 F.3d 802, 809 (3d Cir. 1997) (citing <u>Paoli</u>, 35 F.3d at 741).

Dr. Berndt possesses extensive education and experience in matters of economic damages from actions occurring in the pharmaceutical industry. Dr. Berndt is a long-time professor of applied economics at Massachusetts Institute of Technology and a research associate at the National Bureau of Economic Research. (Berndt ME Rep. ¶ 1.) A major focus of his academic research over the last twenty-five years has been on health economics and the economics of the pharmaceutical, biotechnology, vaccine, and medical device industries, as well as on the impacts of marketing on sales of pharmaceutical drugs, the pricing patterns of generics and brand-name prescription drugs, and prescription-only to over-the-counter switches. (<u>Id.</u> ¶ 2.) A great deal of his research has also involved issues of price measurement with respect to brand-name and generic drugs. (<u>Id.</u> ¶¶ 3–4.) He has served on numerous national committees involved with economic analysis, including those advising the Food and Drug Administration. (<u>Id.</u> ¶ 5.) Finally, Dr. Berndt has been involved in a number of healthcare litigation matters, and has been retained by counsel for branded pharmaceutical and biotechnology firms, generic pharmaceutical manufacturers, third-party payors, the Federal Trade Commission, and the U.S. Department of Justice. (<u>Id.</u> ¶ 6.) He has also served as a court-appointed independent expert in two pharmaceutical antitrust cases. (<u>Id.</u>)

Beyond these qualifications, Dr. Berndt's ME Report reveals the depth of his knowledge. He engaged in a lengthy discussion regarding the participants in the prescription drug market, the U.S. Food and Drug Administration's regulatory role, and the evolution of the generic drug market in the United States (<u>Id.</u> ¶¶ 23–71.) With direct citation to evidence (the list of which spans tens pages), Dr. Berndt provided a detailed opinion as to how Defendants engaged in conduct expressly to pre-emptively switch patients from tablets to film. (<u>Id.</u> ¶¶ 72–147.) Ultimately, he summarized the results of Defendants' scheme, concluding that Reckitt's and MonoSol's joint conduct, together with

the marketplace dynamics, resulted in an inflated Suboxone film market whose lingering effects persist to the present.  (Id. ¶¶ 148–180.)

Against this backdrop, MonoSol posits, in the most general terms, that Dr. Berndt is not qualified to offer an opinion on *antitrust* economics.  Citing to isolated portions of Dr. Berndt's deposition, MonoSol remarks that Dr. Berndt has identified as "an academic health economist who studies health policy," but does not proffer himself as an antitrust economist, a representative of the FDA, or an expert in the law, thus rendering him unqualified to opine on whether MonoSol's conduct harmed competition.  (MonoSol's Mot., Ex. 4, Dep. of Ernst Berndt Part I ("Berndt Dep. I") 27:3–22, 30:26–18; see also id. at 142:5–6 ("And I'm not a legal expert.  I'm not an antitrust expert.")[8]  MonoSol goes on to argue that Dr. Berndt exposed his lack of antitrust expertise when "he repeatedly mischaracterized the agreements between [MonoSol and Reckitt] as 'horizontal' rather than 'vertical.'"  (Id. at 7.)

In light of Daubert's liberal standards, MonoSol's cursory qualification argument lacks merit.  It is true that "[t]he qualifications of an economic expert must be evaluated in the light of the specialized nature of the analysis that may be performed in antitrust cases."  "The Sedona Conf. Commentary on the Role of Economics in Antitrust Law," 7 Sedona Conf. J. 69, 83 (2006).  Thus, for example, "[a] respected Ph.D. economist with 'no background in antitrust markets' and 'not a member of any associations or industrial organization groups which form the bulwark of economists specializing in antitrust law and economics' [may not be] qualified to testify on the relevant market." Id. (quoting Nelson v. Monroe Reg'l Med. Ctr., 925 F.2d 1555, 1572 (7th Cir. 1991) (concurring opinion)).  Nonetheless, MonoSol has identified no legal authority—and I find none—suggesting

---

[8]      (See also MonSol's Mot., Ex. 5, Ernst Berndt Dep. Part II ("Berndt Dep. II"), 476:20–24 ("[B]ecause I'm not a lawyer or an antitrust expert, and so there may be some principles I'm not aware of that are standard practice there."); MonoSol's Mot., Ex. 6, Ernst Berndt Dep. Part III ("Berndt Dep. III"), 735:2–3 ("I don't market myself as an antitrust economist.")

that an economics expert in an antitrust case requires particularized antitrust expertise in order to render an opinion as to what effect certain alleged conduct has on the economics of a particular market.[9]

Indeed, courts have repeatedly recognized that economists are qualified to testify on the market effects of certain collusive or anticompetitive conduct.  See, e.g., In re Processed Egg Prods. Antitrust Litig., No. 08-md-2002, 2016 WL 4385843, at *2–3 (E.D. Pa. Aug. 15, 2016) (finding an economist capable of testifying as to whether an industry's market structure makes it particularly susceptible to collusion by examining geographic scope of the market, interchangeability, barriers to entry, elasticity of demand, and methods of collusion); In re Loestrin 24 Fe Antitrust Litig., 433 F. Supp. 3d 274, 323–24 (D.R.I. 2019) (permitting professor of health economics to opine on alleged anticompetitive conduct, analyze defendants' proffered procompetitive effects, and apply product sacrifice test to defendants' actions).[10]

Dr. Berndt undisputedly has extensive expertise in health care economics.  Consistent with that expertise, he opined that the Defendants' actions resulted in Suboxone film obtaining an eighty

---

[9]    MonoSol relies heavily on the case of O'Brien v. Sofamor, No. 96-8015, 1999 WL 239414, at *1 (E.D. Pa. Mar. 30, 1999).  In that case, plaintiffs sued a manufacturer of spinal implants for injuries resulting from the implantation of faulty bone screws.  In support of their claims, the plaintiffs submitted the report of Dr. Bennett, a board-certified neurologist.  Id. at *3.  The court found that Dr. Bennett was not qualified as he had never performed surgergy of any type, had no training or education in instrumented spinal fusion surgery, had never treated a patient who had undergone one, disclaimed any expertise in biomechanics, metallurgy, or the design of orthopedic implants, and admitted that he did not know what types of instrumentation were available to surgeons performing fusion surgery.  Id. at *4.  In addition, he had not performed any independent research in either the area of spinal fusion surgery or a related area.  Id.  The court found that plaintiff have provided no evidence that Dr. Bennett had the expertise to opine on what caused the plaintiff's worsened condition after spinal surgery and, thus, did not meet the liberal standard for qualification.  Id.
        Aside from demonstrating the well-established principle that an expert must be qualified to opine on the particular area on which he or she speaks, this case seems to have no bearing on whether Dr. Berndt, a health care economist, is qualified to opine on the market impact of certain conduct in the health economics arena.

[10]    See also In re Polyproylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348, 1359 (N.D. Ga. Mar. 28, 2000) (finding expert in econometrics and application of statistical methods to business and economic issues qualified to testify on competitive prices and damages in an antitrust case even though he disclaimed expertise in the area of economics or market behavior).

percent market share, leaving only twenty percent of the overall buprenorphine/naloxone tablet market subject to generic competition, a result that persists to present day.  He concluded that "Defendants' overall scheme, which carried out Reckitt's 'generic defense strategy,' not only protected the Suboxone franchise from AB-rated substitution, but it also impeded a reverse-commute to generic tablets[, which] effectively foreclose[ed] consumers and the healthcare system from realizing the cost savings associated with generic entry" and which allowed MonoSol to "continue[] to reap profits from the duration of Reckitt's market power that MonoSol helped ensure through the development of Suboxone Film."  (Berndt ME Rep. ¶ 20.)  Contrary to MonoSol's argument, Dr. Berndt, at no point, attempted to speak from an antitrust perspective.  Rather he confined his report to the bounds of his expertise and opined upon the effects of Defendants' conduct within the context of the health and healthcare market.

MonoSol also asserts that "Dr. Berndt exposed his lack of expertise in antitrust economics by making a basic mistake concerning the evaluation of antitrust harm that an economist trained in antitrust economics would never make: he repeatedly mischaracterized the agreements between [MonoSol and Reckitt] as 'horizontal' rather than 'vertical.'"[11]  (MonoSol's Mot. 7)  Engaging in a

---

[11]  The deposition testimony at issue is as follows:

> Q.  And the business relationship included MonoSol providing [Reckitt] with its film technology and manufacturing the Suboxone film strips; is that right?
> A.  Yes.
> Q.  And so you would describe that, wouldn't you, as a vertical business relationship?
> A.  I'm not sure it's only vertical because there was a lot of collaboration that was involved in jointly developing, so it had many horizontal aspects to it as well.
> Q.  So MonoSol was acting as a company producing substitutes for the branded drugs that Reckitt was producing; is that your testimony?
> . . .
> A.  My testimony is that MonoSol collaborated with Reckitt in jointly developing and putting together an FDA application to market a product that was not going to be AB-substituted to Reckitt's brand.

(Berndt Dep. 45:3–23.)

simplistic discussion of horizontal and vertical relationships, MonoSol argues that Dr. Berndt's insistence that MonoSol and Reckitt are horizontal competitors "is a good leading indicator that his expertise in health economics does not qualify him to opine on antitrust harm." (Id. at 9.)

Dr. Berndt's report did not purport to characterize MonoSol and Reckitt's relationship as horizontal or vertical.[12]   Rather, he limited his opinions to the nature of MonoSol and Reckitt's collusion and the impact that had on the healthcare market from an economic perspective.   The precise legal characterization of Defendants' contractual relationship—while relevant to the ultimate antitrust violation—does not bear on the reliability of Dr. Berndt's proposed testimony, other than potentially exposing some limitation on Dr. Berndt's knowledge in the field of antitrust economics.

Dr. Berndt is more than adequately qualified under the liberal Daubert standards to render his market effects opinion.  Reckitt remains free to cross-examine Dr. Berndt with statements made in his deposition that may expose the limitations of his knowledge.  Dr. Berndt, however, sufficiently meets the liberal standards of qualification under Daubert.

## B. **Reliability**

MonoSol's second challenge to Dr. Berndt's report questions the reliability of Dr. Berndt's method of identifying anticompetitive harm.  In support, MonoSol posits three arguments: (1) Dr. Berndt's lack of qualifications undermines the reliability of his methodology; (2) Dr. Berndt relies on a standard to evaluate MonoSol's conduct that is not an accepted method of identifying antitrust harm and is antithetical to the principles of antitrust economics; and (3) Dr. Berndt's theory of

---

[12]     Indeed, MonoSol has not demonstrated that Dr. Berndt's testimony is completely unfounded on economic principles, particularly given the intricacies of characterizing relationships as horizontal or vertical. More recent jurisprudence has eschewed such strict distinctions and has recognized that vertical relationships can give rise to horizontal conspiracies.  See United States v. Apple, Inc., 791 F.3d 290, 324–25 (2d Cir. 2015) (holding that vertical agreements can be used to facilitate coordination of a horizontal conspiracy).

antitrust harm does not distinguish between anticompetitive and procompetitive conduct, further vitiating the reliability of both his market effects and disgorgement analyses.

I have previously addressed MonoSol's argument regarding Dr. Berndt's qualifications and, as such, will not repeat that discussion here.

### 1.   Methodology in Identifying Anticompetitive Conduct

MonoSol also takes issue with Dr. Berndt's use of a standard he called the "spirit" of the Hatch-Waxman Act.  According to MonoSol, "Dr. Berndt attempts to fashion the 'spirit' of an industry-specific legislative and regulatory scheme into a new standard for evaluating whether conduct is anticompetitive as a matter of antitrust economics."  (MonoSol's Mot. 14.)  MonoSol notes that, according to Dr. Berndt, MonoSol allegedly circumvented the AB-substitution system via a scheme that included the MonoSol agreement to develop for Reckitt a film version of Suboxone that would not be AB-rated to tablets, followed by Reckitt's disparagement of tablets and withdrawal of tablets from the market.  (Id. at 15.)  MonoSol argues that Dr. Berndt's opinion that such conduct is contrary to the "spirit" of the Hatch-Waxman Act is not a recognized or legitimate test of whether said conduct has any anticompetitive effects as a metter of antitrust economics, but rather is a standard "concocted by Dr. Berndt to support the States claims." (Id. at 16.)

I have no basis on which to conclude that Dr. Berndt's methodology is illegitimate or unreliable under Daubert standards.  Contrary to MonoSol's argument, a drug company's violation of the "spirit" of the Hatch-Waxman Act and its underlying public policy has been deemed a basis for finding those actions anticompetitive for purposes of antitrust laws.  In the Namenda antitrust case, the plaintiffs argued that the defendants' product-hop, i.e., moving patients from one formulation of its branded drug to another formulation, prior to the entry of generics was designed to impede competition because the new formulation was not AB-rated to the generics.  New York ex Rel Schneiderman v. Actavis PLC, 787 F.3d 638, 642–43 (2d Cir. 2015).  On appeal from a

preliminary injunction by the district court, the Second Circuit considered the defendant's argument that its efforts to avoid generic substitution laws were not anticompetitive and that "antitrust law is not a vehicle for enforcing the 'spirit' of drug laws." Id. at 658.  Rejecting that argument, the Second Circuit remarked that "the Supreme Court has made clear that '[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue'" Id. (quoting Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 411 (2004)).  The Court went on to note that, "[l]eading antitrust authorities have encouraged courts to acknowledge market defects, such as a price disconnect and the exclusivity of patents, in the antitrust analysis.  And in other Hatch-Waxman contexts, this court has recognized that efforts to manipulate aspects of the Hatch-Waxman incentive structure to exclude competition could state an antitrust claim." Id. Therefore, the Court concluded that "the district court appropriately considered the unique market characteristics of the pharmaceutical industry in concluding that antitrust law 'requires [Defendants] to allow generic competitors a fair opportunity to compete using state substitution laws.'" Id.

In similar fashion, Dr. Berndt—relying on Plaintiffs' allegations that Reckitt and MonoSol conspired anticompetitively to extend the lifecycle of Suboxone through a series of antitcompetitive activities to switch patients from Suboxone tablets to film, thereby impeding the ability of generic tablets to compete in the market—provided an extensive opinion regarding the effect Defendants' actions would have had on the market.  He started with an explanation of how the U.S. pharmaceutical market has sought to strike a balance between creating and maintaining the incentives for developing innovative new drugs while also encouraging competition.  (Berndt ME Rep. ¶ 14.) He referred to the Hatch-Waxman legislation as the "grand compromise" between the manfacturers of branded innovator drugs and the generic drug industry.  (Id. § VI.C.2., ¶ 59.)  He went on to discuss how the key mechanism behind generic drug competition is the AB-rating system, which allows generics to compete on price.  (Id. ¶ 15.)  Dr. Berndt then noted that Reckitt and MonoSol's

introduction of Suboxone film, combined with the other challenged conduct, was designed precisely to undermine this substitution mechanism and preclude erosion of market share from the entry of generics.  (Id. ¶ 16.)  Dr. Berndt remarked that Reckitt "sought to evade the Hatch-Waxman Act's automatic substitution provisions, effectively evading and unraveling 'the grand compromise.'"  (Id. ¶ 72.)   After describing the challenged conduct, Dr. Berndt undertook to define the impact such actions had on the buprenorphine/naloxone market, noting that the Suboxone film market share increased from 0% to 80% between 2010 and 2013, leaving only 20% of the overall market subject to generic competition.  (Id. ¶ 18.)   Ultimately, Dr. Berndt concluded that "Defendants' overall scheme, which carried out Reckitt's 'generic defense strategy,' not only protected the Suboxone franchise from AB-rate substitution, but it also impeded a reverse-commute to generic tablets."  (Id. ¶ 20.)   Such actions have "prevent[ed] the goals of the 'grand compromise' Hatch-Waxman legislation from being achieved."  (Id.)

Regardless of whether Dr. Berndt's opinion is substantively correct, I find that his proffered methodology bears adequate indicia of reliability for purposes of surviving Daubert.  See Paoli, 35 F.3d at 744 (concluding that the "evidentiary requirement of reliability" amounts to a lower burden "than the merits standard of correctness").  Although MonoSol baldly argues that Dr. Berndt's standard is "invented" and presses that Dr. Berndt must "use the methods and procedures of antitrust economics to explain why the conduct he characterizes as contrary to the spirit of the Hatch-Waxman Act was actually anticompetitive," MonoSol does not provide any case citations, expert opinion, or examples of what exactly such an analysis would be.   Accordingly, I will reject this challenge.

2.        Alleged Inconsistency in Market Effects and Disgorgement Reports

MonoSol's final challenge to Dr. Berndt's report contends that his opinions are internally inconsistent.  Specifically, according to MonoSol, Dr. Berndt's Market Effects Report condemned MonoSol for actions that, according to Dr. Berndt's Disgorgement Report, are not anticompetitive.

More specifically, Dr. Berndt's Market Effects Report opined that MonoSol's conduct in developing, selling, and truthfully promoting film was anticompetitive. Yet, in his Disgorgement Report— where Dr. Berndt created a counterfactual "but-for" world free of alleged anticompetitive conduct to estimate the profits that Defendants would have earned in that hypothetical world—MonoSol is assumed to have engaged in the same conduct of developing the film, selling it to Reckitt, and truthfully promoting it. In other words, according to MonoSol, Dr. Berndt treated MonoSol's conduct as both anticompetitive and not anticompetitive at the same time, rendering his approach unreliable on its own terms.

MonoSol's Motion improperly attempts to segregate Plaintiffs' alleged overarching scheme of anticompetitive conduct into multiple discrete acts—an argument that has been repeatedly rejected in this case. See In re Suboxone Antitrust Litig., 967 F.3d 264, 270–71 (3d Cir. 2020) (noting that the court must "look at 'all the acts taken together [to determine whether they] show the willful acquisition or maintenance of a monopoly.'" (quoting Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 813 (3d Cir. 1984)).

Dr. Berndt considered MonoSol as a crucial part of the entire scheme. As noted by Dr. Berndt, Plaintiffs' theory is that Reckitt and MonoSol "allegedly conspired to employ a scheme to extend Reckitt's monopoly power in the U.S. buprenorphine/naloxone market by engaging in anticompetitive activities to switch patients from Suboxone Tablets to Suboxone Film, effectively impeding the ability of generic versions of Suboxone Tablets to compete in the market." (Berndt ME Rep. ¶ 7.) In order to do so, Reckitt and MonoSol "conspired anticompetitively to extend the lifecycle of Suboxone by entering into a Development Agreement in December 2006 to develop Suboxone Film as a new dosage form that would not be subject to the AB-rated substitution of generic buprenorphine/naloxone tablets." (Id. ¶ 8.) After development of the Suboxone Film, "Reckitt, with MonoSol's awareness" took multiple actions to switch Suboxone tablet prescribing to Suboxone film

prior to the entry of generic tablets, including: informing the market of Reckitt's intention to withdraw tablets beginning in March 2010, advancing misleading allegations of safety and public health issues with tablets, setting prices for tablets higher than film, providing larger rebates and discounts for film despite the fact that tablets had a lower cost of goods sold, incentivizing clinical liaisons to induce physicians to switch patients away from tablets, discontinuing patients' ability to participate in the "Here to Help" program to drive patients away from tablets and towards film, and engaging in various tactics to delay the market entry of generic tablets.  (Id.)  In other words, Dr. Berndt assumed that MonoSol did not simply develop a film version of Suboxone under contract with Reckitt, but rather was a key player in the development of the entire product hop scheme that allowed Defendants to switch the prescribing market to film.

In his Disgorgement Report, Dr. Berndt then constructed a but-for world to determine what profits MonoSol would have earned absent the totality of the anticompetitive conduct.  Where, as here, the theory is not that any one act itself was unlawful, but that all the acts taken together constituted an antitrust violation, an expert need not segregate and attribute a fixed amount of damages to any one act.  Bonjorno, 752 F.2d at 812.  Consistent with this law, Dr. Berndt's Disgorgement Report created a "but-for" world which assumed that Reckitt would have neither filed a citizen petition nor delayed the shared REMS for Suboxone tablets and that Reckitt and MonoSol would not have enaged in the totality of the "product hop" conduct analyzed in the Market Effects report. (Berndt Disgorgement Rep. ¶ 23.)  Although Dr. Berndt assumed that MonoSol would have still developed film in conjunction with Reckitt, he asserted that "MonoSol earned greater profits than it would have in the but-for world absent the alleged scheme."  (Id. ¶ 45.)  He noted that because MonoSol received payments for each film strip it sold to Reckitt and royalty payments based on net sales of film strips sold by Reckitt, "[i]f fewer strips had been sold, either to or by Reckitt, MonoSol would not have earned as much profit."  (Id.)

Certainly, should MonoSol be able to prove at trial that its sole role in the alleged anticompetitive scheme was development of film, without any concurrent efforts to conspire with Reckitt to subvert the AB-rating system, disparage tablets, and hinder the ability of generic tablets to enter the market, MonoSol can argue that Dr. Berndt's disgorgement analysis with respect to MonoSol's profits is flawed. [13] At this juncture, however, and for purposes of Daubert, Dr. Berndt's underlying assumption that MonoSol was involved in the entirety of the anticompetitive scheme does not render unreliable his disgorgement analysis based on MonoSol's development and profit from the film.  As such, I will not exclude Dr. Berndt's opinions as inherently contradictory.

## V.   CONCLUSION

None of the Daubert challenges raised will be granted.  I respectfully suggest that counsel should more carefully consider the difference between pressing a true Daubert challenge and alternative forms of advocacy used to contest an expert opinion through either a traditional trial objection, a counter expert's opinion, or cross-examination.  Counsel are reminded that Rule 702 has a "liberal policy of admissibility," Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quotation omitted), and "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Advisory Comm. Notes (2000).

For all of the foregoing reasons, I will deny Reckitt's and MonoSol's Motions in their entirety.  An appropriate Order follows.

---

[13]     In support of its argument, MonoSol cites Apotex v. Cephalon, Inc., 321 F.R.D. 220 (E.D. Pa. 2017). In that case, the court agreed with the defendants that one of the key underlying assumptions of the expert's damages calculation was unsupported by the record.  Id. at 235–36.  Here, by contrast, the validity of Plaintiffs States' allegations regarding an anticompetitive conspiracy between MonoSol and Reckitt has not been proven or disproven.